IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| PATRICK BRAXTON, *et al.*, | ) | |
|    Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:23-00127-KD-N |
| | ) | |
| HAYWOOD STOKES III, *et al.*, | ) | |
|    Defendants. | ) | |

## REPORT & RECOMMENDATIONS

This action is before the Court[1] on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) with brief in support collectively filed by Defendants Haywood Stokes III, Gary Broussard, Jesse Leverett, Voncille Brown-Thomas, Willie Tucker (collectively, the "Newbern Defendants") and the Town of Newbern ("Newbern" or "the Town") on October 25, 2023 (Docs. 62, 63), an opposition response collectively filed by Plaintiffs Patrick Braxton, James Ballard, Barbara Patrick, Janice Quarles, Wanda Scott and Dorothy Holley (collectively, "Plaintiffs") (Doc. 65) and Defendants' reply in support (Doc. 66). Upon consideration and for the reasons stated herein, the undersigned **RECOMMENDS** Plaintiffs' second amended complaint (Doc. 57) be **DISMISSED without prejudice** as a shotgun pleading, and that the Court **GRANT LEAVE** for Plaintiffs to re-plead within a time fixed by the Court.[2]

---

[1] The assigned District Judge has referred this motion to the undersigned Magistrate Judge for appropriate action under 28 U.S.C. § 636(a)–(b), Federal Rule of Civil Procedure 72, and S.D. Ala. GenLR 72(a). *See* S.D. Ala. GenLR 72(b); (10/25/2023).

[2] In accordance with this recommendation, the undersigned **RECOMMENDS** Defendants' motion to dismiss (Doc. 62) and motion to strike (Doc. 61) be **DENIED as moot**.

## I. *Background*

### A. Introduction

This is a civil rights case brought under 42 U.S.C. § 1983 arising out of Newbern's 2020 regular municipal elections and subsequent actions allegedly taken by the Newbern Defendants to maintain control of the Town's governance. Lurking in the backdrop, however, is more than 60 years of electoral malfeasance with respect to the Town's electoral customs and practices. Plaintiffs contend the actions taken by the Newbern Defendants, spearheaded by Stokes, both before and after the 2020 elections, as well as the Town's history of non-compliance with Alabama election law, have resulted in a myriad of constitutional violations all aimed at preventing the Town's black majority from electing candidates of their choice.

### B. Procedural History

Braxton, at the time proceeding without counsel (*pro se*), initiated an action on November 21, 2022 in the Circuit Court of Dallas County, Alabama.[3] After obtaining counsel, a first amended complaint ("FAC") was filed March 17, 2023. (Doc. 2-8). The FAC was brought by Braxton, Ballard, Patrick, Quarles and Scott and named Stokes, Broussard, Leverett, Brown-Thomas, Lyn Thiebe, a United States Postal Service employee, and People's Bank of Greensboro ("People's Bank") as defendants. (Doc. 2-8). Thiebe removed this action on April 14, 2023 pursuant to 28 U.S.C. 1442 (Doc. 1), and the Newbern Defendants removed pursuant to 28 U.S.C. § 1441 on April 17, 2023

---

3 This original complaint, bearing civil action no. 27-CV-2022-900217, was styled *Patrick Braxton v. Haywood "Woody" Stokes III, individually and as an employee of the City of Newbern; Jesse Leveret; Voncille Thomas; Willie Tucker; Peoples Bank of Greensboro; John Swanson; and Does 1 to 10.* (Docs. 1, 1-3, 2, 2-1).

2

with the consent of People's Bank (Doc. 2). Since removal, Thiebe and People's Bank have been dismissed without prejudice (Docs. 25, 30, 49, 51) and discovery has been temporarily stayed (Doc. 32). Plaintiffs filed a second amended complaint ("SAC") with the Court's leave on October 5, 2023, which is the operative complaint for current purposes. (Doc. 57).

