**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**

Patrick Braxton, *et al.*,

        *Plaintiffs*,

        vs.

Haywood Stokes, III, *et al.*,

        *Defendants*.

Case No. 2:23-CV-00127-KD-N

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

i

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 2

ARGUMENT .................................................................................................................... 8

    I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ................................. 8

        A.    Defendants' Hand-Me-Down-Governance System Heavily and Unnecessarily Burdens the Right to Vote in Violation of the First and Fourteenth Amendments............................... 8

            i.    Defendants' Actions Unduly Burden Plaintiffs' Right to Vote. .................................. 9

            ii.    Defendants' Unconstitutional Practices Do Not Advance any State Interests. ..........11

        B.    Defendants' Hand-Me-Down-Governance System Violates the Voting Rights Act. ..... 12

            i.    The Racial Disparity Is Distinct in the Challenged Hand-Me-Down System and Lack of Notice in Special Elections. ..................................................................................... 14

            ii. Black Voters in Newbern, Alabama Suffered Past Discrimination and the Effects of the Past Discrimination Continue. ..................................................................................... 17

            iii. No Opportunities to Cote Outside the Challenged System of the Hand-Me-Down-Governance Exist. ..................................................................................... 19

            iv. Defendants' Hnd-Me-Down Governance System Is Not Ordinary or Widespread. .... 20

            v. No State Interest Exists in Maintaining the Challenged Hand-Me-Down Governance System and Failing to Hold Town Elections. .................................................................... 20

    II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION . 21

    III.    THE BALANCE OF EQUITIES TIP TOWARDS PLAINTIFFS BECAUSE THE PUBLIC INTEREST IS SERVED BY AN INJUNCTION, AND THE INJUNCTION WOULD NOT HARM DEFENDANTS ........................................................................ 22

CONCLUSION.............................................................................................................. 24

**TABLE OF AUTHORITIES**

**Cases**                                                                                    **Pages**

*Ala. Legis. Black Caucus v. Alabama,*
　575 U.S. 254 (2015)......................................................................................... 14

*Allen v. Milligan,*
　599 U.S. 1 (2023)................................................................................. 14, 17, 19

*Anderson v. Celebrezze,*
　460 U.S. 780 (1983)...................................................................................... 8, 10

*Arakaki v. Hawaii,*
　314 F. 3d 1091 (9th Cir. 2002)....................................................................... 13

*ARC Students for Liberty Campaign v. Los Rios Cmty. Coll. Dist.,*
　732 F. Supp. 2d 1051 (E.D. Cal. 2010)............................................................ 9

*Black v. Curb,*
　464 F. 2d 165 (5th Cir. 1972)......................................................................... 17

*Bonas v. Town of N. Smithfield,*
　265 F.3d 69 (1st Cir. 2001) ........................................................................ 9, 23

*Bryant v. Johnny Kynard Logging,*
　*Inc.*, 930 F. Supp. 2d 1272 (N.D. Ala. 2013) ................................................ 17

*Charles H. Wesley Educ. Found.,*
　*Inc. v. Cox,* 408 F. 3d 1349 (11th Cir. 2005) ............................................. 8, 22

*Chatman v. Spillers,*
　44 F.3d 923 (11th Cir. 1995) .......................................................................... 24

*Democratic Exec. Comm. of Fla. v. Lee,*
　915 F.3d 1312 (11th Cir. 2019) .............................................................. 8, 10, 22

*Dillard v. City of Greensboro,*
　946 F. Supp. 946 (M.D. Ala. 1997)................................................................. 14

*Dillard v. Town of North Johns,*
　717 F. Supp. 1471 (M.D. Ala. 1989)........................................................... 13, 16

*Dougherty County Bd. of Ed. v. White,*
　439 U. S. 32 (1978)......................................................................................... 13

*Duncan v. Poythress,*

657 F.2d 691 (5th Cir. 1981) ............................................................................ 8, 9, 24

*Gonzalez v. Governor of Georgia*,
  978 F. 3d 1266 (11th Cir. 2020) ....................................................................9, 11, 22

*Gonzalez v. Kemp*,
  470 F. Supp. 3d 1343 (N.D. Ga. 2020) ..................................................................... 21

*Hadnott v. Amos*,
  394 U.S. 358 (1969) ................................................................................... 12, 13, 21

*Hale Cnty. v. United States*,
  496 F. Supp. 1206 (D. D.C. 1980) ...................................................................... 2, 19

*Hightower v. Searcy*,
  455 U.S. 984 (1982) ..................................................................................... 15

*Johnson v. De Grandy*,
  512 U.S. 997 (1994) ..................................................................................... 15

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ..................................................................................... 17

*Louisiana v. United States*,
  380 U.S. 145 (1965) ..................................................................................... 21

*Milligan v. Merrill*,
  582 F. Supp. 3d 924 (N.D. Ala. 2022) ...................................................................... 19

*Morse v. Republican Party of Va.*,
  517 U.S. 186 (1996) ..................................................................................... 13

*Nation v. San Juan Cnty.*,
  *No*. 2:12-CV-00039, 2017 WL 6547635 (D. Utah Dec. 21, 2017) ........................................... 23

*Navajo Nation v. San Juan Cnty.*,
  929 F.3d 1270 (10th Cir. 2019) ........................................................................... 23

*Norman v. Reed*,
  502 U.S. 279 (1992) ....................................................................................... 8

*North Carolina v. Covington* ("*Covington II*"),
  138 S. Ct. 2548 (2018) ................................................................................... 21

*North Carolina v. Covington*,
  581 U.S. 486 (2017) ..................................................................................... 23

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ...................................................................... 22

*People First of Ala. v. Merrill*,
   491 F. Supp. 3d 1076 (N.D. Ala. 2020) ................................................. 4, 17

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ..................................................................................... 22

*Searcy v. Williams*,
   656 F.2d 1003 (5th Cir. 1981) ..................................................................... 15

*Stephens v. Haley*,
   823 F. Supp. 2d 1254 (S.D. Ala. 2011) ...................................................... 17

*Turner v. Fouche*,
   396 U.S. 346 (1970) ..................................................................................... 15

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) ................................................................... 23

*United States v. Dallas Cnty. Comm.*,
   850 F.2d 1433 (11th Cir. 1988) ................................................................... 24

*United States v. Hale Cnty. Bd. of Educ.*
   426 F. Supp. 275 (S.D. Ala. 1977) .............................................................. 18

*United States v. Hale Cnty. Bd. of Educ.*,
   12 Race Rel. L. Rep. 114 (S.D. Ala. 1967) ................................................ 18

*United States v. Hale Cnty. Bd. of Educ.*,
   445 F.2d 1330 (5th Cir. 1971) ..................................................................... 17

*United States v. Hale Cnty. Comm'n*,
   425 F. Supp. 433, 436 (S.D. Ala. 1976) ....................................................... 2