### C. Factual Allegations[4]

Newbern is a town of approximately 300 residents in Hale County, Alabama. (Doc. 57). It is a class 8 municipality under Alabama law and organized as a mayor-council form of government. (*Id.*). Ala. Code §§ 11-40-12(a), 11-43-2(b) (2020).[5] The Town is 85% black. (*Id.*). Despite Alabama law requiring quadrennial regular municipal elections for mayor and town council (or "aldermen") positions, Ala. Code §§ 11-43-2(a) and (d), 11-46-21(a), the Town has not held a municipal election in six decades. (Doc. 57). Instead, the Town has a practice of hand-me-down-governance: the sitting mayor picks a successor to "inherit" the position, and the successor then appoints residents to serve on the town council. (*Id.*). Stokes, a white resident, was sitting mayor in 2020 and had served in that role since inheriting it from his predecessor in 2008. (*Id.*). The town council at this time was comprised of Broussard, Leverett, Brown-Thomas and Tucker, each of whom had been appointed by Stokes. (*Id.*). Broussard, Leverett and Tucker are white, while Brown-Thomas is black. (*Id.*).

---

[4] At this stage, well-pleaded facts are accepted as true construed in the light most favorable to the non-movant. *Speaker v. United States HHS CDC & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) (citation omitted).

[5] All references to sections of the Alabama code are to the 2020 version in effect at the time of the SAC's events.

3

In early 2020, Braxton, a black resident of Newbern, decided to run for mayor. (Doc. 57). In the lead up to that year's regular municipal elections, which were to be held August 25, 2020, *see* Ala. Code §§ 11-43-2(a) and (d), 11-46-21(a), Braxton made known his intent to challenge Stokes in the mayoral race. (*Id.*). Under Ala. Code § 11-46-22(a), "[i]t shall be the duty of the mayor to give notice of all municipal elections by publishing notice thereof…" For the regular 2020 municipal elections, that notice should have been posted by no later than July 7, 2020. Ala. Code §§ 11-46-22(a). *See* Ala. Code 11-46-22(b) (prescribing form for notice of election for municipal officers). Once notice is posted, candidates for mayor and town council positions can begin to qualify. Ala. Code § 11-46-22(a). *See* Ala. Code 11-46-22(b) ("Any qualified elector who will have resided within the municipality… for a period of at least 90 days on election day may qualify to run for office by filing the appropriate forms and paying the appropriate fees…"); Ala. Code § 11-46-2 (relating to appropriate fees); Ala. Code § 11-46-25(g) (relating to appropriate forms). Stokes did not post a notice of elections. (Doc. 57). Despite this, Braxton timely filed his paperwork, paid the appropriate fees and formally qualified as a candidate to run for the Office of Mayor of Newbern on July 21, 2020 – the last day to do so. (*Id.*). *See* Ala. Code § 11-46-25(g) (proscribing candidate qualification deadlines).

Stokes failed to timely qualify as a mayoral candidate, and Braxton was the only resident to qualify as a candidate for this race. (Doc. 57). Indeed, Braxton was the only candidate to qualify for any of Newbern's municipal offices, as no other residents timely qualified to become candidates for the town council positions. (*Id.*). When only

4

a single candidate qualifies in an election for a municipal office, the typical ballot procedures proscribed by Ala. Code § 11-46-25 give way to Ala. Code § 11-46-26, which provides:

> In the event only one person has filed a statement of candidacy for an office by 5:00 P.M. on [July 21, 2020], then such person shall for all purposes be deemed elected to such office, any provisions of this article to the contrary notwithstanding. The mayor… shall not cause the name of such person or the office for which his candidacy was declared to be printed on the ballot, but he shall immediately file a written statement with the governing body of the municipality, attested by the clerk, certifying the fact that only one person filed a statement of candidacy for the office… At [the governing body's] first regular meeting after receiving such statement the governing body of the municipality shall adopt a resolution declaring the person named in the statement duly elected to the office described in the statement and shall issue a certificate of election to such person.