*United States v. Marengo Cnty. Comm'n*,
   731 F.2d 1546 (11th Cir. 1984) ................................................................... 12

*Wesberry v. Sanders*,
   376 U.S. 1 (1964) ......................................................................................... 22

Williams v. Rhodes,
   393 U.S. 23 (1968) ......................................................................................... 8

*Williams v. Wallace*,

240 F. Supp. 100 (M.D. Ala. 1965).......................................................................................... 2

*Wright v. Sumter Cnty. Bd. of Elections,*
   361 F. Supp. 3d 1296 (M.D. Ga. 2018)............................................................................. 23, 24

**Statutes**

52 U.S.C. § 10301.............................................................................................................. 12, 15

Ala. Code § 11-46-22......................................................................................................9, 10, 11, 21

Ala. Code §§ 11-43-2.......................................................................................................9, 11

Ala. Code §§ 11-46-21.....................................................................................................9, 11, 21

**Other Authorities**

*Rural Studio Celebrates Three Decades of Living, Working, and Learning in Our West Alabama
   Community,* Rural Studio (Aug. 17, 2023). .................................................................... 4

## INTRODUCTION

For nearly sixty years, Defendants and their predecessors have operated a "hand-me-down governance" system in the town of Newbern. Under this system, Defendants have generally either refused to hold elections at all or failed to provide meaningful notice about upcoming elections. Although about 80% of Newbern residents are Black, Defendants' actions have led to the *de facto* appointment of almost exclusively white residents to the offices of mayor and town council. Defendants' refusal to lawfully administer elections denies Plaintiffs their fundamental right to vote in violation of the U.S. Constitution and Section 2 of the Voting Rights Act of 1965 ("VRA").

Defendants' actions strike at the heart of our representative democracy. The failure to hold elections or, in 2020, to notify the public or opposition candidates about upcoming special elections has effectively prevented people from voting at all. Defendants' actions have totally disenfranchised Plaintiffs and other Newbern residents in violation of our Constitution. Moreover, the totality of circumstances demonstrates that the predominately white town council's past refusal to hold any elections for the majority-Black residents of Newbern and, in 2020, Defendants' failure to inform residents about the "elections," has resulted in discrimination in violation of the VRA.

As described more fully below, Plaintiffs are unquestionably likely to succeed on the merits of their constitutional and Section 2 claims. Accordingly, Plaintiffs respectfully ask this Court to preliminarily enjoin Defendants' unconstitutional practices, permit Plaintiff Patrick Braxton, the lawful mayor of Newbern, to exercise his authority, and to order Defendants to hold and fully publicize new, lawful special elections for all five town council seats no later than November 5, 2024, so that Plaintiffs and all Newbern residents have the opportunity to formally elect representatives of their choice. Defendants cannot go another year violating the constitutional rights of Newbern's residents in overt violation of the bedrock tenets of our democratic system.

1

## FACTUAL BACKGROUND

Since at least mid-1960s, the Town of Newbern ("Newbern" or "the Town") in Hale County has failed to hold or publicize municipal elections as required by Alabama and federal law. Defs.' Answer ¶ 20. There has been no notice given about in Newbern. Braxton Decl. ¶ 5; Patrick Decl. ¶ 5; Ballard Decl. ¶ 5; Quarles Decl. ¶¶ 5, 9; Scott Decl. ¶ 5; Holley Decl. ¶ 5. At the time, Hale County employed discriminatory literacy, good moral character, and voucher tests to prevent Black people from registering to vote. *See Hale Cnty. v. United States*, 496 F. Supp. 1206, 1211 (D. D.C. 1980) (three-judge court); *see also United States v. Hale Cnty. Comm'n*, 425 F. Supp. 433, 436 (S.D. Ala. 1976), *aff'd mem.*, 430 U.S. 924 (1977) (same). Because of this discrimination, Black people (5,999) were 62.5% and white people (3,594) were 37.5% of the county's voting age population, but 94.4% of registered voters were white (3,395) and only 3.6% were Black (218). *Williams v. Wallace*, 240 F. Supp. 100, App. A(M.D. Ala. 1965). But, in the decade after the VRA's passage, Black registration skyrocketed—by 1978, 50.8% of registered voters were Black (8,443 voters with 4,296 Black and 4,150 white voters). *Hale Cnty.*, 496 F. Supp. at 1207.

As of the 2020 census, the total population of Newbern is 133 people, with Black people (89) making up 66.9% and non-Hispanic white people (42) constituting 31.6% of the town's total population. Cooper Decl. ¶ 8. The voting age population of Newbern (115 people over age eighteen years old) is 64.3% Black (73 people) and 34.8% white (40 people). *Id*. Because the town is small, public announcements are typically posted at the Newbern town hall, fire station, post office, library, and streets. Braxton Decl. ¶ 8; Patrick Decl. ¶ 7; Ballard Decl. ¶ 7; Quarles Decl. ¶ 9; Scott Decl. ¶ 7; Holley Decl. ¶ 7. However, no notice about town elections has ever been seen in any of these places. Braxton Decl. ¶¶ 5, 8; Patrick Decl. ¶¶ 5, 7; Ballard Decl. ¶¶ 5, 7; Quarles Decl. ¶¶ 5, 9; Scott Decl. ¶¶ 5,7; Holley Decl. ¶¶ 5, 7. Instead, a series of white mayors and town

2

councilmembers employ a policy and custom of "handing down" the positions of mayor and town councilmember from one white person to the next. The only known Black person to be selected under this system is Defendant Voncille Brown Thomas. Defendants' Mot. to Dismiss at 12. Under this system, white officials have failed to hold any elections in violation of state and federal law, instead appointing their chosen successors. Braxton Decl. ¶¶ 5-7; Patrick Decl. ¶¶ 5-6; Ballard Decl. ¶¶ 5-6; Quarles Decl. ¶¶ 5-7; Scott Decl. ¶¶ 5-6; Holley Decl. ¶¶ 5-6. In 2020, the predominately white town council took a slightly different approach. Defendants scheduled special elections then ensured that those elections went uncontested by illegally refusing to notify the public or potential opposition candidates about the timing or method of qualifying, resulting in the *de facto* reappointment of Defendants. Braxton Decl. ¶¶ 29-30; Patrick Decl. ¶¶ 16-18; Ballard Decl. ¶¶ 16-18; Quarles Decl. ¶¶ 19-21; Scott Decl. ¶¶ 16-18; Holley Decl. ¶ 13. Because of Defendants' "hand-me-down governance" system, the Black voters of Newbern have been denied the opportunity to elect their candidates of choice. Braxton Decl. ¶¶ 5-7; Patrick Decl. ¶¶ 5-6; Ballard Decl. ¶¶ 5-6; Quarles Decl. ¶¶ 5-7; Scott Decl. ¶¶ 5-6; Holley Decl. ¶¶ 5-6.  Thus, Newbern has been and effectively continues to be governed by mayors and town council members who were either appointed or *de facto* "elected" in secret uncontested elections by a small group of nearly all white people without proper notice to the majority-Black residents of the town. Braxton Decl. ¶¶ 5-7; Patrick Decl. ¶¶ 5-6; Ballard Decl. ¶¶ 5-6; Quarles Decl. ¶¶ 5-7; Scott Decl. ¶¶ 5-6; Holley Decl. ¶¶ 5-6.