Per this section of the code, because Braxton was the only candidate to qualify for the mayoral race as of 5:00 p.m. on July 21, 2020, he was "for all purposes (*sic*.) deemed elected" as Newbern's mayor. *Id.* Braxton was the first black mayor elected in Newbern's history. (Doc. 57).

The next steps, as Ala. Code § 11-46-26 dictates, should have been for Stokes to file a written statement with the town council, attested to by the clerk, certifying Braxton as the only qualified candidate for the mayoral contest. Then, at the next regular meeting of the town council, it "shall adopt a resolution declaring [Braxton] duly elected to the office [of Mayor] and shall issue a certificate of election to [Braxton]." *Id.* However, Stokes did not file such a written statement with the town council. (Doc. 57). As a result, the town council did not adopt a resolution declaring Braxton duly elected as Mayor or issue to him a certificate of election. (Doc. 57).

5

Though "deemed elected" as Newbern's mayor pursuant to Ala. Code § 11-46-26 as of 5:00 p.m. on July 21, 2020, Braxton would not assume the duties of the office until November 2, 2020. *See* Ala. Code § 11-46-21 ("Municipal officers elected at regular elections shall assume the duties of their respective offices on the first Monday in November following their election unless otherwise provided in this article and shall serve until their successors are elected and qualified."). In the meantime, "consistent with the past practice" and apparently with the blessing of the county's probate judge, Braxton set out to identify residents willing to be appointed by him to serve as on the town council. (Doc. 57). Braxton asked both black and white residents to serve on the town council. (*Id.*). Ultimately, he found appointees Ballard, Patrick, Quarles and Scott, each of whom are black. (*Id.*). Braxton appointed them to the town council sometime before November 2, 2020, and on that date, the five of them were sworn into office and executed oaths of office. (*Id.*). In late November 2020, now Mayor Braxton and the members of his appointed town council held their one and only meeting at Newbern's Town Hall. (*Id.*).

While Braxton was recruiting potential town council appointees – between July and November 2020 – the Newbern Defendants, led by Stokes, began efforts to prevent Braxton from taking control of Newbern's government. (*Id.*). The alleged scheme unfolded in two parts.

First, the outgoing Mayor Stokes and town councilmembers (Broussard, Leverett, Brown-Thomas and Tucker) met in August 2020 to adopt an ordinance and/or resolution, proposed by Stokes, providing for a special election for the town

6

council positions to be held October 6, 2020. (*Id.*). Notice of this meeting between the mayor and town council for adoption of this ordinance and/or resolution was not given to the community. (*Id.*). Notice of the special election itself was also not given to Newbern residents, despite a requirement of the same pursuant to Ala. Code §§ 11-46-21(b), 11-46-22(a). Stokes, Leverett, Tucker, Broussard and Brown-Thomas, being the only Newbern residents with knowledge of the upcoming special election, apparently took the necessary steps to qualify as candidates in the special election for the five town council positions and were the only residents to do so. (*Id.*). No residents of Newbern voted in this special election. (*Id.*). On November 12, 2020, the Newbern Defendants – now holding themselves out as the members of the town council – executed oaths of office at the City Attorney's office. (*Id.*).

To date, the Newbern Defendants (with the exception of Stokes, discussed *infra.*) hold themselves out as Newbern's "real" town council and those responsible for the Town's governance. (*Id.*). They have continued to conduct Town business under color of their purported authority, and in so doing, have prevented Mayor Braxton and the Braxton-appointed town council from performing the respective duties of their offices. (*Id.*). This second part of the Newbern Defendants alleged scheme includes specific actions such as (1) changing the locks to Town Hall (twice) to prevent access to official town documents and the town council's historical meeting place, (2) instructing the city clerk and city accountant to deny Braxton access to relevant financial and town business documents, (3) appointing Stokes' sister as city clerk, (4) holding town council meetings in private, without notice to the public and