Defendants' infringement of Plaintiffs' voting rights occurs against a backdrop of persistent unresponsiveness and racial discrimination in Newbern. The unelected mayors and town councilmembers have historically only responded to the needs of white residents while dismissing Black residents entirely. Braxton Decl. ¶ 49; Patrick ¶¶ 22, 24; Ballard Decl. ¶¶ 22, 24; Quarles

3

Decl. ¶¶; Scott Decl. ¶¶ 22. 24; Holley Decl. ¶ 17. For example, the town officials failed to provide residents with hand sanitizer, masks, tests, or thermometers during the height of the COVID-19 pandemic in 2020.[1] Braxton Decl. ¶¶ 14-16. To this day, the residents do not know how the COVID-19 relief funds from the federal government sent to support Newbern were spent. *Id.* And Defendant Woody Stokes, who currently holds himself out to be the mayor of Newbern, has publicly opposed working with Auburn University's Rural Studio. Braxton Decl. ¶ 12. Rural Studio is a design-build program that, as a part of Auburn's architecture school, "tackl[es] barriers to homeownership, access to fresh food and wastewater systems, and explor[es] how to use local resources" to design and build homes and other facilities in Hale County.[2] Despite the resources Rural Studios brings to the majority-Black Newbern, Defendant Stokes opposes Rural Studio's presence because, according to him, it is "only focused on helping Black people." Braxton Decl. ¶ 12. Defendant Stokes, the purported mayor, and Defendant Gary Broussard, a purported town councilman, travel around Newbern with Confederate flags on their vehicles and body. Braxton Decl. ¶¶ 29-31, 52; Patrick Decl. ¶¶ 16-20, 24; Ballard Decl. ¶¶ 16-20, 24; Quarles Decl. ¶¶ 19-23, 32; Scott Decl. ¶¶ 16-20, 24; Holley Decl. ¶¶ 13, 17.

In 2020, after Plaintiff Patrick Braxton ("Mayor Braxton") witnessed Defendants Stokes, as acting mayor at the time, and Stokes' town council's failures to respond to the needs of the town during the COVID-19 pandemic, he decided to run for the mayor of Newbern. Braxton Decl. ¶¶ 13, 18-25. At that time, Mayor Braxton also told Defendant Stokes that he planned on qualifying

---

[1] In August 2020, the Alabama Department of Health "reported that Black people in Alabama account for 41.1 percent of COVID-19 related deaths, despite making up just 27 percent of the population." *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1097 (N.D. Ala. 2020). The counties in the Black Belt that are predominately African American, which includes Hale County, had higher COVID-19 related death rates than predominantly white counties. *Id*.

[2] *Rural Studio Celebrates Three Decades of Living, Working, and Learning in Our West Alabama Community,* Rural Studio (Aug. 17, 2023), https://ruralstudio.org/celebrating-30-fallconvo/.

as a candidate for Mayor. *Id.* 25. Defendant Stokes gave Plaintiff Braxton incorrect information about how to qualify and what was needed to qualify. *Id.* 20. Nonetheless, Mayor Braxton successfully identified the correct process and fulfilled the necessary requirements on his own. *Id.* ¶¶ 21-25. Mayor Braxton filed his statement of candidacy and statement of economic interests with the circuit clerk for Hale County and online with the State of Alabama. Braxton Decl. ¶ 23; Defs.' Answer ¶ 27. Mayor Braxton was the only Newbern resident to qualify for any municipal office in Newbern. Braxton Decl. ¶¶ 25, 27; Defs.' Answer ¶¶ 25, 28. Because he was the only person qualified, Plaintiff Braxton became Mayor of Newbern by operation of law in July 2020. Braxton Decl. ¶¶ 25, 28.

As the only lawful member of the town council and, in accordance with Newbern's past practices, Mayor Braxton sought to appoint town council members to serve alongside him in governing the town of Newbern. Braxton Decl. ¶¶ 26-27. To stop Mayor Braxton from appointing his own majority-Black town council, Defendants Stokes, Broussard, Leverette, Thomas, and Tucker held a secret meeting where, they purported to act as the town council and adopted resolutions to conduct a special election for the first time in Newbern history. *See* Defs.' Answer ¶ 37; Braxton Decl. ¶¶ 29, 32; Patrick Decl. ¶¶ 16-17, 20; Ballard Decl. ¶¶ 16-17, 20; Quarles Decl. ¶¶ 19-20, 23; Scott Decl. ¶¶ 16-17, 20; Holley Decl. ¶¶ 13-14. No notice was given to Plaintiffs or any other members of the public about this meeting, nor the resolutions passed at this meeting. Braxton Decl. ¶¶ 29, 31 33; Patrick Decl. ¶¶ 16-17; Ballard Decl. ¶¶ 16-17; Quarles Decl. ¶¶ 19-20; Scott Decl. ¶¶16-17; Holley Decl. ¶ 13. No public notice was given to Mayor Braxton or the other residents of Newbern (except what Defendants might have shared with one another) about the date of the special election, the qualifying deadlines for candidates, or other relevant information about the special election, in direct contravention of Alabama law. Braxton Decl. ¶ 5;

5

Patrick Decl. ¶ 5; Ballard Decl. ¶ 5; Quarles Decl. ¶ 5; Scott Decl. ¶ 5; Holley Decl. ¶ 5. Plaintiffs did not know that Defendants had held a secret special election until months later. Braxton Decl. ¶ 5; Patrick Decl. ¶ 5; Ballard Decl. ¶ 5; Quarles Decl. ¶ 5; Scott Decl. ¶ 5; Holley Decl. ¶ 5. Only Defendants Stokes, Broussard, Leverette, Thomas, and Tucker knew about the special election, thus only they qualified as candidates and thereby effectively and fraudulently re-appointed themselves as the Town Council.