away from Town Hall, (5) suspending Braxton from serving as a volunteer firefighter and first responder, and (6) the *coup de grâce*, passing a resolution to remove Mayor Braxton from office pursuant to Ala. Code § 11-40-25(b) and subsequently appointing Stokes as mayor pursuant to Ala. Code §§ 11-40-25(d), 11-43-42(b).[6] (Doc. 57). Moreover, Stokes specifically (1) conspired with officials at People's Bank to prevent Braxton's access to the Town's financial records, (2) conspired with Thiebe to prevent Braxton's access to the Town's mail, (3) appointed a new fire chief for Newbern, John Swanson, over Braxton's objections and (4) conspired with Swanson to change the locks at the fire department to prevent Braxton's access. (*Id.*).

Throughout the course of these events, Braxton continued to fight for his rightful position as mayor, both he and his town council appointees have continued to hold town council meetings, and together, they have sought to govern the Town to the extent possible, largely without avail. This action followed.

## II.     *Legal Standards*

Under Fed. R. Civ. P. 8(a)(2), a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Further, under Rule 10(b), "[a] party must state its claims… in numbered paragraphs, each limited

---

6 Pursuant to Ala. Code § 11-40-25(b), "[a]ny municipal official who misses all regular and special called council or commission meetings for 90 consecutive days, beginning on the date of the absence, shall be removed from office by operation of law." The city clerk is responsible for tracking absences for this purpose. Ala. Code § 11-50-25(c). Further, "[a]t the next council or commission meeting following the date an elected municipal official has been removed from office pursuant to this section, the council or commission may vote to reinstate the elected municipal official removed from office… If the council or commission does not reinstate the removed elected municipal official pursuant to subsection (d), the council or commission shall fill the vacancy as provided by law." Ala. Code § 11-40-25(d)-(e). Ala. Code § 11-34-42(b), in turn, provides that: "In cities of less than 12,000 inhabitants and in towns… [i]n the event of a vacancy from any cause in the office of mayor, the council shall fill the vacancy from its own membership or from without membership of the council…"

as far as practicable to s single set of circumstances." Fed. R. Civ. P. 10(b). "If doing so would promote clarity," Rule 10(b) further requires "each claim founded on a separate transaction or occurrence… be stated in a separate count." *Id*. The Eleventh Circuit has explained:

> The self-evident purpose of these rules is to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what his claim and frame a responsive pleading… These rules were also written for the benefit of the court, which must be able to determine which facts support which claims, whether the plaintiff has stated any claims upon which relief can be granted, and whether evidence introduced at trial is relevant.

*Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) (cleaned up) (citations omitted).

Pleadings that violate either Rules 8 or 10 are termed "shotgun pleadings" – which are "flatly forbidden by the spirit, if not the letter of these rules." *Id*. (citing *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1544 n.14 (11th Cir. 1985) (Tjoflat, J. dissenting)). Discussing such pleadings in *Weiland v. Palm Beach County Sheriff's Office*, the Eleventh Circuit stated:

> Though the groupings cannot be too finely drawn, we have identified four rough types or categories of shotgun pleadings. The most common type – by a long shot – is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without

9

specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

792 F.3d 1313, 1321-23 (11th Cir. 2015) (footnotes omitted). Dismissal of a complaint on shotgun pleading grounds is warranted where (1) it is "virtually impossible" to know which factual allegations are intended to support which claim(s) for relief, (2) when a failure to "parcel out and identify" the facts relevant to those claim(s) "materially increases the burden of understanding the factual allegations underlying each count" or (3) when multiple defendants are "indiscriminately lump[ed] together" by failing to specific how each defendant is responsible for the acts or omissions giving rise to a claim for relief. *Clifford v. Freeman*, 855 F. App'x 525, 528 (11th Cir. 2021) (unpublished) (citing *Weiland*, 792 F.3d at 1323-25). If dismissing a complaint on shotgun pleading grounds, the district court must provide one chance to remedy deficiencies. *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018).