In November 2020, Mayor Braxton was sworn in as mayor, and Plaintiffs Janice Quarles, Barbara Patrick, James Ballard, and Wanda Scott were sworn in as town council members. Braxton Decl. ¶ 27; Ballard Decl. ¶¶ 13-14; Quarles Decl. ¶¶ 16-17; Scott Decl. ¶¶ 13-14; Patrick Decl. ¶¶ 13-14. Ten days later, in a counter ceremony based on the fraudulent uncontested elections, Woody Stokes was sworn in as mayor and Gary Broussard, Jesse Donald Leverett, Voncille Brown Thomas, and Willie Richard Tucker were sworn in as town councilmembers. Defs.' Answer ¶ 42. The probate county judge provided no explanation why he allowed a second Mayor and town council to be sworn in. Braxton Decl. ¶ 31. Only after Defendants Stokes, Broussard, Leverett, Thomas, and Tucker were sworn in, did Plaintiffs begin to hear about how Defendants re-appointed themselves through the secret uncontested election.

Since December 2020, Defendants have prevented Mayor Braxton from exercising his full powers. Braxton Decl. ¶¶ 39, 50; Patrick Decl. ¶ 20; Ballard Decl. ¶ 20; Quarles Decl. ¶¶ 23, 30; Scott Decl. ¶ 20; Holley Decl. ¶ 23. Though most of the town recognizes Mayor Braxton as the formal mayor, he has no access to the town hall, the town bank account, town mail, and other tools he needs to fulfill his duties. Braxton Decl. ¶¶ 34-39. This has resulted in a town without formal governance, as Defendants refuse to respond to the concerns of all residents of Newbern. Braxton

6

Decl. ¶¶ 50-51, 54-55; Patrick Decl. ¶¶ 20-21, 23-25; Ballard Decl. ¶¶ 23-25; Quarles Decl. ¶¶ 23-26, 30-33; Scott Decl. ¶¶ 23-24; Holley Decl. ¶¶ 14, 16-18.

The Newbern town hall has been locked since November 2020, for over three years. Braxton Decl. ¶¶ 35, 48, 51; Quarles Decl. ¶¶ 24, 26. Plaintiffs have not been able to access the town hall as officials or residents of Newbern. Braxton Decl. ¶¶ 34-35, 48-49; Quarles Decl. ¶¶ 24, 26. The town hall is not regularly open during regular business hours for residents to seek the assistance or support of town officials. *See id.* Town council meetings have not been held at town hall, or another public space. Braxton Decl. ¶ 34; Patrick Decl. ¶ 21; Ballard Decl. ¶ 21; Quarles Decl. ¶ 24; Scott Decl. ¶ 21. Defendants repeatedly changed the lock so that the official key provided to Mayor Braxton does not work. Braxton Decl. ¶ 35.

Every day, residents feel their basic living affected by the lack of formal governance due to Defendants' continued refusal to hold meaningful elections, which has significant practical effects on the living conditions in Newbern. Braxton Decl. ¶¶ 10-13, 42-46; Patrick Decl. ¶ 23; Ballard Decl. ¶ 23; Quarles Decl. ¶¶ 29, 31; Scott Decl. ¶ 23; Holley Decl. ¶ 16. For example, a private company intends to support the installation of a proper sewage system in Newbern. Braxton Decl. ¶ 44. But Defendant Woody Stokes, who continues to hold himself out as the mayor of Newbern, has refused to support this project. *Id*. ¶ 45. Many of the Black residents of Newbern do not have a proper sewage system, meaning that their homes flood constantly with raw sewage. Braxton Decl. ¶¶ 11; Quarles Decl. ¶ 13. Contractors who are committed to working on the installation have paused the project because the governance of the town is in dispute. Braxton Decl. ¶ 45.

7

**ARGUMENT**

To prevail on a request for a preliminary injunction, Plaintiffs must show they are: (1) likely to succeed on the merits, (2) likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in Plaintiffs' favor, and (4) that interim relief is in the public interest. *Charles H. Wesley Educ. Found., Inc. v. Cox,* 408 F. 3d 1349, 1354 (11th Cir. 2005). Because all factors weigh in Plaintiffs' favor, this Court should grant a preliminary injunction.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.  Defendants' Hand-Me-Down-Governance System Heavily and Unnecessarily Burdens the Right to Vote in Violation of the First and Fourteenth Amendments.

The First and Fourteenth Amendments protect "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *Duncan v. Poythress*, 657 F.2d 691, 704 (5th Cir. 1981) (explaining that the right to vote implicates "substantive" due process). The constitutionality of a challenged election rule is governed by the *Anderson-Burdick* test. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). Under that test, courts "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Id*.

If the burden imposed is severe, the law is subject to strict scrutiny. *Norman v. Reed*, 502 U.S. 279, 280 (1992); *see also Lee*, 915 F.3d at 1318 ("Regulations imposing severe burdens must be narrowly tailored and advance a compelling state interest.") (citations omitted). Defendants' hand-me-down governance policy fails strict scrutiny. First, Plaintiffs' right to vote is heavily burdened by Defendants' actions which run contrary to state law, the Constitution, and basic

8

fairness. And Defendants have not identified any legitimate state interest that is served by their failure to regularly hold elections.

### i. Defendants' Actions Unduly Burden Plaintiffs' Right to Vote.

Through Defendants' failure to hold elections and administration of a secret election without providing proper notice to the electorate, Defendants have totally deprived Plaintiffs and other residents of Newbern of the right to participate in elections. The failure to hold elections as required by state law places an unconstitutional burden on the right to vote. *See, e.g.*, *Gonzalez v. Governor of Georgia*, 978 F. 3d 1266, 1271 (11th Cir. 2020); *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001); *Duncan,* 657 F.2d at 703; *ARC Students for Liberty Campaign v. Los Rios Cmty. Coll. Dist.,* 732 F. Supp. 2d 1051, 1058 (E.D. Cal. 2010). This "total and complete disenfranchisement of the electorate as a whole is patently and fundamentally unfair." *Bonas*, 265 F.3d at 75.

Under state law, Newbern is required to hold and notify voters about elections every four years. Ala. Code §§ 11-43-2(a), (d); Ala. Code §§ 11-46-21(a) (requiring quadrennial elections); Ala. Code § 11-46-22 (requiring the public to receive notices of elections). By their own admission, Defs.' Answer) ¶ 20, Defendants have repeatedly failed to hold municipal elections in Newbern for decades in violation of state law. "It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law so that they may fill the seats of government through the power of appointment," and yet that is exactly what Defendants have done in Newbern for decades. *Gonzalez*, 978 F. 3d at 1271 (alterations in original and citation omitted).