### III. *Discussion*

Plaintiffs' SAC bears hallmarks of each of the four types of shotgun pleadings identified in *Weiland*. 792 F.3d at 1321-23. Together, these deficiencies fail "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." 792 F.3d at 1321-23. While defendants do not seek dismissal of the SAC on shotgun pleading grounds, the undersigned finds judicial economy and fundamental fairness are best served by addressing this issue *sua sponte* from the outset.

One need look no further than Defendants' motion to dismiss and brief in support to see the practical effect of how the SAC's pleading deficiencies have failed to provide sufficient notice of its grounds. (Docs. 62, 63). In their brief, Defendants largely argued for dismissal on qualified immunity grounds, clearly working on a presumption they were being sued in their respective individual capacities. (*Id.*). This was a fair presumption as well given that: (1) previous iterations of the complaint included individual capacity claims (*see e.g.*, Doc. 2-1), (2) for relief, the SAC sought in part "punitive damages as established at trial," which are only available from individuals under § 1983 in individual capacity actions, *Duncan v. Bibb Cty. Sheriff's Dep't*, 471 F. Supp. 3d 1243, 1254 (N.D. Ala. July 9, 2020) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268-70 (1981)) and (3) when litigating the Newbern Defendants' motion to stay discovery (Doc. 28), they argued for a stay in part due to their purported entitlement to qualified immunity – an issue to be resolved "at the earliest possible stage," *Saucier v. Katz*, 553 U.S. 194, 201 (2001) – and Plaintiffs did not clarify there were no individual capacity claims at that time; instead, they argued qualified immunity would fail. (*See* Doc. 39). Indeed, the undersigned granted the motion to stay discovery in part because qualified immunity had been invoked and in observance of *Saucier*'s directive. (Doc. 43).[7] Only in their opposition response do Plaintiffs clarify the Newbern Defendants are being sued in their official capacities

---

7 Notably, this raises the question of whether discovery should continue to be stayed at this juncture. People's Bank is no longer a defendant (*see* Docs. 51, 52), and if qualified immunity is no longer a relevant defense for the Newbern Defendants, the undersigned's initial considerations for granting the motion may have withered. As such, the undersigned **RECOMMENDS** the Court **GRANT LEAVE** for either party to seek an order to re-instate discovery by a time to be fixed by the Court. Discovery will remain temporarily stayed until otherwise ordered.

11

for injunctive and declaratory relief and that damages relief is sought only from the Town. (Doc. 65). While capacity issues alone could undoubtedly be handled at a later stage of litigation, the lack of clarity in this respect is symptomatic of the larger pleading deficiencies.

The SAC undoubtedly is a shotgun pleading of the first type, as the first paragraph in each of Plaintiffs' four counts "re-allege and incorporate by reference each allegation contained in the preceding and subsequent paragraphs as though fully set forth herein." (Doc. 57, PageID.643, 648, 649, 651). The result is that each "count" is essentially a recitation of the entire the complaint, which foists upon the Court "the onerous task of sifting out irrelevancies in order to decide for itself which facts are relevant to a particular cause of action asserted." *Brantley v. CSX Transp., Inc.*, 2023 U.S. Dist. LEXIS 189511, *4 (M.D. Fla. Oct. 23, 2023) (citing *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 205 F.3d 1293, 1295 (11th Cir. 2002)). While this deficiency alone would likely not be conclusive to the undersigned's ultimate recommendation, a type-one shotgun pleading is "[t]he most common type – by a long shot," *Weiland*, 792 F.3d at 1321, and each moment spent attempting to construe a shotgun pleading is one less spent on other matters waiting to be heard by the Court. *See Byrne v. Nezhat*, 261 F.3d 1075, 1130-31 (11th Cir. 2001) (describing negative effects of shotgun pleadings and their burden on the prompt administration of justice); *Strategic Income Fund*, 305 F.3d at 1295 n.10 (noting, with examples, the "great concern" posed by the aggregate negative effects of shotgun pleading).