The same is true of Defendants' failure to notify the public or opposition candidates of the 2020 special elections. Alabama law requires Newbern to notify voters of special elections in a

9

specific manner, including publishing notice of the election in the local paper, and posting public notices. Ala. Code § 11-46-22. Defendants failed to do so here. In *Lee*, the Eleventh Circuit held that providing belated notice to voters about errors or deficiencies affecting their absentee ballots imposed a "serious burden" on the right to vote. 915 F.3d at 1321. This is because the state's inadequate notice rules only gave voters an "illusory" opportunity to cast or cure their insufficient ballots. *Id.* at 1324. If inadequate notice of errors on absentee ballots unconstitutionally burdens the right to vote, then so must the failure to give any notice about an election at all. Defendants' practices prevent residents from voting in elections and excludes candidates opposed to the status quo from competing in elections. This "exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for likeminded citizens." *Anderson,* 460 U.S. at 787-788. Because no notice was given to Plaintiffs or other residents of the 2020 election or related deadlines, "and, because the right abridged by the lack of notice is also fundamental," Defendants failure to give fair notice traveled into "unconstitutional territory." *Cf. Campbell v. Bennett*, 212 F. Supp. 2d 1339, 1343 (M.D. Ala. 2002) (finding that the State's failure to notify candidates of newly shortened qualification deadlines had unconstitutionally burdened their right to vote); *Swanson v. Bennett*, 219 F.Supp.2d 1225, 1229-31 (M.D. Ala. 2002) (same).

Defendants' practices also severely restrict who may run for office, "limit[ing] the field of candidates from which voters might choose." *Anderson*, 460 U.S. at 787-788 (holding that overly restrictive candidate qualifications are unconstitutional). Defendants' hand-me-down governance system prohibits competitive elections, heavily burdening the right to vote in free and fair elections. *Cf. Anderson,* 460 U.S. at 787 (citations omitted) ("The right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or

10

other candidates are 'clamoring for a place on the ballot.'"). Given the significant burdens that Defendants' hand-me-down-governance system places on Plaintiffs' right to vote and ability to participate in elections, that system is subject to strict scrutiny.

> ii. *Defendants' Unconstitutional Practices Do Not Advance any State Interests.*

Defendants have no interest in failing to hold elections, in failing to notify voters, or in otherwise maintaining their hand-me-down governance system in violation of state law. *Cf. Gonzalez*, 978 F. 3d at 1271. Defendants' actions violate state law in at least two ways. First, Alabama law required Defendants to regularly hold elections and notify voters, candidates, and others about upcoming elections. Ala. Code §§ 11-43-2(a) and (d), 11-46-21(a), 11-46-22. Defendants have failed to do this. Second, Alabama law required Defendants, as the purported town council in 2020, to notify the mayor of any special election so that the mayor could provide notice to Newbern voters. Ala. Code § 11-46-22(a). Although Mayor Braxton was the only person who qualified for mayor (or city council) at the time Defendants decided to schedule and hold a special election, Defendants failed to notify Mayor Braxton or anyone else outside their circle of the 2020 special election. Braxton Decl. ¶¶ 29-31. Indeed, the Alabama Supreme Court requires strict compliance with its notice of election laws and itself has required new special elections where officials fail to provide voters with the required notice of elections. *See e.g., Ex parte Scrushy*, 262 So. 3d 638, 641-42 (Ala. 2018) (affirming an order calling for a new election where officials had failed to comply with the two-months advance notice required by Section 11-46-22(a)); *Bouldin v. City of Homewood*, 174 So. 2d 306, 311-13 (Ala. 1965) (holding that the failure to comply with certain notice requirements required an election's invalidation); *see also City of Birmingham v. Bouldin*, 190 So. 2d 279 (1966) (similar). Based on the foregoing, Defendants lack any interest

(compelling or otherwise) in flagrantly violating state law in a manner that severely burdens Plaintiffs' constitutional right to vote.

## B. Defendants' Hand-Me-Down-Governance System Violates the Voting Rights Act.

Section 2 of the Voting Rights Act ("VRA") imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013). "'The essence of a Section 2 claim . . . is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities' enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Section 2 "applies to a broad range of voting rules, practices, and procedures," "does not demand proof of discriminatory purpose," and even "a 'facially neutral' law or practice may violate [Section 2]." *Brnovich v. Democratic Nat'l Comm.,* 141 S. Ct. 2321, 2333 (2021). And "an 'abridgement' of the right to vote under § 2 does not require outright denial of the right." *Id*.

For example, failing to provide voters or candidates with accurate information about voting procedures may violate Section 2. *See id*. at 2333 n.4 (collecting vote denial cases including *Brown v. Post*, 279 F. Supp. 60 (W.D. La. 1968) and *United States v. Post*, 297 F. Supp. 46 (W.D. La. 1969)); *accord Hadnott v. Amos*, 394 U.S. 358, 366 (1969). And "even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984) (citation omitted).

Section 2 requires an examination of the "totality of circumstances," 52 U.S.C. § 10301(b), in particular the non-exclusive list of factors drawn from the 1982 Senate report (the "Senate

12

Factors").[3] In *Brnovich*, the Court also identified certain guideposts for assessing Section 2 claims in the vote denial context, including: (1) the existence of significant racial disparities between Black and voters opportunities to participate; (2) evidence that these disparities are driven by past discrimination; (3) the extent to which, despite the challenged practice, there remain other opportunities to vote; (4) the extent to which the challenge practice is widespread in other states or jurisdictions; and (5) the extent to which the state or jurisdiction's asserted interest in maintaining the challenged practice is tenuous, *Brnovich*, 141 S. Ct. at 2338-40, 2346, 2348.

Practices that result in a failure to provide voters or candidates with accurate information about upcoming elections, *Dillard v. Town of North Johns*, 717 F. Supp. 1471, 1476 (M.D. Ala. 1989), have the "potential to 'undermine the effectiveness of voters who wish to elect [particular] candidates.'" *Morse v. Republican Party of Va.*, 517 U.S. 186, 205 (1996) (plurality) (quoting *Allen*, 393 U. S. at 570)). "Rules concerning candidacy requirements and qualifications . . . fall into this category because of their potential to 'undermine the effectiveness of voters who wish to elect [particular] candidates.'" *Id*. (quoting *Allen*, 393 U.S. at 570); *see also Dougherty County Bd. of Ed. v. White*, 439 U. S. 32, 40 (1978); *Hadnott*, 394 U.S. at 366; *Arakaki v. Hawaii*, 314 F. 3d 1091, 1095-97 (9th Cir. 2002).

---

[3] The factors include: 1) the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process; 2) the extent to which voting in government elections is racially polarized; 3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; 4) the exclusion of minorities from a candidate slating process; 5) the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; 6) the use of overt or subtle racial appeals in political campaigns; 7) the extent to which minorities have been elected to public office in the jurisdiction; 8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the minority group; 9) whether the policy underlying the use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Gingles*, 478 U.S. at 36-37 (citation omitted).

Plaintiffs are likely to succeed on the merits of their Section 2 claim. Indeed, Plaintiffs' claim goes to the heart of what the VRA seeks to secure – "an end to the denial of the right to vote based on race." *Brnovich*, 141 S. Ct. at 2330. Defendants' failure to regularly hold elections, attempts to prevent the Plaintiffs from maintaining their town positions, administration of a secret special election without providing proper notice to the electorate, and hand-me-down governance policy, individually and cumulatively, impose a discriminatory burden on Black voters that results in the denial of their right to vote. This prevention of Black voters from exercising their constitutional right to vote or serve in town office is linked to the discriminatory social and historical conditions that have affected Black voters both in Alabama and Newbern. Each of the *Brnovich* guideposts, as well as the relevant Senate Factors, weigh heavily in Plaintiffs' favor.