The SAC also fits the mold of a type-two shotgun complaint to a limited extent.

Those are pleadings "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland*, 792 F.3d at 1322. While it would be unfair to characterize the SAC as being replete with vague or immaterial facts – indeed, many of the allegations therein are both specific and seemingly material – many allegations are made "upon information and belief,"[8] a point not lost on defendants, who posit in their reply brief that such statements are not entitled to a presumption of truth at the motion to dismiss stage. (*See* Doc. 66, PageID.763 (citing *Resnick v. City of Troy*, 2019 WL 2092567, *6 (M.D. Ala. May 13, 2019); *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Doe v. Univ. of Ala. in Huntsville*, 177 F. Supp. 3d 1380, 1392 (M.D. Ala. 2016))). Defendants' argument here is correct to some extent, but the *carte blanche* assertion that allegations made "upon information and belief" are conclusory and not entitled to a presumption of the truth is not. *See Khan v. United States*, 2014 U.S. Dist. LEXIS 203036, *12 (S.D. Fla. July 7, 2014) ("*Twombly* does not prevent a plaintiff from pleading facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible" (citations omitted)). It is likely that many of the "upon information and belief" statements made in the SAC, when viewed alongside other factual allegations, are sufficient to support the necessary inferences of validity to entitle them to a presumption of the truth; however, this point is worth noting for purposes of promoting clarity in a future third amended complaint.

---

8 *See* Doc. 57 at ¶¶ 3, 18, 22, 25, 26, 39, 42, 44, 45, 46, 48, 49, 52, 55, 57, 62, 65, 76, 87, 88, 90, 91, 93, 99, 122.

Moreover, type-three and type-four deficiencies are persistent throughout this SAC. *Weiland* characterizes those as "commit[ting] the sin of not separating into a different count each cause of action or claim for relief," and "asserting multiple claims against multiple defendants without specifying which defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against," respectively. 792 F.3d at 1323. Type-three deficiencies can be seen in each of the four discrete counts and seem to be, at least in part, a byproduct of the type-one and type-four deficiencies that also persist throughout.

With respect to type-three deficiencies, Count I is presented as a single claim for intentional racial discrimination in violation of the Fourteenth Amendment's equal protection guarantees and the Fifteenth Amendment's right to vote; however, it is comprised of multiple potential equal protection claims, due process claims, and at least one claim that could likely be construed as a First Amendment violation.[9] (Doc. 57). Count II suffers from this type because, while framed as a single conspiracy, it appears to comprise more than one. *See e.g., New York Packaging II LLC, v. Private D Capital Grp. Corp*, 2023 U.S. Dist. LEXIS 34092, *12 (S.D. Fla. Feb. 28, 2023) (dismissing multiple conspiracies combined into a single count as shotgun claims). While each potential conspiracy was allegedly perpetrated with racially discriminatory underpinnings, this count potentially describes (1) a conspiracy to deny Newbern residents the right to vote generally (on account of the practice of

---

9 This would be the allegation that Defendants suspended Braxton from his position as a fire fighter and first responder "[i]n response to Braxton's objections to these appointments and to Braxton's efforts to assert his rights and privileges as Mayor." (*See* Doc. 57, PageID.642).

14

hand-me-down-governance), (2) a conspiracy to specifically prevent Braxton from taking office and performing his mayoral duties, (3) a conspiracy to prevent Braxton's councilmember-appointees from taking office by holding a special election and (4) a conspiracy to prevent Newbern residents from voting in that special election to ensure the Newbern Defendants' victory. (Doc. 57).