> i. *The Racial Disparity Is Distinct in the Challenged Hand-Me-Down System and Lack of Notice in Special Elections.*

The hand-me-down-governance system has a substantial disparate impact on the Black voters in Newbern. Since at least the passage of the VRA in 1965, which resulted in the widespread enfranchisement of Black voters, Defendants and their predecessors have defied state law and declined to hold elections to prevent Newbern residents, 65% of whom are Black, from voting. Defendants' actions have effectively disenfranchised the majority-Black residents of Newbern, while benefiting white residents and the overwhelmingly white officials who have used the hand-me-down-governance system to hold onto power. Indeed, because voting is racially polarized in Hale County and across Alabama, the white officials in power almost certainly would have lost in any elections where the majority-Black electorate were free to vote for candidates of their choice. *See Allen v. Milligan*, 599 U.S. 1, 22 (2023) (affirming that voting is racially polarized in the Black Belt, including Hale County); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 277 (2015) (similar); *Dillard v. City of Greensboro*, 946 F. Supp. 946,

14

952-53 (M.D. Ala. 1997) (racial polarization in a nearby city); *Hale Cnty.*, 496 F. Supp. at 1213 (racial polarization in the county).

First, the results of Defendants' longstanding appointment process also had a disparate impact on Black voters. *See* 52 U.S.C. § 10301(b) ("The extent to which members of a protected class have been elected to office . . . is one circumstance which may be considered"); *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994) (explaining that a lack of proportionality is "a relevant fact in the totality of circumstances"). Although white voters are only 35% of the voting-age population, Cooper Decl. ¶ 8, no Black person has ever been appointed or otherwise selected as mayor under Defendants' system and, prior to the appointment of Defendant Thomas, no Black person had ever been appointed to the town council. Today, white people hold 83% or five of Newbern's six elected offices. Braxton Decl. ¶¶ 6, 33; Quarles Decl. ¶ 6. Under the Section 2 results test, "[o]ne may suspect [discrimination] from political famine[.]" *De Grandy*, 512 U.S. at 1017; *accord Turner v. Fouche*, 396 U.S. 346, 362–63 (1970) (finding that a government body's failure to appoint Black people to public office constituted strong evidence of racial discrimination); *Searcy v. Williams*, 656 F.2d 1003, 1010 (5th Cir. 1981), *aff'd sub nom. Hightower v. Searcy*, 455 U.S. 984 (1982) (same).

Similarly, Defendants' practices had a significant disparate impact on Black voters in the uncontested "election" that Defendants held in 2020. There, only one Black person (Defendant Thomas) was notified of election and any related filing deadlines. In contrast, at least four white people (Defendants Stokes, Broussard, Leverett and Tucker) were notified and qualified to run in those elections. That is, although 65% of Newbern's voting-age population is Black, white people constituted 83% of the people who knew about and were able to qualify for in the sham election. Moreover, Black people were 100% of the opposition candidates (Plaintiffs Braxton, Ballard,

15

Patrick, Quarles and Scott) whom Defendants failed to notify about the uncontested election. Put yet another way, Defendants told 0.8% of Black voters (1 of 115) about these "elections"; whereas at least 12.5% of the white voters (5 of 40) knew about and participated in this process.

The purpose and result of this system is that the Town Council has been and remains overwhelming white, that predominately white people have been the only ones told about elections or candidate qualification rules, and that elected positions have been almost exclusively held by white people. *See* Braxton Decl. ¶¶ 5-8; Patrick Decl. ¶¶ 5-9; Ballard Decl. ¶¶ 5-9; Quarles Decl. ¶¶ 5-9; Scott Decl. ¶¶ 5-9; Holley Decl. ¶¶ 5-9.

Here, Plaintiffs experienced a situation similar to the plaintiffs in *Dillard*, 717 F. Supp. at 1476, where a district court found that an Alabama town violated Section 2 in refusing to provide candidate forms to Black candidates while providing them to white candidates. *Id.* at 1477. The Court found that not only did the town mayor and officials fail to provide information equally to all candidates, but the mayor also expressly refused to provide the information when one of the Black plaintiffs asked him for help at the town council office. *Id.* at 1476-78. The mayor was aware that the Black plaintiffs were seeking to take advantage of the new court-ordered single-member districting plan and that their election would result in the town council being majority-Black. *See id.* at 1477. Despite the town officials' attempts to prevent the plaintiffs from meeting the candidate requirements, the plaintiffs ultimately registered for three town council positions. *Id.* at 1474. After the three Black plaintiffs were elected to the town council, however, the mayor refused to swear them into office. *Id.* at 1475-76. The court ruled that "once [town officials] voluntarily proceeded to provide [] forms and information to any candidates, the town had to do so in a racially nondiscriminatory manner or run afoul of § 2" and provide it to anyone else who asked as well. *Id.* at 1476-77.

16

Just as in *Dillard*, Defendants selectively decided to provide accurate information to white voters about the election, while refusing to widely inform Black residents (save one) about the same. Braxton Decl. ¶ 24, 33, 54; Patrick Decl. ¶ 17; Ballard Decl. ¶ 17; Quarles Decl. ¶¶ 20-21, 30, 33; Scott Decl. ¶¶ 17-18; Holley Decl. ¶¶ 13-14. *See also Post*, 297 F. Supp. at 50-51 (finding that election officials violated Section 2 in inadequately informing Black voters about the mechanics of a voting machine); *Brown*, 279 F. Supp. at 64 (finding that officials violated Section 2 in failing to inform Black voters about absentee voting options). By preventing Plaintiffs and other Black residents from voting on or even participating in Defendants' hand-me-down governance policy, Defendants violated the VRA. *Cf. League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (finding that when a state's actions in taking away Latino voters' opportunity to elect candidates "because Latinos were about to exercise it" "[bore] the mark of intentional discrimination").