Different, but still deficient under type-three, is Count IV, entitled "Violation of Section 2 of the Voting Rights Act[,] 52 U.S.C. § 10301, et seq. (Discriminatory Results)." (Doc. 57, PageID.651). Section 2 provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote account of race or color…" 52 U.S.C. § 10301(a). At its core, § 2 "prohibits all forms of voting discrimination." *Thornburg v. Gingles*, 478 U.S. 30, 45 n. 10 (1986) (citation omitted). However, "two distinct types of discriminatory practices and procedures are covered under section 2: those that result in 'vote denial' and those that result in 'vote dilution.'" *Burton v. City of Belle Glade*, 178 F.3d 1175, 1196 (11th Cir. 1999). *See Sixth Dist. Of the African Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1273 n.9 (N.D. Ga. Dec. 9, 2021) ("VRA § 2 claims generally constitute allegations of vote dilution (e.g., challenges to election districting schemes) or vote denial (e.g., challenges to time, place or manner restrictions in voting)); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1167 (N.D. Ala. Sept. 30, 2020) ("A plaintiff may file two types of cases under Section 2: vote denial/abridgement and vote dilution"

15

(citation omitted)). *See also*, Daniel P. Tokaji, The New Vote Denial: Where Election Reform Meets the Voting Rights Act, 57 S.C. L. Rev. 689, 702-03 (characterizing "vote denial" as "practices that prevent people from voting or having their votes counted," as opposed to "vote dilution," which "refers to practices that diminish political minorities' political influence in places where they are allowed to vote.").

The SAC is not clear whether Plaintiffs' § 2 claim is a vote denial claim, a vote dilution claim, or both. It is certainly not a vote dilution claim in the traditional "cracking and packing" sense, where minority voting blocs are either fragmented or concentrated within certain boundaries to minimize their influence, *see e.g., Johnson v. De Grandy,* 512 U.S. 997, 1007 (1994), as boundary line-drawing plays no role in the SAC's allegations; but the allegations therein related to the Town's practice of hand-me-down-governance could be viewed as a vote dilution claim in the sense that it allegedly aims to minimize the majority-minority population's voting strength by preventing "equal opportunity to elect candidates of their choice." (Doc. 57). Plaintiffs' § 2 claim is more likely a vote denial claim, because the described practice of hand-me-down-governance has allegedly resulted in a denial of the right to vote. (*Id*). But the claim does not fit neatly here either; it is not rooted in a poll tax, literacy test or a specific statute, law or ordinance that results in hinderance to a minority group from voting, but in a structural custom and practice of not holding elections at all. In any event, because these two types of claims are "fundamentally different" and involve different analyses, such a distinction at the pleading stage is critical for a defendant's ability to formulate a comprehensive response. *See Greater Birmingham*

*Ministries v. Sec'y of State of Ala.*, 966 F.3d 1202, 1234-25 (11th Cir. 2020) (distinguishing the two types of claims), reh'g en banc denied, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 997 F.3d 1363 (11th Cir. 2021); *People First*, 491 F. Supp. 3d at 1167 ("These types of claims are distinct, and the analysis is different depending on the type of claim filed" (footnote omitted)).[10]

Finally, the primary type-four issue is the SAC's collective references to "Plaintiffs" and "Defendants" at various points when only certain defendants' conduct is at issue or only certain plaintiffs' interests are at stake.[11] This is primarily relevant on Plaintiffs' side of the case in part because, if the Newbern Defendants are being sued solely in their official capacities (as Plaintiffs clarify in their opposition response (*see* Doc. 65)), then any claims against them are "simply another way of pleading an