> *ii. Black Voters in Newbern, Alabama Suffered Past Discrimination and the Effects of the Past Discrimination Continue.*

Alabama, Hale County, and Newbern have a long, well-established history of racial discrimination in voting, education, healthcare, employment and other areas against Black Alabamians. "Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented." *Milligan*, 599 U.S. at 22 (citation omitted); *see also People First*, 491 F. Supp. 3d at 1173-74 (describing the extensive history of "racial bias" in voting and other areas in Alabama). Black residents of Hale County have also experienced Alabama's history of public and private acts of discrimination in education, the criminal legal system, and employment. *See, e.g., Black v. Curb*, 464 F. 2d 165 (5th Cir. 1972); *United States v. Hale Cnty. Bd. of Educ.*, 445 F.2d 1330 (5th Cir. 1971); *Bryant v. Johnny Kynard Logging, Inc.*, 930 F. Supp. 2d 1272 (N.D. Ala. 2013); *Stephens v. Haley*, 823 F. Supp. 2d 1254 (S.D. Ala. 2011); *United States*

17

*v. Hale Cnty. Bd. of Educ*. 426 F. Supp. 275 (S.D. Ala. 1977); *United States v. Hale Cnty. Bd. of Educ*., 12 Race Rel. L. Rep. 114 (S.D. Ala. 1967). As a result of that discrimination, Black voters in Newbern and Hale County tend to be poorer, less educated, have worse health outcomes, and lower employment than their white neighbors.

For example, according to the U.S. Census Bureau's 2015-2019 American Community Survey, 59.4% of the county's population is Black and 39.5% is white. Cooper Decl., Ex. A, p. 2. In Hale County, about 19.2% of Black people, but only 11.8% of whites failed to complete high school. And only 9.4% of Black residents, as compared to 20.7% of white residents have a college degree or higher level of educational attainment. *Id.* at p. 17. About 32.8% of Black residents live in poverty (including 51.2% of Black children under 18), as compared to only 11.8% of whites (and only 14.9% of white children); and 38.1% of Black people and only 7.6% of whites receive food stamps. *Id.* at pp. 20, 29. Black unemployment (16.1%) as a percentage of the civilian aged 16 to 64 labor force is three times white unemployment (4.9%) in the county. *Id.* at p. 33. Black median household income is only $24,165 and white median household income is more than double that amount ($57,364). *Id.* at p. 24. Many Black residents (21.7%) lack access to computer and 39.7% lack broadband internet access (versus only 10.6% of whites without a computer and 18.8% without broadband internet). *Id.* at pp. 42-43. And 20% of Black residents aged 18-64 lack health insurance (versus 8.3% of whites). *Id.* at 41.

Similar racial disparities exist in Newbern. For example, Newbern remains a segregated town where the center of the town, the town hall building, is not accessible and blatantly locks out Black residents. Braxton Decl. ¶¶ 34-35, 48-49; Quarles Decl. ¶¶ 24, 26. The white residents have a proper sewage system, and the Black residents do not. Braxton Decl. ¶¶ 11, 44; Quarles Decl. ¶ 13. The Black residents lack any path forward to a sewage system installed so long as the town

18

governance is unresolved. Braxton Decl. ¶¶ 11, 44; Quarles Decl. ¶ 13. The Defendants who hold themselves out to be the governing town officials have always ignored the requests of the Black residents. Braxton Decl. ¶¶ 10-11; Quarles Decl. ¶¶ 12-13. To this day, the Defendants continue to patrol the town with Confederate paraphernalia on their vehicles and clothing. Braxton Decl. ¶ 52; Quarles Decl. ¶ 32.

"[L]ow income hinders political participation by restricting access to information and by increasing the inconvenience of registering and voting." *Hale Cnty.*, 496 F. Supp. at 1214; *see also Milligan v. Merrill*, 582 F. Supp. 3d 924, 1022 (N.D. Ala. 2022) (three-judge court) ("[B]ecause white Alabamians tend to have 'more education and therefore higher income' than Black Alabamians, they tend to be better able . . . [to] 'afford to contribute to political campaigns; [and] afford to run for office[.]'") (citations omitted), *aff'd sub. nom Allen v. Milligan*, 599 U.S. 1 (2023).

### *iii. No Opportunities to Vote Outside the Challenged System of the Hand-Me-Down- Governance Exist.*

Defendants have always refused to administer any aspect of the election system in the Town of Newbern in a fair, open, or nondiscriminatory manner. Braxton Decl. ¶¶ 5-8, 29-33; Patrick Decl. ¶¶ 5-7, 17-18; Ballard Decl. ¶¶ 5-7, 16-18; Quarles Decl. ¶¶ 5-10 20-21, 30; Scott Decl. ¶¶ 5-7, 17-18; Holley Decl. ¶¶ 5-7, 17. For decades, not only did Defendants and their predecessors fail to hold elections, Defendants also failed to provide information about how to be considered for this hand-me-down governance or how to qualify as a candidate. Defendants simply failed to provide any opportunities for Black people to participate in the local political process. Braxton Decl. ¶¶ 5-8, 22-25, 33, 54; Patrick Decl. ¶¶ 5-7, 17-18; Ballard Decl. ¶¶ 5-8, 17-18; Quarles Decl. ¶¶ 5-9, 20, 30; Scott Decl. ¶¶ 5-7, 17-18; Holley Decl. ¶¶ 5-7. Defendant Town and Defendants Stokes, Broussard, Leverett, Thomas, and Tucker, who purport to be Town officials, claim that they held a special election in 2020 in which they were the only candidates who qualified

19

to run. Braxton Decl. ¶ 30; Patrick Decl. ¶¶ 16-17; Ballard Decl. ¶¶ 16-17; Quarles Decl. ¶¶ 19-20; Scott Decl. ¶¶16-17.

But the Defendants did not advertise that special election. Braxton Decl. ¶ 30; Patrick Decl. ¶ 5, 7, 18; Ballard Decl. ¶¶ 5, 7, 18; Quarles Decl. ¶¶ 5, 7, 21; Scott Decl. ¶¶ 5, 7, 18; Holley Decl. ¶¶ 5, 7. The Defendants failed to post any notice about the special election at the Newbern town hall, fire station, post office, library, and streets, despite acknowledging it was the first time the town would be hosting an election in decades. Braxton Decl. ¶ 30; Patrick Decl. ¶¶ 5, 7, 18; Ballard Decl. ¶¶ 5, 7; Quarles Decl. ¶¶ 5, 7-9; Scott Decl. ¶¶ 5, 7; Holley Decl. ¶¶ 5, 7. There is no guarantee that all residents of Newbern, especially Black residents will receive notice of how to qualify or vote in future elections. Braxton Decl. ¶ 55; Patrick Decl. ¶ 25; Ballard Decl. ¶ 25; Quarles Decl. ¶ 34; Scott Decl. ¶ 25; Holley Decl. ¶ 18.

### iv. Defendants' Hand-Me-Down Governance System Is Not Ordinary or Widespread.

The court can consider whether Defendants' challenged practice "has a long pedigree or [is] in widespread use in the United States." *Brnovich*, 141 S. Ct. at 2339. Here, again, Defendants' hand-me-down governance runs contrary to state law and the practices of every other town in Alabama. Allowing the Defendants to continue their hand-me-down governance violates the basic tenants of democracy and state law.

### v. No State Interest Exists in Maintaining the Challenged Hand-Me-Down Governance System and Failing to Hold Town Elections.