---

10 A key distinction in the two analyses, for example, is the applicability of the "Senate factors" identified in the Senate Report accompanying the 1982 VRA amendments. *See* S. Rep. 97-417 at *28-29, 97th Cong., 2nd Sess. 1982, 1982 U.S.C.C.A.N. 177, 1982 WL 25033. These factors undoubtedly are relevant in the vote dilution context. *See Gingles*, 478 U.S. at 46 (noting the "factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims…"); *Solomon v. Liberty County*, 899 F.2d 1012, 1015 (11th Cir. 1990) (Kravitch, J., concurring specially) (noting that a showing of the Senate factors "will typically establish a section 2 violation" in the vote dilution context). However, the Eleventh Circuit openly questioned the applicability of these factors in the vote denial context in *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299 (11th Cir. 2021), reh'g en banc denied, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 997 F.3d 1363 (11th Cir. 2021). Ultimately, the panel opinion concluded the district court did not abuse its discretion in failing to consider the Senate factors in a vote denial case, but went on to apply them anyway "to demonstrate the futility of the exercise." 992 F.3d at 1332. Despite a sharp dissental criticizing the panel decision's approach to the Senate factors in a vote denial context as being "simply not supported by law," 997 F.3d at 1370-72 (Martin, J., dissenting from denial of reh'g with Wilson, J., Ronsenbaum, J., and Pryor, J.), at present, it would appear consideration of the Senate factors writ large is not a necessary undertaking for the district court in a vote denial case, at least in this circuit. *See also*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021) (questioning applicability of the Senate Factors beyond vote dilution cases); *Simmons v. Galvin*, 575 F.3d 24, 42 n.24 (1st Cir. 2009) ("[T]he Supreme Court's seminal opinion in *Gingles*… is of little use in vote denial cases").

11 Importantly here, "[b]ecause standing is not dispensed in gross, a plaintiff must demonstrate standing for each claim and for each form of relief that is sought." *J W v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) (cleaned up). Given the recommendation that this SAC be dismissed without prejudice as a shotgun pleading and leave granted to amend, the undersigned opts not to espouse on whether, as pled, certain plaintiffs have standing to bring certain claims.

17

action against an entity of which an officer is an agent" and are "functionally equivalent" to a direct suit against the Town, which is also a defendant here. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). However, one example of this would be the allegation in Count IV that "Defendants provided incorrect or incomplete information to Mayor Braxton on how to qualify as a candidate for Mayor," despite an earlier allegation attributing this conduct solely to Defendant Stokes. (Compare Doc. 57, ¶ 143 with ¶ 40).

Plaintiffs, on the other hand, have interests which vary greatly. This can be best illustrated by viewing some of the SAC's allegations through the lens of Plaintiff Holley. She did not run for elected office like Braxton, nor was she appointed to be on the town council like Ballard, Patrick, Quarles and Scott; rather, she is simply a black resident of Newbern. (Doc. 57, PageID.624). Thus, in Count I for example, she may have an interest in the Town's alleged practice of hand-me-down-governance resulting in disenfranchisement or with respect to the lack of notice provided for elections, but she does not have any interest in vindicating the alleged usurpation of "duties, responsibilities and privileges" associated with the mayoral or town councilmember positions. Yet, in paragraph 109 for example, the SAC states "Defendants… took actions to prevent Plaintiffs, Black residents, from assuming positions in Newbern Town Council." (Doc. 57, PageID.645). This collective reference to "Plaintiffs" would presumptively include Holley and Braxton, despite neither of them have an interest in assuming positions on the town council.

*IV.  Conclusion*

Upon consideration and for the reasons stated herein, the undersigned **RECOMMENDS** Plaintiffs' SAC (Doc. 57) be **DISMISSED without prejudice** as a shotgun pleading and that the Court **GRANT LEAVE** to re-plead by filing a third amended complaint within a time to be fixed by the Court. In accordance with that recommendation, the undersigned further **RECOMMENDS** Defendants' motion to dismiss (Doc. 62) and motion to strike (Doc. 61) be **DENIED as moot**. Additionally, the undersigned **RECOMMENDS** the Court **GRANT LEAVE** for either party to seek an order to re-instate discovery, within a time to be set by the Court.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within 14 days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 6th day of February 2024.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**