Defendants lack any legitimate interest in maintaining this hand-me-down-governance system. Defendants have acted contrary to state law, by failing to hold or publish notice of any elections. Ala. Code § 11-46-22; Ala. Code § 11-46-21. Defendants no longer seem to maintain

20

any justifications for their use of the challenged hand-me-down governance, as they concede they were trying to correct the past practice by holding the 2020 election. Defs.' Mot. To Dismiss at 20.

Taking the totality of the circumstances, the Defendants have explicitly denied the vote to Black residents in Newbern by both failing to hold elections for decades and failing to notify voters of the uncontested elections held in 2020. For the reasons above, Plaintiffs are likely to succeed on the merits of their Section 2 claim.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

When faced with such blatantly unconstitutional and discriminatory practices, courts "[have] not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154 (1965); *see also North Carolina v. Covington* ("*Covington II*"), 138 S. Ct. 2548, 2553 (2018) (recognizing that district courts have a "duty to cure illegal[] [discrimination] through an orderly process in advance of elections").

Here, the proper remedy is to order a new, official election. *See Gonzalez v. Kemp*, 470 F. Supp. 3d 1343, 1352 (N.D. Ga. 2020) (granting a preliminary injunction that required special elections to cure a state's past failure to hold election consistent with state law, *aff'd*, 978 F.3d 1266, 1269 (11th Cir. 2020); *see also Hadnott*, 394 U.S. at 367 (ordering new elections where discriminatory procedures had disqualified Black candidates, resulting in white candidates winning uncontested elections). Defendants' conduct has so pervasively and unfairly impacted prior elections that a court-ordered official election is the only way for Plaintiffs and all residents of Newbern to have a meaningful opportunity to participate in municipal elections and exercise their right to vote.

21

Defendants' actions irreparably harmed Plaintiffs and other voters. "[M]issing the opportunity to vote in an election is an irreparable harm for the purposes of a preliminary injunction." *Gonzalez*, 978 F.3d at 1272; *see also Lee*, 915 F.3d at 1339-40. And the "protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc.*, 408 F.3d at 1355.

And as described above, Plaintiffs' right to participate in elections, have their votes counted, and hold municipal office are impaired by Defendants' hand-me-down governance policy. Braxton Decl. ¶ 55; Patrick Decl. ¶ 25; Ballard Decl. ¶ 25; Quarles Decl. ¶ 34; Scott Decl. ¶ 25; Holley Decl. ¶ 18.

## III.    THE BALANCE OF EQUITIES TIP TOWARDS PLAINTIFFS BECAUSE THE PUBLIC INTEREST IS SERVED BY AN INJUNCTION, AND THE INJUNCTION WOULD NOT HARM DEFENDANTS.

Plaintiffs' ongoing injuries are substantial, whereas Defendants will suffer no hardship if they are enjoined from maintaining their unlawful policy of hand-me-down-governance.[4] Plaintiffs' requested relief supports the public interest because the protection of "franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d at 1355; *see also Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("It is enough to say now that, once a State's [voting scheme] has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan."); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are

---

[4] When "[t]he nonmovant [on a motion for preliminary injunction] is the government, [] the third and fourth requirements—'damage to the opposing party' and 'public interest'—can be consolidated." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020).

illusory if the right to vote is undermined."). By contrast, Defendants have no legitimate interest in enforcing an unconstitutional policy. *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

Nor would requiring Defendants to administer a new municipal election cause them any harm. In deciding whether ordering a new election will burden election officials, courts may consider "the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and the need to act with proper judicial restraint when intruding on state sovereignty." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017). Here, each factor supports ordering a new election.

First, and as described above, Plaintiffs suffer from a severe and unconstitutional burden on the right to vote. *See supra* Factual Background; *supra* Section I(A); *Bonas,* 265 F.3d , at 75; *Nation v. San Juan Cnty., No*. 2:12-CV-00039, 2017 WL 6547635, at \*18 (D. Utah Dec. 21, 2017), *aff'd sub nom. Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270 (10th Cir. 2019) (finding it proper to order new elections based on "severe and longstanding" violations of the right to vote).

Second, there is no evidence that ordering a special election will disrupt town governance. The election can be held at the same time as the November 2024 presidential election, which is still six months away, and which Defendants must already take steps to prepare for as required by law. Statewide and county elections occur at one polling place (the Town Hall) in Newbern. Defendants will have more than enough time to acquire the necessary ballots and voting machines. *See e.g., Wright v. Sumter Cnty. Bd. of Elections,* 361 F. Supp. 3d 1296, 1303 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020). Holding these elections in tandem will also minimize any administrative burdens. *Navajo Nation,* 2017 WL 6547635, at \*18.

Third, administering a special election at the same time as the November 2024 presidential election constitutes an exercise in judicial restraint that does not improperly intrude on state sovereignty. Plaintiffs are not asking Defendants to rewrite their election rules or administer a costly new election on a short timeframe, rather, Plaintiffs are asking Defendants to remedy their decades-long failure to hold elections in the first place. *See Wright,* 361 F. Supp. 3d at 1305; *Gonzalez v. Kemp*, 470 F. Supp. 3d 1343, 1352 (N.D. Ga.) (granting preliminary injunction requiring special election), aff'd, 978 F.3d 1266 (11th Cir. 2020); *cf. also United States v. Dallas Cnty. Comm.*, 850 F.2d 1433, 1441-42 (11th Cir. 1988) (ordering special elections after two years of delay); *Chatman v. Spillers*, 44 F.3d 923, 924-25 (11th Cir. 1995) (ordering special elections in a city where elections had not occurred for nine years).

Plaintiffs "are not asking the federal courts to count ballots or otherwise 'enter into the details of the administration of an election.'" *Duncan*, 657 F.2d at 703 (citations omitted). Rather, "[t]heir request is far simpler and more basic: they ask for the election itself, as required by state law." *Id*. (citations omitted). Because a preliminary injunction is needed to protect Plaintiffs' exercise of their right to vote, would serve the public interest, and would not harm Defendants, this Court should grant Plaintiffs' requested relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask this court to issue a preliminary injunction against Defendants.

Dated: March 22, 2024

Respectfully submitted,

*/s/ Leah Wong*
Leah Wong*
Morenike Fajana*
NAACP Legal Defense
& Educational Fund
40 Rector Street, 5th Floor

24

New York, NY 10006
(212) 217-1677
lzwong@naacpldf.org
mfajana@naacpldf.org

*/s/ Richard P. Rouco*
Richard P. Rouco
George N. Davies
Quinn, Connor, Weaver,
Davies & Rouco, LLP
2 – 20th Street North
Suite 930
Birmingham, AL 35203
Tel. 205-870-9989
Fax. 205-803-4143
rrouco@qcwdr.com
gdavies@qcwdr.com

*admitted pro hac vice