```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF ALABAMA

 3                       SOUTHERN DIVISION

 4   _____
                                     )  CIVIL NO. CV23-00127
 5   PATRICK BRAXTON;                 )  COURTROOM 4B
     JAMES BALLARD;                   )  U.S. FEDERAL COURTHOUSE
 6   BARBARA PATRICK;                 )  MOBILE, ALABAMA
     JANICE QUARLES;                  )  MAY 06, 2024
 7   WANDA SCOTT;                     )  PAGES 1 TO 119, INCLUSIVE
     DOROTHY HOLLEY;                  )
 8                                    )
                 PLAINTIFFS,          )
 9                                    )
     VS.                             )
10                                    )
     HAYWOOD STOKES, III;             )
11   GARY BROUSSARD;                  )
     JESSE DONALD LEVERETT;           )
12   VONCILLE BROWN THOMAS;           )
     WILLIE RICHARD TUCKER;           )
13   TOWN OF NEWBERN,                 )
                                      )
14               DEFENDANTS.          )
     _____ )
15
                     PRELIMINARY INJUNCTION
16        BEFORE THE HONORABLE KRISTI K. DuBOSE
               UNITED STATES DISTRICT COURT JUDGE
17

18   APPEARANCES:

19   FOR THE PLAINTIFFS:

20       NAACP Legal Defense & Educational Fund, Inc.
         By:  Leah Wong, Esq.
21       By:  Morenike Fajana, Esq.
         40 Rector Street, 5th Floor
22       New York, New York  10006

23       Quinn, Connor, Weaver, Davies & Rouco, LLP
         By:  George N. Davies, Esq.
24       Mountain Brook Office Building
         2700 Highway 280, Suite 380
25       Birmingham, Alabama  35223
```

1    <u>APPEARANCES CONTINUED:</u>

2    FOR THE DEFENDANTS:

3        Holtsford Gilliland Hitson Howard Stevens Tuley & Savarese
         By:  Rick A. Howard, Esq.
4        By:  Morgan B. Beckman, Esq.
         4001 Carmichael Road, Suite 300
5        Montgomery, Alabama  36106

6    Courtroom Deputy:  Nicole Hawkins
     Law Clerk:  Frank DeBorde
7    Law Clerk:  Pierce Ostwalt
     Court Reporter:  Melanie Wilkins, RMR, CRR

8

9            Proceedings reported by machine stenography.

10                 Transcript produced by computer.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1            [May 06, 2024, 9:01 a.m. in open court.]

2            THE CLERK:  We are on the record in Civil Action

3    No. 23-127, Patrick Braxton, et al., versus Haywood Stokes,

4    III, et al., for a preliminary injunction hearing.

5            Plaintiffs, if you'll identify yourselves for the

6    record.

7            MS. FAJANA:  Morenike Fajana of the NAACP Legal

8    Defense Fund.

9            THE COURT:  I can't hear you.

10           MS. FAJANA:  Sorry, sorry.  Morenike Fajana of the

11   NAACP Legal Defense Fund for the plaintiffs.

12           MS. WONG:  Good morning, Your Honor.  Leah Wong for

13   the NAACP Legal Defense Fund.

14           MR. DAVIES:  Good morning, Your Honor.  George Davies

15   with the firm Quinn Connor for the plaintiffs.

16           MS. HENDERSON:  Good morning, Your Honor.  Shawnell

17   Henderson with the NAACP Legal Defense Fund.

18           THE CLERK:  Defendant?

19           MR. HOWARD:  Rick Howard.

20           MS. BECKMAN:  Morgan Beckman for the defendants.

21           THE COURT:  Okay.  Ms. Henderson, I don't have you

22   down.

23           MS. WONG:  Your Honor, Ms. Henderson is a legal

24   assistant with us.

25           THE COURT:  Oh, okay.
```

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

1          MS. WONG:  Thank you so much.

2          THE COURT:  All right.  So we are here today on a

3     request by the plaintiffs for a preliminary injunction.  The

4     first thing you need to show me is a likelihood of success on

5     the merits.  So I'll listen to any evidence you would like to

6     present on that.

7          MS. WONG:  Great.  And, at the start, Your Honor,

8     we'd like to invoke the rule to sequester the witnesses today

9     from the courtroom while the others are testifying.

10         THE COURT:  All right.  Who is going to be a witness?

11    Raise your hand if you are going to be a witness.  Doesn't look

12    like anybody -- oh, yes, sir.  Are you Mr. Braxton?

13         PLAINTIFF BRAXTON:  Yes, ma'am.

14         THE COURT:  Mr. Braxton can stay in the courtroom and

15    Ms. Janice Quarles.

16         MR. HOWARD:  If you are going to be a witness, I need

17    you to step out.  You may testify or may not.

18         THE COURT:  Are they a defendant in the case?

19         MR. HOWARD:  Ms. Tucker is not a defendant.

20         THE COURT:  Okay.

21         MR. HOWARD:  But I don't know that I need her.

22         THE COURT:  Right.  If you are a defendant or a

23    plaintiff, you can stay in the courtroom whether you are going

24    to be a witness or not, but if you are not a defendant or

25    witness, you need to step out if you are going to be a witness.

1      MS. WONG:  Okay.  So any witnesses that are defendant

2  or plaintiff should just stay in the courtroom?

3      THE COURT:  Yes.

4      MS. WONG:  Oh, okay.

5      THE COURT:  Okay.  Go ahead.

6      MS. WONG:  All right.  Good morning, Your Honor.

7  Leah Wong from the NAACP Legal Defense Fund representing

8  Plaintiffs Patrick Braxton, Janice Quarles, Wanda Scott, James

9  Ballard, Barbara Patrick, and Dorothy Holley.  Thank you again

10  for providing the parties to present to the Court today.

11      Following the Court's order lifting the stay of

12  discovery, the parties have now conducted 12 depositions since

13  the conclusion of the preliminary injunction briefing.  Those

14  depositions drew out facts that were unavailable at the time of

15  the PI briefing, new facts that only make the need for relief

16  starker.

17      As a result, there are many facts that are no longer

18  in dispute.  It is undisputed that nobody with authority to

19  hold elections has ever held elections in Newbern for as long

20  as they can recall.  Each defendant has now testified there

21  have never been municipal elections in the Town of Newbern,

22  Alabama.

23      Four out of five defendants testified to never having

24  submitted qualifying papers for elected office before 2020 when

25  mayor Braxton first qualified.  So let that sink in.  They held

1    themselves -- defendants held themselves out as town officials

2    in charge of the lives of residents for years, decades without

3    being voted in as town officials.  And all the plaintiffs have

4    testified to not having any meaningful access or insight into

5    the governance of their own town.

6          The defendants' only defense to this decades-long

7    unlawful policy is that they attempted to hold an unauthorized

8    2020 special election after discovering Plaintiff Braxton was

9    the only person who legally qualified with the state for any

10   town official position.

11         Defendants do not dispute, Your Honor, that they were

12   not elected officials when purporting to hold this election.

13   And although defendants argue in their briefing that this was

14   to rectify the long-standing hand-me-down governance of passing

15   power to one another, Defendant Stokes has testified that had

16   Patrick Braxton agreed to just continue working with the

17   defendants who are sitting in town office, they would have

18   never sought to even blatantly or belatedly file qualifying

19   papers let alone administer a special election.

20         And they didn't ultimately conduct any so-called

21   election, not in a manner that anyone would know about it, let

22   alone know when and how to qualify for it.

23         So relief is all the more necessary when it is clear

24   that defendants will do whatever it takes to hold onto

25   municipal power, including retroactively manufacturing paper

1    trails, rather than just let the residents select their own

2    representatives.

3         Patrick Braxton is the only person in this case and

4    in this town, frankly, who rectified -- who tried to rectify

5    the status quo, despite having to confront secrecy and

6    selectivity and obscurities around the elections and

7    governance, and he followed the state process before the

8    state-required deadline.

9         But, nonetheless, defendants then carried out a

10   scheme to invalidate the results of the regularly scheduled

11   2020 municipal elections and then arbitrarily set a new

12   schedule to effectively appoint themselves into the vacant town

13   council seats.  No meaningful notice to anyone about the new

14   timeline to qualify or vote and no reason or rhyme to this

15   timeline.

16        The ultimate reason underlying their efforts to undue

17   the legitimacy of the first-ever black mayor of the Town of

18   Newbern is because they could not bear the possibility of

19   having a black majority town council for a black-majority town.

20   So they, again, deliberately deprived the residents, the black

21   residents, from knowing or participating in what they say was

22   the first-ever election, something that should have been the

23   town news.

24        THE COURT:  Let me stop you there.  So the defense

25   responds to that by saying they also deprived the white

1  residents.  What's your response to that?

2         MS. WONG:  I think that if anyone has been deprived,

3  this is a constitutional violation that has to be rectified,

4  and so we are here in front of the Court asking for, you know,

5  relief that would let all the residents of Newbern vote then.

6         But I do think the circumstantial evidence of the

7  history of Newbern, of the history of Hale County, and also the

8  history of who knew about elections and who didn't, when there

9  even were the, you know, demeanor of elections are largely the

10 black residents.

11        At the end of the day, it is an 80 percent

12 black-majority town, and there has never been a black mayor and

13 only one black town council member.  That is not representative

14 government, let alone the fact that the black residents just

15 simply don't know about how to even politically participate.

16        THE COURT:  Well, let me help you here.  What I'm

17 asking is, obviously, under an equal protection argument, you

18 do have to show racial motive.  But are we proceeding today

19 under a substantive due process where you don't have to show

20 racial motive and that you are here on behalf of all the

21 citizens of Newbern not being able to vote for the last however

22 many years?

23        MS. WONG:  Your Honor, we are proceeding on

24 substantive due process?

25        THE COURT:  Okay.

1          MS. WONG:  The right to vote has been found to be a

2    violation of substantive process under the First and Fourteenth

3    Amendment, and there is a long history of cases that state when

4    there is discrimination found and it's unduly burdening the

5    plaintiffs -- or the residents' right to vote that there has

6    been a violation of their constitutional rights.

7          THE COURT:  Right.

8          MS. WONG:  And there's no compelling state interest

9    whatsoever to --

10          THE COURT:  I guess what I'm saying is, you don't

11    have to show racial motive?

12          MS. WONG:  Not under --

13          THE COURT:  Just substantive.  I just want to make

14    sure that's clear.  I wasn't sure if the defendant was agreeing

15    with that, and you can address that.  Under the substantive due

16    process, it's my reading of the law, they don't have to show

17    racial motive, but I'll let you convince me otherwise if I'm

18    wrong about that.

19          Go ahead.

20          MS. WONG:  Sorry.  Okay.  So, all that said, the only

21    issue then before the Court is whether there officially needs

22    to be municipal elections in Newbern as required by state law.

23    The plaintiffs believe it is the only way to remedy the

24    decades-long deprivation of their rights and ensure all

25    residents, regardless of race, Your Honor, have an opportunity

1    to have access to their right to vote.

2            And this court has authority and should ensure that

3    the town hold municipal elections in connection with the

4    general election this November.  Our reason is, this provides

5    not only the certainty that an election will actually happen,

6    but also that the infrastructure of voting machines, officials,

7    ballots, and notice will be available, despite defendants time

8    and time again failing to secure such administration.

9            Having the election this year will also ensure that

10   there are actually authorized town councils undisputed between

11   anyone in this town who can hold the municipal elections during

12   a regular municipal election year next year.

13           And, on the merits, it is undisputed that plaintiffs'

14   rights have been violated under the substantive due process

15   provisions of the Constitution and also the Voting Rights Act,

16   Section 2, which also does not require a -- you know, a finding

17   of explicit discrimination.  Simply the results of racial

18   discrimination is enough for Voting Rights Act, Section 2.

19           And all of this is a violation of one's right that

20   underpins all of the others, and it presumes an irreparable

21   harm every single day that this isn't rectified.  So we really

22   believe that this is the best -- having a new election is in

23   the balance of all parties' equities, and also it will be

24   necessary to truly advance the public interest.

25           THE COURT:  We are going to hold off on the

1    irreparable harm issue right now.  Let's just --

2              MS. WONG:  Let's do substantive.

3              THE COURT:  I would like to hear about your merits.

4    Okay.

5              MS. WONG:  Yeah.  So I think, you know, in our

6    briefing, we have a series of cases that both provide for,

7    under the Constitution and Voting Rights Act, how at this rate,

8    the fact that there has been no election held at all, it is one

9    of the most, I would say, blatant examples of vote denial under

10   the Voting Rights Act.  It's what the Voting Rights Act was

11   enacted to fix.

12             There are so many -- this is such a blatant violation

13   of the Voting Rights Act that, you know, most of our cases

14   harken back to the 1965s because most municipalities and

15   jurisdictions in America, before Shelby and after Shelby, would

16   no longer do something that's this obvious.

17             There's a lot of case law around, you know, voting

18   practices that are a little bit widespread, a little bit

19   necessary for the proper administration, convenient for

20   government officials, but no one -- no case out there and no

21   court has allowed the -- just the, you know, not having any

22   elections at all.

23             THE COURT:  Right.  Why don't we move to the

24   evidentiary phase.

25             MS. WONG:  All right.

12

1              THE COURT:  Great.

2              MS. FAJANA:  Your Honor, the plaintiffs would like to

3     call their first witness.  That's Plaintiff Patrick Braxton.

4              THE COURT:  Okay.

5              MS. FAJANA:  Would you like me to ask questions at

6     the lecturn?

7              THE COURT:  That would be great.  Since you have such

8     a soft voice, we need to get you as close to a microphone as

9     possible.

10             Mr. Braxton, if you would come forward and this lady

11    right here will swear you in.

12                      **PATRICK B. BRAXTON,**

13        **having been first duly sworn, testified as follows:**

14             THE COURT:  Okay.  If you would have a seat right

15    here.

16             THE WITNESS:  Good morning.

17                    **<u>DIRECT EXAMINATION</u>**

18    BY MS. FAJANA:

19    Q.   Good morning, Mayor Braxton.

20    A.   Good morning.

21    Q.   I would just like to ask you a few questions.  So can you

22    please state your name and address for the record.

23    A.   Patrick B. Braxton.

24             THE COURT:  And there's no need for the address, just

25    your city.

```
1              THE WITNESS:  Newbern, Alabama.
2    BY MS. FAJANA:
3    Q.    And how long have you lived in Newbern?
4    A.    All my life.
5    Q.    Have you ever heard of --
6              THE COURT:  Well, let me back up.  If there becomes a
7    reason for the address, it needs to be redacted from the
8    record.
9              THE REPORTER:  Yes, ma'am.
10             MS. FAJANA:  Okay.  Understood.
11   BY MS. FAJANA:
12   Q.    Have you ever heard of municipal elections happening in
13   Newbern?
14   A.    No.
15   Q.    In the past, how did you learn that someone became the
16   mayor of Newbern?
17   A.    Just by hearing round town that this person is the mayor.
18   Q.    And how did you learn that someone had become a member of
19   the town council in Newbern?
20   A.    I guess the same way.  You know, hearing it by word.
21   Q.    Have you ever heard any information about how to run for
22   mayor for Newbern?
23   A.    No.
24   Q.    Have you ever seen any information posted about how to run
25   for town council in Newbern?
```

1   A.    No.

2   Q.    When did you decide to run for mayor of Newbern?

3   A.    In 2019, I started making plans to run for mayor.

4   Q.    And when you decided to run for mayor, what did you do

5   next?

6   A.    I seeked out to find me a vacant house in Newbern.

7   Q.    And then what did you do after finding a vacant house in

8   Newbern?

9   A.    I rented a house.  They said I had to be inside the city

10  limits.

11  Q.    Did you talk to anyone else when you decided to run for

12  mayor of Newbern?

13  A.    Yes.

14  Q.    And who did you speak to?

15  A.    I speak with Junior Walthall, the mayor -- the former

16  mayor from Uniontown, and I spoke to the mayor from Greensboro.

17  Q.    And who is the mayor of Greensboro?

18  A.    Johnnie Washington.

19  Q.    And what did you discuss with Junior Walthall and Johnnie

20  Washington?

21  A.    About running for mayor and what the procedure I need to

22  do for to run for mayor.

23  Q.    Did you discuss how to qualify for mayor?

24  A.    Yes.

25  Q.    Did you have a conversation with Defendant Woody Stokes

1   about how to run for mayor?

2   A.    No.   I didn't have a conversation with him how to run for

3   mayor.

4   Q.    Did you discuss with Defendant Woody Stokes the fact that

5   you were going to run for mayor?

6   A.    Yes.

7   Q.    And what all did you discuss with Defendant Stokes at that

8   time?

9   A.    That I was going to run for mayor and I need qualifying

10  papers to actually be running for mayor.

11  Q.    And what did Defendant Stokes say to you?

12  A.    He said we don't have no balloting machines, no voting

13  machine to even have an election in this area.

14  Q.    So what did you do next after that conversation?

15  A.    I kept pushing for paper to run for mayor.

16  Q.    And how did you get the papers to run for mayor?

17  A.    He left the store and went home and came back about

18  30 minutes later and told me he was going to leave the papers

19  at the People's Bank with the Clerk Lynn Williams.   I need to

20  go to the bank and get the paper from her because he'll also be

21  a candidate.

22  Q.    And did you go to the bank to get the forms from the

23  clerk?

24  A.    Yes.

25  Q.    And what did you do after you got the forms from the

1  clerk?

2  A.   I left the bank and proceeded to the courthouse and

3  proceeded to city hall with my forms.

4  Q.   And did you submit your forms at city hall?

5  A.   Yeah.  I submitted one form to Arthur Crawford.  And then

6  I went by the courthouse and talked to Daynelle Tinkle.  And I

7  was showing her the paperwork I had, and she told me some of

8  this was good and some of it was not good.  And she showed me

9  the right form to have for the -- to take back to correct, to

10  fill out for -- to be a candidate for mayor.  And she told me

11  you have to have a qualifying fee.  Some towns have $25.  Some

12  towns have $50.  And, when I got back to the bank, I gave the

13  clerk -- I brought her the money for $50 because I didn't know

14  what it was.  So I just bought one for $50 and gave it to her.

15  Q.   Did you do anything else after you submitted your forms

16  and submitted the qualifying fee?

17  A.   Yes.  I got in touch with a friend of mine who was running

18  for mayor in Uniontown, and she got with me that evening, me

19  and her husband.  And she helped me did my economic interest

20  form at her house, and then she notarized it.

21  Q.   And did you do anything else after you submitted your

22  economic interest form?

23  A.   No more.  Waited.  Because I put all my paperwork in

24  for -- to be mayor.

25  Q.   And what did you hear back your paperwork?

1   A.   It's later on in the year that I was the only one

2   qualified to be a mayor in Newbern.

3   Q.   And what year was this?

4   A.   That was in 2020.

5   Q.   Did you have another conversation with Defendant Stokes

6   about qualifying for mayor?

7   A.   No.

8   Q.   After you found out that you were the only person who

9   qualified for mayor of Newbern, what did you do next?

10  A.   Oh, I proceeded out to tell everyone in the community that

11  I had got the mayor seat.

12  Q.   Did you do anything else?

13  A.   No more than just called different ones, and we talked

14  about, you know, strategy.  And I talked to the mayor -- the

15  former mayor from Uniontown, Mr. Phillip White.

16  Q.   And what did you discuss with Mr. Phillip White?

17  A.   You know, going to meetings and getting with the Black

18  Mayors Association, you can learn from them.

19  Q.   And what kind of conversations did you have with the Black

20  Mayors Association at this time?

21  A.   Oh, they welcomed me in and telling me, you know, meetings

22  are very important, you know, knowing how to government your

23  towns.

24  Q.   Did you have any conversations with the Black Mayors

25  Association about how to form a town council?

18

1   A.   Yes, when I went to a meeting with them.

2   Q.   And what was discussed?

3   A.   That if no one have qualified for town city council, look

4   around your community and ask someone to serve with you.

5   Q.   And did you do that?

6   A.   Yes.

7   Q.   Who all did you ask to serve on the city council with you?

8   A.   I asked Janice Quarles, Barbara Patrick, Wanda Scott, and

9   James Ballard.  And then when I went back and asked Liz Avery

10  and then I asked Marla, Laird Cole's wife.

11  Q.   And what is Liz Avery's race?

12  A.   White.

13  Q.   What is Marla Cole's race?

14  A.   White female.

15  Q.   And why did you ask this specific group of people to serve

16  on city council with you?

17  A.   I was trying to have a mixed city council.

18  Q.   When you say "mixed," what do you mean?

19  A.   I would say, you know, not all one-sided.

20  Q.   Was there anything else you were looking for in terms of

21  who you asked to serve on city council with you?

22  A.   Yes.  I was looking for, you know, different opinions

23  coming from different sides for how to run the town and govern

24  the town.

25  Q.   Did you ask anybody who had previously served on a town

DIRECT - PATRICK B. BRAXTON

1  council?

2  A.    No.

3  Q.    Why not?

4  A.    My city council, we got sworn in in November 2022 -- I

5  mean, 2020, by a bench judge, and that's why I didn't ask no

6  one else.

7  Q.    But, before your city council was sworn in, did you decide

8  to ask people who had not previously been on the town council?

9  A.    Say that again.

10  Q.    Before your town council was sworn in, in November of

11  2020, why didn't you ask anyone who had served on town council

12  at that time that you were recruiting people?

13  A.    I wanted kind of like a fresh start in Newbern and new

14  ideas, give everybody a chance to be equal and give them a

15  chance to voice their opinions, new opinions in the town.

16  Q.    So you recruited a number of people to serve on your town

17  council.  And then what happened next?

18  A.    Then I ended up going to a meeting in Montgomery, a Black

19  Mayors Association meeting, and then we had a meeting -- that's

20  when I first met Lori over there from the League of

21  Municipalities.

22  Q.    And what time frame is this that you met with Lori at the

23  Black Mayors Association?

24  A.    It was after I was sworn in for mayor.

25  Q.    And was it also after your town council was sworn in?

DIRECT - PATRICK B. BRAXTON                                        20

1    A.   Yes.

2    Q.   And what was discussed between Lori, from the League of

3    Municipalities, and you at this meeting at the Black Mayors

4    Association?

5    A.   Lori was up doing a speech, and when she got through

6    speaking, she begged for me to come out of the room.  She

7    called me out the room.  And we walked in the hallway, and we

8    had a conversation.  And she told me that there was already a

9    city council there.  I said what?  And she said I'm telling

10   you, you might as well just get along with them for the next

11   4 years because I helped put that together.

12   Q.   And was this the first time that you heard that there was

13   another city council?

14   A.   Yes.

15   Q.   Did anyone who was serving -- strike that.

16        Had anyone who was serving on that second city

17   council reached out to you or spoken to you before you had this

18   conversation with Lori?

19   A.   No.

20   Q.   And how did you respond after you received this

21   information from Lori from the League of Municipalities?

22   A.   I didn't know what to do it because I was devastated.  And

23   then, that Monday, I went back to the courthouse, and that's

24   when I, sure enough, know there was another city council

25   because I asked if there was any public records came in besides

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

DIRECT - PATRICK B. BRAXTON                                    21

1   mine.

2   Q.    And what records did you see at the courthouse at that

3   time?

4   A.    Not the qualifying paper.  They were sworn in at

5   Mr. William Holmes' office.

6   Q.    And do you remember the date that it said that the second

7   city council was sworn in?

8   A.    The papers were filed on the 12th of November, 10 days

9   after my swearing in.

10  Q.    And you saw that the second city council had been sworn in

11  at William Holmes' office?

12  A.    Yes.

13  Q.    And who is William Holmes?

14  A.    An attorney for the town.

15  Q.    So this second city council had not been sworn in by a

16  judge; is that right?

17  A.    No.

18  Q.    What did the clerk at the courthouse say to you after

19  showing you the swearing-in papers from the second city

20  council?

21  A.    Looks like y'all got a problem down there.

22  Q.    And did the clerk say anything else?

23  A.    Told me it should have been a red flag when them other

24  papers came in.  She said it should have been a red flag.

25  Q.    And what did you do next after you got this information?

1   A.   I went -- proceeded to talk back to the Black Mayors

2   Association.

3   Q.   And what conversation did you have with the Black Mayors

4   Association at that time?

5   A.   About we had two separate city councils.

6   Q.   And who did you speak with at that time?

7   A.   Vickie Moore.

8   Q.   And what did Vickie Moore say?

9   A.   She asked me which city council got sworn in first.

10  Q.   And what did you say?

11  A.   The ones got sworn in November the 2nd.

12  Q.   And how did Vickie Moore respond?

13  A.   Vickie said, I'm thinking -- she said, I'm thinking that

14  you in your rights because you were sworn in first.  Don't hold

15  me to this.  I'm thinking you in the right.

16  Q.   Did you say anything else to one another at that time?

17  A.   No more, just talked to the vice president of the Black

18  Mayors Association.

19  Q.   Was anyone else there when you spoke to the vice president

20  of the Black Mayors Association?

21  A.   Yeah.  Vickie Moore.

22  Q.   And what all did you discuss?

23  A.   The same thing that I discussed with Vicky.

24  Q.   Did you talk to attorney William Holmes at this time?

25  A.   I think I talked to him later on after all this had came

1  down.

2  Q.   How much later on do you think you spoke to William

3  Holmes?

4  A.   I'm thinking.  I'm thinking it might have been in the time

5  frame of November and December when we spoke.

6  Q.   And what did you discuss with Attorney William Holmes at

7  that time?

8  A.   Me and the vice president from the Black Mayors

9  Association went over and talked with William Holmes about what

10  had happened.  And Mr. Holmes, he discussed, you know, what had

11  happened, and the vice president asked him, you know, what all

12  did he cover.  And he told said, Oh, the only thing I ever

13  mostly cover is little divorce cases, this and that, and he

14  said I mostly get paid for what I do.  He said, I'm not big in

15  politics.

16  Q.   Did Attorney William Holmes say anything else about the

17  second city council?

18  A.   No.  He just gave us some files, and we left.

19  Q.   Did the vice president of the Black Mayors Association say

20  anything else about the second city council to Attorney William

21  Holmes?

22  A.   I don't remember what all he said to him, but we was

23  getting up and ready to leave that office.

24  Q.   Did Attorney William Holmes ever call and invite you to a

25  town council meeting with the second city council?

1    A.    I don't recall if he called me.

2    Q.    How many town council meetings with the second city

3    council were you invited to?

4    A.    When you say the second city council --

5    Q.    The defendants' city council.

6    A.    I'm thinking I had two to three voicemails on my phone.

7    Q.    And do you remember who left the voicemails?

8    A.    Oh, Ms. Tucker.  I'm thinking it's Ms. Tucker because she

9    was the clerk.

10   Q.    And what did she say in the voicemails to you?

11   A.    We having a meeting.

12   Q.    And who is Ms. Tucker?

13   A.    Mr. Stokes' sister.

14   Q.    Did she say when the meeting would be held?

15   A.    No.  She didn't say when the meeting was held.  She said

16   we having a meeting.

17   Q.    Did she say where the meeting would be?

18   A.    No.  She did not go into no detail.

19   Q.    And did she say who would be at the meeting?

20   A.    No.

21   Q.    And was it the same thing in the second voice mail

22   invitation?

23   A.    Yes, just we having a meeting.

24   Q.    Did you receive any text messages from Ms. Tucker?

25   A.    I don't remember receiving no text messages.

DIRECT - PATRICK B. BRAXTON

1  Q.   Did you receive any other calls from Ms. Tucker beyond

2  those two voicemails?

3  A.   It was two or three.  I don't remember no more.

4  Q.   Did you receive any calls from Defendant Stokes inviting

5  you to a town council meeting?

6  A.   No.

7  Q.   Are you aware of the different town council meetings that

8  were happening with the defendants' town council at this time?

9  A.   What you mean by that?

10 Q.   Did you ever hear about the defendants' town council

11 meeting with other people in town at the same time?

12 A.   When I was -- when my city council was sworn in?

13 Q.   Yes.  When your city council was sworn in.

14 A.   Yes, I heard about meetings.

15 Q.   Did you ever talk to Lisa Swanson about a meeting that the

16 defendants' city council had?

17 A.   Yes.

18 Q.   And what all did you talk about?

19 A.   We was talking about the meeting, what the city council --

20 what the former city council had.  And I told her, I said,

21 Ms. Tucker called me and left me a voice mail, said we having a

22 meeting.  And she said, Listen here, my friend.  I'm glad you

23 didn't go up there to that.  I said, Why that?  She said that

24 wasn't nothing but a bunch of white folks.  It's just like a

25 meeting.  They won't want you there.  Please don't go to

1   nothing like that.

2   Q.   And what did you say to that?

3   A.   I told her okay, and she said, You hear me, friend?  And I

4   said, Yes.

5           THE COURT:  Who is Lisa Swanson?

6           THE WITNESS:  Resident of Newbern.

7           THE COURT:  Resident of Newbern.

8           THE WITNESS:  Outside the city limits.

9           THE COURT:  Okay.

10  BY MS. FAJANA:

11  Q.   And what is Lisa Swanson's race?

12  A.   White female.

13  Q.   Did you talk to anybody else about this meeting that Lisa

14  Swanson told you about?

15  A.   Liz Avery.

16  Q.   And what did you and Liz Avery discuss at that time?

17  A.   Just what Lisa had told me.

18  Q.   And do you remember when this meeting was?

19  A.   No, I can't remember exact date.

20  Q.   What time frame do you think it was?

21  A.   I know it had to be some parts of December.

22  Q.   So why didn't you attend any meetings with the

23  defendants's city council?

24  A.   Because the city council are already sworn in, and, once

25  we were sworn in by a judge, that was the right ones to be

1   holding the meetings with.

2   Q.   Have you ever seen any of the defendants display a

3   confederate flag?

4   A.   No more than Gary Broussard on the font of his truck.

5   Q.   Have you ever seen any of the defendants wear a

6   confederate flag in any way?

7   A.   No more than Mr. Stokes on his bandanna.

8              MS. FAJANA:  All right.  Thank you, Mayor Braxton.

9   No further questions from me.

10             MR. HOWARD:  Do I cross-examine now?

11             THE COURT:  Yes.

12             Do you have questions for her too?

13             MS. WONG:  No.  Sorry, Judge.

14             THE COURT:  I have questions.  Nobody is going to

15   talk to him about the notice of the special election or

16   anything?

17             MS. FAJANA:  Sure.  Would you like for me to ask the

18   witness about it?

19             THE COURT:  Well, that seems to be the heart of your

20   case.

21             MS. WONG:  We also have other witnesses who will

22   speak to it.

23             MS. FAJANA:  Sure.  I'm happy to.

24   BY MS. FAJANA:

25   Q.   So, Mayor Braxton, did you ever see a notice in town

DIRECT - PATRICK B. BRAXTON                                   28

1    saying that there were going to be town council elections in

2    2020?

3    A.   No, I ain't seen no notice.

4    Q.   Did you ever see a notice in the Newbern Mercantile about

5    this time about elections?

6    A.   No.  I go to the Newbern Mercantile every day.

7            THE COURT:  You were going to what every day?

8            THE WITNESS:  To the store.

9            MS. FAJANA:  At Newbern Mercantile.

10   BY MS. FAJANA:

11   Q.   What is Newbern Mercantile?

12   A.   That's a little general store in the neighborhood.

13           THE COURT:  Tell you what.  Let me ask you a few

14   questions.  So I've never been to Newbern.  I myself grew up in

15   a little tiny town too.  So I'm imagining it to be something

16   like this:  You might have a post office, you might have a

17   little building that they call city hall, and you might have

18   one or two gas stations.  Am I describing --

19           THE WITNESS:  One.

20           THE COURT:  You got one.  Do you have a red light?

21           THE WITNESS:  A caution light.

22           THE COURT:  You got a caution light.  So that's --

23           THE WITNESS:  Yes.

24           THE COURT:  And you've got a Dollar General, I'm

25   sure?

```
1              THE WITNESS:  No.

2              THE COURT:  Not even a Dollar General?

3              THE WITNESS:  No.

4              THE COURT:  So that's it?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  One mercantile store, city hall.

7   Is there a little post office too?

8              THE WITNESS:  Post office.  A little fire station.

9              THE COURT:  A little fire station?  Okay.

10             THE WITNESS:  A fire station.  And we finally got a

11  library built.

12             THE COURT:  You got a library built.

13             Okay.  So you are telling me didn't see a notice

14  posted at the mercantile; you go there every day?

15             THE WITNESS:  I go there every day.

16             THE COURT:  And did you see one at the post office?

17             THE WITNESS:  I did not.

18             THE COURT:  And how often did you go there?

19             THE WITNESS:  I go by the post office walking down

20  the street, and I am on the street every day talking to people.

21             THE COURT:  And city hall, is that like part of the

22  post office?

23             THE WITNESS:  It's one block.  Everything on the same

24  block.

25             THE COURT:  Okay.  And you never saw a notice?
```

CROSS - PATRICK B. BRAXTON                                    30

1           THE WITNESS:  No.

2           THE COURT:  Is there a place to post notices at the

3   city hall?

4           THE WITNESS:  Yeah, in the windows.

5           THE COURT:  In the windows?

6           THE WITNESS:  Yeah, in the windows.

7           THE COURT:  You see other notices there?

8           THE WITNESS:  No more when we have an election, they

9   put the ballot --

10          THE COURT:  Up on the window to show you?  And you

11  never saw anything like that?

12          THE WITNESS:  No, ma'am.

13          THE COURT:  Okay.  And there was some other -- oh,

14  fire station.  Part of the city hall?

15          THE WITNESS:  No.  It's two separate buildings, but

16  they are right there together.

17          THE COURT:  Okay.  Thanks.

18          Okay.  Anything else?

19          MS. FAJANA:  No, nothing further from me.  Thank you.

20                       **CROSS-EXAMINATION**

21  BY MR. HOWARD:

22  Q.  Hey, Mr. Braxton.  How you doing today?

23  A.  I'm doing all right.

24  Q.  Good to see you again.

25  A.  All right.

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

1   Q.   Mr. Braxton, isn't it true that you don't remember anybody

2   ever wanting to be the mayor; is that correct?

3   A.   Nobody but me.

4   Q.   You don't remember anybody ever wanting to be the mayor

5   before you came along, do you?

6   A.   No, no.

7   Q.   You don't remember anybody ever wanting to be a town

8   council member, do you?

9   A.   No.

10  Q.   You don't remember anybody ever asking for an election, do

11  you?

12  A.   No.

13  Q.   You don't remember anybody ever complaining there was no

14  election before you qualified; correct?

15  A.   No.

16  Q.   On your statement of candidacy, you listed your address;

17  is that correct?

18  A.   Yes.

19  Q.   I don't want to go into the number and the street, but you

20  earlier testified that you rented a house just for this

21  election; correct?

22  A.   Yes, I did.

23  Q.   And you told me that you don't live in that house the

24  majority of the time?

25  A.   Yes.  I told you three nights out the week.

1  Q.   That's right.  Not the majority of the time?

2  A.   Nope.

3  Q.   Everybody knew that and knew that you probably didn't

4  qualify, but, yet, anybody even challenged your mayorship, did

5  they?

6  A.   Saying they didn't challenge it?

7  Q.   Well, people probably knew that you didn't live in Newbern

8  the full time, but they knew that and never even challenged

9  your qualifications for mayor, did they?

10 A.   I don't know if they challenged it.

11 Q.   Did anybody ever file any documents at the courthouse

12 saying you are not qualified?

13 A.   I don't know.  I didn't never seen no documents.

14 Q.   Nobody stopped you from becoming the mayor at this point,

15 did they?

16 A.   No, nobody stopped me from becoming the mayor.

17 Q.   And you went -- when you decided to become mayor, you went

18 and talked to Woody, and he told where you to get the

19 paperwork, didn't he?

20 A.   He had to give me the paperwork because he's the mayor.

21 Q.   You got the paperwork, and Woody told you how to get it;

22 right?

23 A.   He had to give it to me because he's the mayor.

24 Q.   Okay.  You got it; correct?

25 A.   Yes, I got it.

1    Q.   You went to city hall, and those ladies at city hall gave

2    you the correct paperwork, didn't they?

3    A.   Yes.

4                MR. HOWARD:  Your Honor, in this hearing, our

5    affidavit is acceptable?  Do we need to call a custodian of

6    records?

7                THE COURT:  Have you talked with your colleagues

8    about that?

9                MR. HOWARD:  Yes.  I told them I didn't know what you

10   wanted us to do.

11               THE COURT:  Well, usually --

12               MR. HOWARD:  I --

13               THE COURT:  Usually, if they agree about the

14   custodian is sufficient, then that's sufficient.

15               MR. HOWARD:  That's fine.  We know they have an

16   affidavit and an expert.  It's up to you.

17               MS. WONG:  What was your question?

18               THE COURT:  Yeah.

19               MR. HOWARD:  Do we need to call a custodian of

20   records or affidavits?

21               THE COURT:  For what?

22               MR. HOWARD:  To authenticate documents.

23               MS. FAJANA:  Is this for his --

24               THE COURT:  What documents?

25               MR. HOWARD:  It's documents I'm going to use in his

CROSS - PATRICK B. BRAXTON

1    cross-examination.

2            THE COURT:  Well, can you show it to him so maybe we

3    can cut to the chase.  Is there an objection?

4            MR. HOWARD:  It's just documents that --

5            THE COURT:  Okay.  What numbers are they?

6            MR. HOWARD:  It is -- the first one is Exhibit 1,

7    page 8.

8            THE COURT:  All right.  Exhibit 1 appears to be all

9    the town records.  Is that what it purports to be?

10           MR. HOWARD:  Yes.

11           THE COURT:  Is there any reason why you think this is

12   not authentic?

13           MS. FAJANA:  I'm sorry, Your Honor.  We are just now

14   getting --

15           MR. HOWARD:  I need to get yours too.

16           THE COURT:  Wait.  You never gave them your exhibits?

17           MR. HOWARD:  We haven't swapped them yet.  Well, they

18   had these in our documents from last June.

19           MS. FAJANA:  So I'm sorry.  This is Exhibit 8?

20           MR. HOWARD:  It's page -- Exhibit 1, page 8.

21           MS. FAJANA:  I see.

22           THE COURT:  I think maybe I can -- this is not about

23   procedural due process.  It's not about that at all.  This is

24   about -- the issue to be determined today is whether there's a

25   likelihood of success on the issue of substantive due process,

CROSS - PATRICK B. BRAXTON                                          35

1   which goes to the special election.  So if we can cut the chase

2   and let's talk about that, that would be helpful to the Court.

3            MR. HOWARD:  Okay.  Substantive due process.

4            THE COURT:  Substantive due process as it relates to

5   the special election.  And the whole hand-me-down government --

6   I forget how you phrased it -- that's the bigger case.

7            MR. HOWARD:  Been there right now, Your Honor.

8            THE COURT:  Today, we are about the substantive due

9   process and whether they have a substantial likelihood of

10  success on that, and any remedies that's a result of that are

11  also only as to substantive due process and as to the special

12  election.

13  BY MR. HOWARD:

14  Q.   We are going to -- earlier, you testified that you saw a

15  document where the defendants' town council members were sworn

16  in and that was November 12th, 2020; correct?

17  A.   Yes.

18  Q.   You filed your first complaint in the Circuit Court of

19  Dallas County on November 21st, 2022; is that correct?  I can

20  show you the document if you need it.

21  A.   Yes.  I filed my first complaint in Dallas County.

22  Q.   On November 21st of 2022?

23  A.   I don't remember the exact date, but I filed it in Dallas

24  County.

25  Q.   Okay.  Would it shock you to know you filed your complaint

CROSS - PATRICK B. BRAXTON                                    36

1   about this special election 2 years and 8 days after the

2   defendants were sworn in?

3   A.    No.  It wouldn't shock me because I went through a period

4   of lawyers trying to get someone to take the case.

5           MR. HOWARD:  Your Honor, regarding whether they can

6   prevail on their substantive issues, we do ask the Court to

7   take judicial notice that the statute of limitations for a 1983

8   claim is 2 years.  They exceeded that by 8 days when they filed

9   their first complaint in Dallas County, and that would

10  encompass any 1983 claim and 1985 claim.  And that's probably

11  more since their complaint.

12  BY MR. HOWARD:

13  Q.    You didn't can go to the post office and look for a notice

14  for an election, did you?

15  A.    I didn't never seen anything.  I didn't know to go look

16  there.

17  Q.    Well, you didn't go and look for one at the post office?

18  A.    I said I didn't know to go look for there for a special

19  election.

20  Q.    You didn't look for one at the store, did you?

21  A.    I didn't see one posted.

22  Q.    You didn't see one at the town hall?

23  A.    I didn't seen one over there in the town hall.

24  Q.    You were asked about phone calls asking you to become --

25  or come to the city council; correct?

CROSS - PATRICK B. BRAXTON

1  A.   Yes.

2  Q.   You said you had two voicemails?

3  A.   Yes.

4  Q.   And you destroyed those voicemails; correct?

5  A.   I don't have that phone no more.

6  Q.   Okay.  You also said that you got text messages; right?

7  A.   I think I got some text messages.

8  Q.   You told me at your deposition that you couldn't dispute

9  whether you had text messages?

10  A.   I said I think.

11  Q.   But you told me you couldn't dispute it.

12  A.   I said I think.

13  Q.   Okay.  You think you couldn't dispute it?

14  A.   Which one you want?

15        THE COURT:  Wait.  You know there's no jury here.

16  BY MR. HOWARD:

17  Q.   You told me in your deposition you couldn't dispute

18  whether you got text messages or not.  Did I say that

19  correctly?

20  A.   Yeah, you said that correctly.

21  Q.   Dena Tucker sent you eight different text messages asking

22  you to come to town hall on the date.  You said you didn't get

23  those text messages?

24  A.   Yes, I said it.

25  Q.   Okay.  Do you think -- well, Lori Lein, you talked to the

1   League of Municipalities, Lori Lein at the conference.  She

2   told you that the defendants' town council was legitimate,

3   didn't she?

4   A.   She told me she helped put something together.

5   Q.   Was that something she helped with the special election?

6   A.   Oh, she didn't go in no detail.

7   Q.   But she put you on notice that the defendants' town

8   council was legitimate, didn't she?

9   A.   She didn't go in no detail.

10   Q.   Did she tell you that was your town council and you had to

11   work with them?

12   A.   She said you might as well get along with them for the

13   next 4 years.

14   Q.   Okay.  Do you think that if you had engaged the town

15   council, you would have been the mayor in charge of the

16   election?

17   A.   If I had engaged them?

18   Q.   Well, you've admitted that they sent two voicemails asking

19   you to come to the meeting.  Did I understand you correctly?

20   A.   Yeah, you understand me correctly.

21   Q.   And you were undoubtedly the mayor in Newbern, weren't

22   you?

23   A.   Yeah.

24   Q.   If you had engaged with their town council, do you think

25   you would have been in charge of placing the notices for the

CROSS - PATRICK B. BRAXTON                                          39

1   special election?

2   A.   Okay.  When did she tell me?  That was after.

3   Q.   Well, if you had engaged early on.  You were the mayor in

4   Newbern; correct?

5            THE COURT:  Let me -- I'm confused.  He became --

6   according to him, he became the mayor on November 2nd.  The

7   special election was held October 12th.

8            THE WITNESS:  Right.

9            MR. HOWARD:  If he would have engaged with them early

10  on.

11           THE COURT:  As mayor-elect?

12           MR. HOWARD:  Correct.

13           When you talked to Lori.

14           THE COURT:  How can mayor-elect decide that?

15           MR. HOWARD:  If he had just been involved, they could

16  have had it after.  I could move on.  I know what you are

17  talking about.

18  BY MR. HOWARD:

19  Q.   Did you ever go to any town council meetings with that --

20  with the defendants?

21  A.   No, I did not.

22           MR. HOWARD:  Your Honor, do you need me to only talk

23  about whether they can succeed on their claims or move on --

24           THE COURT:  Not claims.  Claim.  We are here on one

25  claim today, and that's the substantive due process.  I think

CROSS - PATRICK B. BRAXTON

1   they also -- I should say two claims -- and also the Voting

2   Rights Act, Section 2.  Just those two.  The procedural due

3   process is not on the table.

4          MR. HOWARD:  Okay.  I can stop there if -- when we

5   move into the imminent harm --

6          THE COURT:  Right.

7          MR. HOWARD:  -- I can cross-examine him later on

8   that; right?

9          THE COURT:  No, no, no, no.  This is your time to do

10  all of it.

11         MR. HOWARD:  Okay.

12         THE COURT:  We are not going to go back through the

13  witnesses again.

14         MR. HOWARD:  Okay.  I wasn't sure.

15         THE COURT:  Sorry.  That's my fault for saying we are

16  going to start with merits.  But, no, we are not going to do

17  witnesses twice.

18  BY MR. HOWARD:

19  Q.   You filed your complaint back in 2022, correct, in Dallas

20  County?

21  A.   Yes.

22  Q.   And then you waited over a year to file your motion for

23  preliminary injunction.  Are you aware of that?

24  A.   I waited a year?

25  Q.   Yes.

CROSS - PATRICK B. BRAXTON                                                      41

1    A.    That's when I got attorneys.

2    Q.    Okay.

3    A.    I was going through different attorneys trying to get them

4    to take the case.

5    Q.    So your attorney filed an amended complaint on

6    March 17th, 2023, and the motion for preliminary injunction

7    was filed March 22nd, 2024.  You waited over a year to file

8    your motion for preliminary injunction; is that correct?

9    A.    Yes.  I told you I was going through different attorneys,

10   trying to get attorneys to take the case.

11   Q.    In your deposition, you told me nothing has really changed

12   since you filed the complaint.

13   A.    In the town.

14   Q.    And you also told me that nothing bad is going to happen

15   in the next 12 months if we don't have an election.  Do you

16   remember that?

17   A.    I didn't never tell you nothing bad was going to happen.

18          MR. HOWARD:  Your Honor, would you like me to put it

19   on the overhead?

20          THE COURT:  Sure.

21   BY MR. HOWARD:

22   Q.    There we go.  Can you see that, Mr. Braxton?

23   A.    Yeah.

24   Q.    I got the highlighted part there too.  I asked you, If we

25   don't have an election this year, what bad is going to happen

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

1   over the next 12 months?

2            Your response is, Oh, I can't say nothing bad.

3            Did I read that correctly?

4   A.   Yeah.  And I just told you again.  I can't say nothing

5   bad -- something bad is going to happen.

6   Q.   Okay.  When you selected your council, nobody got to vote

7   on that, did they?

8   A.   No.

9   Q.   You didn't put up any notice that you were having some

10  kind of council election, did you?

11  A.   No.

12  Q.   Did you violate the folks in Newbern's rights by not

13  allowing them to vote for town council?

14  A.   I can't tell you I violated their rights.

15  Q.   Well, they didn't get to vote on your council, did they?

16  A.   I proceeded in the due process of the former mayor did,

17  and I went through the community and asked people to serve.

18  Q.   But no vote; right?

19  A.   No vote.

20  Q.   No notice; correct?

21  A.   No.

22           MR. HOWARD:  That's all I have of this witness, Your

23  Honor.

24           THE COURT:  All right.  Redirect.

25                    **REDIRECT EXAMINATION**

REDIRECT - PATRICK B. BRAXTON                                      43

1  BY MS. FAJANA:

2  Q.   Thank you, Mayor Braxton.  I just have a few more

3  questions for you.  So going back to the time that you were

4  trying to qualify for mayor, did Defendant Stokes actually hand

5  you any of the qualifying paperwork?

6  A.   No.

7  Q.   So how did you get that qualifying paperwork?

8  A.   Went to the bank and got them from Lynn Williams.

9  Q.   And at the time -- so moving forward in time.  After you

10 qualified, did any of the defendants reach out to you regarding

11 the fact that you were the mayor-elect?

12 A.   No.

13 Q.   Did you have any other conversations with any of the

14 defendants at that time about the procedures for transferring

15 power from one mayor to another?

16 A.   No.

17 Q.   Did any of the defendants talk to you about wanting to

18 serve with you as your town council members with you as the

19 mayor?

20 A.   No.

21 Q.   Going to the conversation that you had with Ms. Lori from

22 the League of Municipalities, what time frame was that?

23 A.   That was in November.  We had went to a meeting over there

24 at the Black Mayors Association, and there was -- before

25 November the 12th, when we had the meeting because that's

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

1  when I -- after I came back from the meeting, that's when I

2  went to the courthouse and found the records that they had

3  found.

4  Q.   So this was after any special election that the defendants

5  may have organized would have happened?

6  A.   Say that again now.

7  Q.   Let me ask another question.  So, at this time, the

8  defendants had already had their supposed special election --

9  A.   Yes.

10  Q.   -- when you found out that there was a second city

11  council; correct?

12  A.   Yes.

13  Q.   And then, regarding you recruiting people to serve on your

14  town council, when you learned that you qualified for mayor,

15  had anybody qualified for any town council positions at that

16  time?

17  A.   No.

18  Q.   So --

19  A.   Not that I know of.

20  Q.   So all of the town council positions were vacant?

21  A.   Yes.

22  Q.   So at that time you recruited people to fill those vacant

23  town council positions; is that right?

24  A.   Yes.

25  Q.   Because none of the defendants had qualified for those

REDIRECT - PATRICK B. BRAXTON                                    45

1    town council positions at that time?

2    A.    Yes.

3    Q.    So you went to the court to look at the papers saying that

4    the defendants had been sworn in as a second city council some

5    time in the second or third week of November, would you say?

6    A.    Yes.  It was before the 12th when I went there.  No,

7    after the 12th.  It was after the 12th when I got the

8    papers.  It was on a Monday.

9    Q.    After November 12th of 2020?

10   A.    Yeah.

11   Q.    But you don't remember the date?

12   A.    No.

13   Q.    But would you say that that's really the first time that

14   you understood that there really was a second city council?

15   A.    Yes.  That's when I had got clarity there was two city

16   councils in Newbern.

17   Q.    And, in the first complaint that you filed in Dallas

18   County, you were making allegations not just based off of what

19   happened in November of 2020; is that right?

20   A.    Yes.

21   Q.    You were also making allegations about things that --

22   separate incidents that happened after November 2020?

23   A.    Yes.

24            MS. FAJANA:  Thank you.  No further questions.

25            THE COURT:  Thank you, sir.  You may step down.

```
 1              Next witness.

 2              MS. WONG:  Ms. Janice Quarles.

 3              THE COURT:  Ms. Janice Quarles, if you'll come up and

 4    raise your right hand.

 5                          JANICE QUARLES,

 6          having been first duly sworn, testified as follows:

 7              THE COURT:  All right.  Please have a seat,

 8    Ms. Quarles.

 9                          DIRECT EXAMINATION

10    BY MS. WONG:

11    Q.   Hello, Ms. Quarles.  Could you tell the Court what your

12    age is?

13    A.   My age is 73 years.

14    Q.   And, Ms. Quarles, how long have you lived in Newbern,

15    Alabama?

16    A.   I have lived in Newbern most of my life.

17    Q.   And is it a small or a big town?

18    A.   It's a small town.

19    Q.   Do people speak to each other or share news through

20    conversation?

21    A.   We speak.  Surely.

22    Q.   And, Ms. Quarles, what was it like growing up in Newbern?

23    A.   Well, when I grew up in Newbern, it wasn't very much to

24    do, just like it is now.  But, like I say, I'm 73 years old.

25    So most of our time was spent outside doing things that
```

1   children and teenagers like to do.

2   Q.   And, Ms. Quarles, what is the Government in Newbern, to

3   your knowledge?

4   A.   Well, to my knowledge, I don't really know of any

5   government in Newbern.  We --

6   Q.   Oh.  Go ahead.  Sorry.  Go ahead, Ms. Quarles.  You can

7   finish.

8   A.   We don't have any municipal elections in Newbern.  So I

9   don't really know of any government in Newbern.

10  Q.   So, to clarify, have you ever known about any municipal

11  elections or participated in any in Newbern?

12  A.   No.  I have never known, and I've never participated.

13  Q.   To your knowledge, how did mayors and city council members

14  get their positions?

15  A.   Well, I don't know how mayors get their positions.  I

16  really don't.  I have known -- out of the years that I have

17  lived in Newbern, I have known only three mayors.  And how they

18  got their positions, I do not know.

19  Q.   Ms. Quarles, who are the three mayors that folks knew of

20  as mayor in Newbern?

21  A.   Well, the first mayor that I knew of was Mr. Robert

22  Walthall.  He was mayor of there for decades.  And after

23  Walthall was Paul Owens.  And after Paul Owens was Mr. Woody

24  Stokes.

25  Q.   Did you have a relationship with any of the former mayors?

1    A.   Well, I wouldn't really say a relationship.  Mr. Walthall,

2    my mother worked in their home, did domestic work for them, for

3    over 50 years.  And so we would -- that's how I knew he was

4    mayor.

5              And Mr. Owens, I would see them, he and his wife, you

6    know, like going to the store and post office and -- before he

7    even became mayor.

8              And Mr. Stokes, it's pretty much the same.

9    Q.   And, to your knowledge, how did Patrick Braxton become the

10   mayor of Newbern?

11   A.   Well, Patrick said that he filed special documents and he

12   submitted them to the right places and he was duly elected

13   mayor of Newbern.

14   Q.   And, Ms. Quarles, how did you become involved with the

15   Newbern town council?

16   A.   Well, Patrick Braxton asked me if I would serve as a city

17   council person on the council board of Newbern.

18   Q.   And what did he say in that conversation?

19   A.   Well, he asked if I would like to serve.  At that time he

20   was only running for mayor -- not running for mayor, making

21   preparations and getting his paperworks in when he first asked

22   me if I would like to serve as city council.

23   Q.   And why did you agree or decide to serve on this town

24   council?

25   A.   Oh, I was just excited that Patrick really was the first

1  black man that I know of to run for mayor, to be mayor in

2  Newbern, and I was just excited to be a member working with

3  him.  And I said yes.

4  Q.   Ms. Quarles, did you attend town council meetings in the

5  past?

6  A.   Well, years ago, I have been to town council meetings.  I

7  used to attend quite often when Mr. Owens was mayor, and I have

8  attended some meetings since Mr. Stokes has been mayor.

9  Q.   And what was your purpose in attending these town council

10 meetings?

11 A.   Well, each time I think that really I attended the

12 meetings, I always came with a problem.  I always wanted to --

13 I got on the agenda for things that I found problems within

14 Newbern.

15 Q.   And were these problems responded to?

16 A.   Well, I had some problems with some -- work on the street

17 that I live on.  There was a large hole there for a long time.

18 And I did ask Mr. Stokes several times about getting some work

19 done to fix the road, and he never responded.

20 Q.   Ms. Quarles, did you ever ask to be on the town council?

21 A.   No, I never asked.

22 Q.   And why not?

23 A.   I never -- I was never really interested in being a town

24 council person.

25 Q.   And your interests -- are you interested --

50

1   A.    And I didn't know you just had to go and ask if you could

2   be a city council member.

3   Q.    Did anyone ever ask you to express -- to serve on the town

4   council?

5   A.    No one, other than Patrick.

6   Q.    Ms. Quarles, where are public events or announcements

7   usually posted in the town?

8   A.    Usually in our post office or in the Newbern Mercantile.

9   It's no longer there, but that's where most notices would be.

10  Q.    Anywhere else?

11  A.    And the building now that is a library, we would have

12  notices there.  But there's never been any other -- any notice

13  of elections in Newbern.

14  Q.    And are there local newspapers that you read, Ms. Quarles?

15  A.    Yes.  The *Greensboro Watchman,* I read sometimes.

16  Q.    And does the *Greensboro Watchman* announce elections for

17  the president, sheriff, county?

18  A.    Yes.

19  Q.    In 2020, Ms. Quarles, how often did you go to the post

20  office?

21  A.    In 2020, I would go to the post office maybe 3 days a

22  week.

23  Q.    And what about the town library?

24  A.    The town library, I would go once a week.  We had a little

25  committee.  We would meet there once a week.

1    Q.    And what about the mercantile store?

2    A.    Yes.  The mercantile, I would visit maybe once or twice a

3    week.

4    Q.    And, during this period, did you see any notice for any

5    municipal elections?

6    A.    No.

7    Q.    Did members of your family or neighbors see any notice?

8    A.    No.

9    Q.    Did you read about any mayor or town council elections in

10   the *Greensboro Watchman?*

11   A.    No.

12   Q.    Would you have run for town council had you known there

13   would be elections?

14   A.    Of course, if I had known of any elections.

15   Q.    And would you have voted for town council had you known

16   there would be elections?

17   A.    Sure.  Yes.

18   Q.    Ms. Quarles, have you been back or have you gone to town

19   council since -- or town hall since being sworn in?

20   A.    No.

21   Q.    Have you seen anyone else at the town hall?

22   A.    Only once.

23   Q.    Can you describe that day?

24   A.    Well, in November of 2020, shortly after Braxton and other

25   city councils, we had been sworn in as city councilmen.  I was

1  standing on the street one night, one evening late, and I saw a

2  large group of people in the town house.

3  Q.   And can you describe this group of people at the town

4  hall?

5  A.   I really couldn't tell who they were, just saw cars coming

6  up and people going in.

7  Q.   And were you given notice or saw any notice of this

8  meeting in town hall?

9  A.   No, I wasn't.

10 Q.   And what would you say the race of the folks at the town

11 hall were?

12 A.   Well, I just assumed they was white.

13 Q.   Did you assume or did you see, Ms. Quarles?

14 A.   I didn't really see any -- everybody that was going in was

15 going in on the other side, the back side, and you can't really

16 see through the glasses to tell who -- if they was black or

17 white.

18 Q.   But other people that you saw out in the parking lot,

19 could you describe what race they were?

20 A.   I didn't really see anybody in the parking lot.

21 Q.   Okay.  And did you cross the street to join the meeting,

22 Ms. Quarles?

23 A.   No, I did not.

24 Q.   Why not?

25 A.   I wasn't invited over there.  I didn't know what was going

53

1    on over there, and I didn't think it would be a place for me to

2    go.

3    Q.   Why didn't you feel like it was your place to go?

4    A.   Well, I didn't see -- you know, like I say, I didn't --

5    there was no notice of any meetings going on in Newbern that I

6    had seen, heard, and I didn't care to go over there.

7    Q.   And do you know if Mayor Braxton was at this meeting at

8    the town hall?

9    A.   I don't know if he was.

10   Q.   Ms. Quarles, can you describe the impact on you to not

11   have elections for mayor or town council?

12   A.   Well, it is an impact on me.  Like I say, I have lived in

13   Newbern all my life, and at this time I just feel that it is

14   time for a change.  We have seen mayors in Newbern, never knew

15   how they got to be mayor.  We've seen city councilmen and never

16   known if there was any elections.  And, as far as I know up to

17   date, there's never been any elections.

18          And, after Mayor Braxton had been sworn in, I and

19   other members -- it's really -- to me, it's just totally

20   humiliating to see the things that he went through, we went

21   through, going through these processes and thinking that, oh,

22   yeah, we have a mayor, we have a black mayor, we maybe can get

23   together now with our white residents and the black and the

24   whites and work together.

25          But, now, all of this just seems so unrighteous to

1  me, and it is -- I really can't describe how I feel because we

2  were excited.  We did little celebrations in Newbern

3  celebrating Patrick as mayor.  And then, all of a sudden, we

4  hear that he's not mayor; that there is new election.  Well, I

5  had never ever heard of a first election in Newbern.  So, yes,

6  it bothers me greatly.

7  Q.   And, Ms. Quarles, can you describe the impact on you to

8  not have participated in a new election if there was one in

9  2020?

10  A.   Yes.  It really does have an impact on me because if there

11  have been a new election, then I think the town should have

12  known because, as I say, I have never known of an election for

13  mayor in Newbern.  So I feel that the town should have been

14  noticed, notified that there's an election so that the citizens

15  of Newbern could take part.

16  Q.   And, Ms. Quarles, what does being able to vote mean to

17  you?

18  A.   Well, you mean in my town for mayor?

19  Q.   Or even in general being able to vote.

20  A.   Being able to vote.  Do you mean for Newbern mayor?

21  Q.   Right, your right to vote.  Your right to access the vote.

22  A.   Okay.  Yes.  Well, to me, it means a violation if we don't

23  have the right of voting in Newbern.  We all should have that

24  same right, and I would just love to see it acted upon.

25  Q.   And, Ms. Quarles, what would be the impact if there were

DIRECT - JANICE QUARLES

1  no elections this year in 2024 for mayor and town council?

2  A.   Well, I really do feel that there needs to be an election

3  in Newbern.  I feel that this is the right thing to do.

4  Q.   Would you run in the first-ever 2024 town council

5  election?

6  A.   Yes, I will.

7  Q.   And, lastly, Ms. Quarles, what are you hoping to get out

8  of this case?

9  A.   Well, out of this case, I am just looking for

10  justification.  I'm looking for righteous.  I am just looking

11  for us to mend things, to make things right, to justify this

12  whole case.  I'm looking for an election.  I am looking for Pat

13  Braxton to be Newbern's mayor.  I'm looking for the city

14  council that was sworn in to continue to do our duty, to carry

15  out the duty that we were sworn in to do.

16        To me, putting my hand on that Bible and making an

17  oath meant a lot to me.  Since I was not able to carry out our

18  duties in the town house, it seemed to make all of us a liar

19  because we did lie when we swore on that Bible that night.  So,

20  to me, it has a great impact on me.

21        MS. WONG:  No for questions.  Thank you, Ms. Quarles.

22        THE WITNESS:  Thank you.

23

24

25

CROSS - JANICE QUARLES

1                      **CROSS-EXAMINATION**

2 BY MR. HOWARD:

3 Q.   Hello, Ms. Quarles.  How are you doing today?

4 A.   I'm good.  How are you?

5 Q.   Good to see you again.

6 A.   It's good to see you.

7 Q.   Do you know if the folks or the citizens of Newbern got to

8 vote for your membership in the town council?

9 A.   Do I know what?  Excuse me?  Would you repeat that?

10 Q.   Sure.  Did the citizens of Newbern vote for your

11 membership into the town council?

12 A.   For my membership?

13 Q.   Yes, ma'am.

14 A.   No.  I have never known of any voting in Newbern, as I

15 say.

16 Q.   Well, does that include your membership in the town

17 council?

18 A.   It does.

19 Q.   You said you needed elections or wanted elections, I

20 guess, this year.  It's important to do those -- if we had an

21 election, it's important to do the next election correct; would

22 you agree with that?

23 A.   Yes.

24 Q.   Do you know if there's anybody in Newbern that knows

25 exactly where the town's limits are?

1   A.   No.  I would like to know that myself, other than seeing

2   those signs there.  You know?  Yes.

3   Q.   Before we have an election, we've got to figure out who

4   lives in the town and who lives outside the town; correct?

5   A.   Yes, yes, yes.

6              MR. HOWARD:  That's all I have, Your Honor.

7              THE COURT:  All right.  I have some questions for

8   you, Mr. Howard.  Mr. Howard, I have some questions for you.

9              Thank you, ma'am.

10             Do you have any redirect?

11             MS. FAJANA:  No.  No, Your Honor.

12             MS. WONG:  No.

13             THE COURT:  Thank you, ma'am.  You may step down.

14             I thought maybe this will just help me to get

15  started.  What is the state law on filling council members

16  seats when no one qualifies?

17             MR. HOWARD:  I don't know.  I mean, I do know what I

18  believe the law --

19             THE COURT:  For towns under 12,000.

20             MR. HOWARD:  Yeah.  I think the League of

21  Municipality's instruction -- like we --

22             THE COURT:  I don't care what the League of

23  Municipalities said.  I'm saying what is the law on it.

24             MR. HOWARD:  The law is, if someone is in that

25  position of town council, they stay in there if there's no

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

1  election, and then they have an election.

2       THE COURT:  Okay.  And then let me ask you another

3  question.  On your exhibit that you were referring to earlier,

4  Exhibit 1, page 9, is minutes of a town council meeting held in

5  Newbern on August the 10th of 2020.  And, in it, it says, The

6  next order of business the mayor brought before the council was

7  that the town had inadvertently and mistakenly failed to

8  satisfy the requirements of a municipal election.

9       What does that mean?  What was the -- what was the

10  requirements they failed to satisfy?

11       MR. HOWARD:  I don't --

12       THE COURT:  You keep pointing to somebody.  Is

13  there --

14       MR. HOWARD:  I think Woody would be able to answer

15  that, but I believe they did not have an election for town

16  council.

17       THE COURT:  Okay.  Okay.  Well, I guess we'll wait

18  and have the witness -- is Mr. Holmes here?

19       MR. HOWARD:  No.

20       THE COURT:  Okay.  Is this Lori here?

21       MR. HOWARD:  No.

22       THE COURT:  Okay.  All right.  Next witness.

23       MS. FAJANA:  Your Honor, we just have one question,

24  actually, because, when we spoke to Mr. Howard about the

25  witness list, we weren't 100 percent certain which defendants

1    he would call.  So if he's not going to call Defendant Thomas,

2    then we would ask to be able to call her as a hostile witness.

3              THE COURT:  Who is that?  I don't know -- he didn't

4    say anything about Thomas.

5              MS. FAJANA:  So you are not going --

6              MR. HOWARD:  Voncille?

7              MS. FAJANA:  Yes.

8              MR. HOWARD:  She's on my will-call list.

9              MS. FAJANA:  So you will call her?

10             THE COURT:  Right now, we are talking -- we are off

11   the subject here.  I was asking about Lori, whose last name is

12   unknown to me, and William Holmes.  So who are you asking

13   about?

14             MS. FAJANA:  A defendant who is in the room today.

15             THE COURT:  Well, then y'all need to discuss that

16   outside my presence.

17             All right.  Call your next witness.

18        [Counsel confer off the record.]

19             MS. FAJANA:  Okay.  The plaintiffs would like to call

20   Defendant Voncille Thomas and ask that we can call her as a

21   hostile witness.

22             THE COURT:  Well, I don't know if she's hostile or

23   not.  So let's wait until she gets on the -- let's wait until

24   she gets on the stand.  Is Ms. Thomas here?  Voncille Thomas?

25             Ms. Thomas, if you'll come forward and be sworn by

1   the court clerk.  Yes, ma'am.  Raise your right hand.

2                         **VONCILLE THOMAS,**

3         **having been first duly sworn, testified as follows:**

4              THE COURT:  Please have a seat.

5                   <u>**DIRECT EXAMINATION**</u>

6   BY MS. FAJANA:

7   Q.   Good morning, Ms. Thomas.

8   A.   Good morning.

9   Q.   I just have a few questions for you.

10              THE COURT:  All right.  I'm going to need you to pull

11  up and speak into that mic so we can hear what you have to say.

12  BY MS. FAJANA:

13  Q.   Do you recall your deposition testimony regarding the

14  notices of election that Defendant Stokes put up around town

15  for the municipal elections in 2020?

16  A.   I do.

17  Q.   And what was your testimony?

18  A.   My testimony was that notices were placed at the library,

19  the store, and the post office, and the city, the town hall

20  windows.

21  Q.   And do you recall your testimony about how you knew that's

22  where those notices were placed?

23  A.   I do.

24  Q.   And what was your testimony?

25  A.   That I saw him place them there.

1  Q.   And are you aware that Defendant Stokes testified that he

2  put up all those notices alone and that you weren't present

3  with him that day?

4  A.   I didn't say I was present with him.  I said I saw him put

5  them up.

6  Q.   Are you aware -- okay.  I'm going to pull up the

7  deposition testimony from that day.  I just need to get that

8  from my binder really quick.

9           THE COURT:  All right.  Rather than starting out by

10  saying "Your deposition testimony was," the correct way to, if

11  you are trying to impeach her, is to ask her the question

12  first.

13           Did you see notices placed in the town for the

14  special election that was held in October?

15           THE WITNESS:  I saw that they were placed, yes.

16           THE COURT:  Okay.  When did you see they were placed?

17           THE WITNESS:  Shortly after he placed them.

18           THE COURT:  Okay.  "Shortly" meaning what?

19           THE WITNESS:  A couple minutes or so because I was

20  parked.  I'm not even aware that he even knew I was there.

21           THE COURT:  Okay.  And when?  When were they placed?

22           THE WITNESS:  I have a mind issue, so I can't specify

23  dates.

24           THE COURT:  How close to the election were they

25  placed?

1          THE WITNESS:  During that period of time that was

2    specified to us that we had to get it done.

3          THE COURT:  Okay.  What did the notices look like?

4          THE WITNESS:  I don't remember either.  I know it was

5    [indicating].

6          THE COURT:  I'm sorry.  Say that again.

7          THE WITNESS:  All I can say a piece of paper like so

8    [indicating].

9          THE COURT:  Piece of paper, like a normal 8 by 11?

10         THE WITNESS:  No.  It was -- it had been a lineless

11   sheet of paper.

12         THE COURT:  It had been what now?

13         THE WITNESS:  A lineless sheet of paper that had the

14   information typed on there.

15         THE COURT:  Lineless --

16         THE WITNESS:  Typing paper.

17         THE COURT:  Typing paper.  8 and a half by 11, like a

18   normal sheet of typing paper?

19         THE WITNESS:  Well, not quite.  Yeah.  It could have

20   been that big, yes.

21         MS. FAJANA:  Okay.

22         THE COURT:  Okay.  It was heavy, but it was about

23   eight and a half by 11?

24         THE WITNESS:  Yeah.

25         THE COURT:  Okay.  Okay.  Go ahead.

1          MS. FAJANA:  I'm sorry, Your Honor.  I missed your

2    instruction to me about --

3          THE COURT:  Well, you usually don't just dive into

4    depositions.  We usually ask the questions first, and then if

5    her answers are inconsistent with her deposition, then that's

6    when we go into depositions.  Go ahead.

7          MS. FAJANA:  All right.  I guess I was trying to ask

8    about the --

9          THE COURT:  It's not my rule.  It's the way it's

10   done.  Anyway, go ahead.

11   BY MS. FAJANA:

12   Q.   So just to confirm your testimony, you said that -- you

13   are saying today that you were not with Defendant Stokes when

14   he put up the notices of elections but that you were nearby him

15   and that's where you saw him?

16   A.   Yes.

17   Q.   Okay.  I'd like to show you your testimony from the

18   deposition.  Okay.  Starting with line No. 10.

19   A.   Okay.

20          MR. HOWARD:  What page is that?

21   BY MS. FAJANA:

22   Q.   This is page 70 of Ms. Thomas' deposition transcript.

23          So does that change your testimony?

24   A.   It's not going to change my testimony because I did

25   travel.  I wasn't traveling -- we weren't walking hand-in-hand

1    and side-by-side.

2              THE COURT:  Could you put that back up?

3              THE WITNESS:  Is what I'm saying.  That's not going

4    to change that I was present.

5    BY MS. FAJANA:

6    Q.   Just to go over the question.  The question says, And were

7    you already at the library before Woody Stokes put this notice

8    up, or did you travel with him to the library.  And the answer

9    was, Traveled.

10             And then the next question was, You traveled with

11   Woody Stokes to the library as he held on to the papers with a

12   notice.

13             Yes.

14             Okay.  Where were you traveling from?

15             The city hall, town hall.

16             So what is your testimony today about what happened?

17   A.   It's what I just said.  I was not walking side-by-side

18   with him.  I came along behind him after he had put the signs

19   up.

20   Q.   You weren't --

21   A.   Because I felt like there was going to be some question

22   about the signs not being there because this had happened in

23   the past.

24   Q.   So your testimony is that you were walking behind him?

25   A.   You keep wanting to put words in my mouth.

1  Q.   I'm just trying to --

2  A.   I traveled behind him.

3  Q.   Okay.  So, in the deposition, you meant to testify that

4  you traveled behind him, not with him --

5  A.   Correct.

6  Q.   -- which is the answer to the question?

7  A.   Correct.

8  Q.   But that you were present when he put the notices up?

9  A.   I was, if I'm walking behind him.  If I'm walking behind

10 him, yes.  I was present.  I was present to see him put them

11 up.

12 Q.   Okay.  Are you aware that Defendant Stokes testified that

13 no one was present or with him when he put the notices up for

14 the election?

15 A.   Are you aware that I just said I didn't even think he knew

16 I was there?

17 Q.   You are --

18 A.   It's like I can see you and you can't see me?  What's so

19 confusing?

20 Q.   Just the question from the deposition testimony is that

21 you traveled together from the town hall after attending a town

22 council meeting.  But, today, your testimony is that he didn't

23 know that you were traveling with him because you were standing

24 behind him, trailing him from the town council meeting, to the

25 places where he put the notices up; is that right?

1   A.   That's correct, because I was riding and he was walking.

2   Q.   So you didn't have a conversation while he was putting the

3   notices up?

4   A.   No, ma'am.

5   Q.   So that's how it's possible that he didn't know that you

6   had followed him from a town council meeting and watched him

7   put the notices up?

8   A.   Right.

9   Q.   Okay.

10          THE COURT:  Well, hold on.  There's some information

11  there I want to make sure I understand.  It was right after a

12  town council meeting that you say that you saw this happen?

13          THE WITNESS:  I think it was directly after the

14  council meeting.

15          THE COURT:  Okay.

16          THE WITNESS:  We had the -- we had the -- we had the

17  flyers at that time.

18          THE COURT:  The what?

19          THE WITNESS:  The flyers.

20          THE COURT:  The flyers?

21          THE WITNESS:  Yeah.

22  BY MS. FAJANA:

23  Q.   Had anyone that you served on town council with submitted

24  any qualifying forms or filing fees before 2020?

25  A.   Once again, I have to state I can't do dates.  I cannot do

DIRECT - VONCILLE THOMAS                                        67

1   dates, but I know -- I'm aware that everyone that I'm serving

2   with had filed and qualified.  That's all I can say.  I can't

3   do dates.

4   Q.   So you can't confirm whether other people on the town

5   council submitted their qualifying forms or filing fees before

6   2020 because you can't do dates?

7   A.   I can't confirm it because I can't do dates, and all I can

8   confirm it by is what they said they had done.

9   Q.   Have you seen anyone submit qualifying forms or statements

10  of economic interest?

11  A.   I have seen copies of economic interest.

12  Q.   Have you seen anyone actually hand those statements to the

13  town clerk of economic interest?

14  A.   Yes, I have.

15  Q.   And where did you see other city council people submit

16  statements of economic interest?

17  A.   At town council meetings.

18  Q.   And you saw people who are currently serving on town

19  council submit their statements of economic interest?

20  A.   Yes.

21  Q.   And are you aware that Defendant Broussard and Defendant

22  Stokes said they had never submitted statements of economic

23  interest in your presence?

24  A.   No.

25  Q.   Does that change your testimony?

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

1   A.   No.  Huh-uh.

2   Q.   Do you know any reason why they would claim that they

3   haven't filed those statements in your presence when they have?

4   A.   Because Woody may not have.  He may have already have

5   given it to the clerk.

6   Q.   I'm sorry.  I --

7   A.   Other times, Gary did not always bring his when we brought

8   ours because his -- because we were electronically filing them.

9   So it was just a courtesy that the clerk had had the copy.

10  Q.   Is your testimony now that you saw copies of it or that

11  you saw them actually hand these forms to the clerk?

12  A.   I saw them handing copies to the clerk.

13  Q.   Okay.  And their testimony is that they never handed any

14  forms to a clerk in your presence?

15  A.   I can't -- I can't speak upon what they said.

16  Q.   But you -- your testimony --

17  A.   I can't speak upon what they said.

18  Q.   I understand.  But your testimony is that you saw them

19  hand these forms over and that they just don't remember that

20  they did that in your presence?

21  A.   I can't speak on that, but yes.

22          MS. FAJANA:  Okay.  No further questions, Your Honor.

23          THE COURT:  Cross.

24

25

| 1 | **CROSS-EXAMINATION** |
|---|---|
| 2 | BY MR. HOWARD: |
| 3 | Q.   Hello, Voncille.  How are you? |
| 4 | A.   I'm good. |
| 5 | Q.   Where all did you say -- where all did you say that you |
| 6 | saw the notice, Ms. Thomas. |
| 7 | A.   Thank you.  Library, town hall, post office, the store. |
| 8 | Q.   I'm going to show you what's marked as Defendant's |
| 9 | Exhibit 1.  It's page 19 of those exhibits.  Is that the notice |
| 10 | that you saw at those places? |
| 11 | THE COURT:  We never did get an -- were you going to |
| 12 | object to Exhibit 1?  We are only going to admit what's being |
| 13 | referred to in this hearing. |
| 14 | MS. FAJANA:  No, we are not going to object, Your |
| 15 | Honor. |
| 16 | THE COURT:  Okay.  So, so far, 8, 9 -- and what was |
| 17 | your next number? |
| 18 | MR. HOWARD:  1. |
| 19 | THE COURT:  No, no.  The page. |
| 20 | MR. HOWARD:  Oh, the page?  19. |
| 21 | THE COURT:  So Exhibit 1, pages 8, 9, and 19 are |
| 22 | admitted. |
| 23 | Go ahead. |
| 24 | THE WITNESS:  Yes, sir. |
| 25 | |

1  BY MR. HOWARD:

2  Q.   You okay.  Did you choke?

3  A.   I'm going to make it.

4  Q.   Okay.  Good.  That is the notice that you saw in those

5  four places; correct?

6  A.   Yes, sir.

7          MR. HOWARD:  Nothing further, Your Honor.

8          THE COURT:  Thank you.

9          You don't have anything else for her?

10         MS. FAJANA:  No, no, Your Honor.

11         THE COURT:  Next witness.

12         Was the election on November the 6th or the 12th?

13 Why do I have the 12th on my mind?  Was it the 6th?

14         MR. HOWARD:  There was -- the 12th was the date in

15 November.

16         THE COURT:  Okay.  Maybe I got those confused.

17         MR. HOWARD:  That we --

18         THE COURT:  If a run-off was necessary.

19         MR. HOWARD:  Well, the 12th, I think the evidence

20 was, that was the date that our folks were sworn into office.

21         THE COURT:  Right.  I'm getting the dates mixed up.

22         All right.  Next witness.

23         MS. FAJANA:  The plaintiffs don't have any additional

24 witnesses, Your Honor.

25         THE COURT:  Okay.

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

DIRECT - HAYWOOD STOKES, III

```
1              Defendant?

2              MR. HOWARD:  Woody.

3              THE COURT:  Mr. Stokes, please raise your right hand.

4                        HAYWOOD STOKES, III,

5            having been first duly sworn, testified as follows:

6              THE COURT:  Please have a seat, sir.

7                        DIRECT EXAMINATION

8    BY MR. HOWARD:

9    Q.    Woody, when did you first become mayor of Newbern?

10   A.    I do not know the date.

11   Q.    How did you get to be mayor of Newbern?

12   A.    I was asked would I sit as a mayor by the previous mayor

13   in which I stated I would if he couldn't find anybody else that

14   was willing to.

15   Q.    Apparently, he didn't find anybody else that was willing

16   to, did he?

17   A.    No.

18   Q.    Tell me about when Patrick Braxton came to you and said he

19   wants to be the mayor.

20   A.    When he came and said he wanted to be the mayor, I told

21   him the only thing he need to do is fill out qualifying papers

22   and turn them in, but I said I don't know what to do.  I'll

23   have to find out.

24   Q.    Then what happens?

25   A.    I called the town attorney and asked what to do.  And he
```

DIRECT - HAYWOOD STOKES, III

1  said get him the papers, and then he'll have to pay for

2  qualifying fees and take it over to the courthouse and turn it

3  in.  I think the deadline was at 5:00 o'clock, 4:00 o'clock or

4  something that day.

5  Q.   And Mr. Braxton was the mayor?

6  A.   That's correct.

7  Q.   Did you get a call from anybody?

8  A.   Did I get a call from anybody?

9  Q.   Did the League of Municipalities give you a call about

10  Mr. Braxton?

11  A.   I did.

12  Q.   What happened?

13  A.   I received a call from the League of Municipalities'

14  attorney, and they told me that Mr. Braxton --

15          THE COURT:  Do you have a name?  I'm sorry.  Do you

16  have a name?

17          THE WITNESS:  I'm thinking -- I'm not sure if it was

18  Lori or not.

19          MR. HOWARD:  Your Honor, it's Lori Lein, L-E-I-N .

20          THE WITNESS:  L-E-I-N.

21          MR. HOWARD:  That's correct Lori Ann Lein.  I've got

22  her business card in my box.  I can give that to you or put it

23  as an exhibit if I need to.

24          THE COURT:  That's okay.

25

1   BY MR. HOWARD:

2   Q.   What did she tell you?

3   A.   She told me that Mr. Braxton had qualified as a mayor;

4   therefore, he was deemed mayor by default because no one ran

5   against him and that -- and then she said that I did not try to

6   interfere with any of the electoral process.  And I said, well,

7   I have no intention of it.  I said who would -- who would

8   request that I didn't?  And I was told that Mr. Braxton and

9   Mr. Bobby Singleton stated for me not to interfere with the

10  election.

11  Q.   Who is Bobby Singleton?

12  A.   He handles a position in Montgomery.  That's all I can

13  tell you.

14          THE COURT:  He handles a position in Montgomery.

15          THE WITNESS:  He is in the political system.

16          THE COURT:  Oh, okay.

17          THE WITNESS:  But what his -- if he's a legislator or

18  what, I don't know.

19          THE COURT:  Okay.  Okay.

20          THE WITNESS:  I don't keep -- I don't run politics.

21  BY MR. HOWARD:

22  Q.   Did she place -- did Lori Lein place you on notice that

23  you needed an election for town council members?

24  A.   She did.

25  Q.   Tell me about that.

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

74

1    A.   Well, she --

2              THE COURT:  Can you tell me the time frame that you

3    had this conversation with Lori?

4              THE WITNESS:  This was after the election in

5    November --

6              THE COURT:  Okay.

7              THE WITNESS:  -- when Patrick won by default.

8              I turned all businesses over to the town attorney,

9    William Holmes, and he communicated with Lori Lein from that

10   point on whatever she told him for us to do.  We met, and we

11   did.  And that's -- she's the one that said there would have to

12   be a special election to establish a -- to vote in a town

13   council since the mayor had won by default as he qualified for

14   elections.

15             THE COURT:  I think we got our time periods off.  You

16   want to try to help him?

17             MR. HOWARD:  Yes, Your Honor.

18             THE COURT:  Help me understand the time periods.

19             MR. HOWARD:  Yes.

20   BY MR. HOWARD:

21   Q.   Is it possible that Mr. Braxton qualified to be mayor some

22   time in the summer of 2020?

23   A.   Yeah, whatever the cut-off date of it is.  There was a

24   cut-off period for qualifying before the election.

25   Q.   Okay.  And Braxton qualified and Ms. Lein told you about

1  the town council.  Earlier, I showed Voncille the notice for

2  election.

3  A.    Right.

4  Q.    And the election was October 6, 2020?

5  A.    Okay.

6  Q.    Does that help you with a time frame of when all this took

7  place?

8  A.    Yes.

9  Q.    Okay.

10  A.    Anyway, she instructed that we hold an election for

11  council.

12  Q.    Okay.  Is this after Braxton had qualified?

13  A.    Yes, it was after.

14  Q.    The only one that qualified --

15  A.    After his qualification.  It was after the qualifying

16  deadline.

17  Q.    After his qualification but before the November election?

18  A.    Correct.

19  Q.    Okay.

20  A.    That is correct.

21  Q.    And what did she tell you?

22  A.    She told -- she told the attorney -- he told us that we

23  had to post the information in public places, at least three

24  public places, in the town where residents could see them.  And

25  we put the information that they said put on the form

1  pertaining to the qualifying for running for town council seat.

2  Q.   Where did you put the notices?

3  A.   I put a notice inside the town council -- I mean, the town

4  hall.  I put one inside the -- the information so-called box at

5  the mercantile.  I put one in the post office and one in the

6  library.

7            MR. HOWARD:  Your Honor, I believe that's all I have.

8            THE COURT:  Cross.

9            So inside the town council hall or town hall, inside,

10 where inside?

11           THE WITNESS:  Just taped to the window.

12           THE COURT:  Like facing out?

13           THE WITNESS:  Yes, like a notice.

14           THE COURT:  And then where did you place the next

15 one?

16           THE WITNESS:  The one at the mercantile, there was

17 a -- it was a box thing somebody made that you put notices,

18 business cards.  You know, just information --

19           THE COURT:  Like a board that you stick up?

20           THE WITNESS:  Yeah, with a plexiglass window on it.

21           THE COURT:  All right.  So who owned the mercantile

22 at the time?

23           THE WITNESS:  At that time, I don't know if Leah

24 Avery still owned it.  I think they did.  I think they still

25 owned it, the Averys.

DIRECT - HAYWOOD STOKES, III

1          THE COURT:  Okay.

2          THE WITNESS:  And she ran it.

3          THE COURT:  Would you have had to ask their

4   permission to put it up?

5          THE WITNESS:  Yes.

6          THE COURT:  And did you --

7          THE WITNESS:  Well, I told her I was putting a notice

8   in the box.

9          THE COURT:  Okay.  Laura --

10         THE WITNESS:  I didn't ask for permission because

11  everybody just put snuff there.

12         THE COURT:  And her name is Laura Avery?

13         THE WITNESS:  Leah.

14         THE COURT:  Okay.  I'm getting Lauras and Leahs.

15         THE WITNESS:  Leah Avery.

16         THE COURT:  For permission.

17         And you put one in the post office.  Where in the

18  post office?

19         THE WITNESS:  I did.  I posted it on the corkboard

20  inside the post office.

21         THE COURT:  Okay.  And then where in the library?

22         THE WITNESS:  In the library, I put it to the right

23  column.  If you are leaving out the front door of the library,

24  it was pinned up on the right side on the column.

25         THE COURT:  So outside the library?

CROSS - HAYWOOD STOKES, III

1        THE WITNESS:  Inside.

2        THE COURT:  Oh, inside, okay.

3        THE WITNESS:  You would see it if you were leaving to

4   go outside inside the library.  There ain't nowhere outside to

5   put it outside.  It's steel and concrete.

6        THE COURT:  Okay.  Inside.  Okay.  Thank you.  Cross.

7                      **CROSS-EXAMINATION**

8   BY MS. FAJANA:

9   Q.   All right.  Mr. Stokes, when Mayor Braxton asked you how

10  to qualify for mayor and what forms he needed to fill out, why

11  didn't you know what to tell Mayor Braxton?

12  A.   Because I didn't know.

13  Q.   Because you had never filled out those forms before

14  yourself?

15  A.   No.

16  Q.   At the time that you were having this conversation with

17  Mayor Braxton, were you the lawful mayor?

18  A.   I assumed I was.

19  Q.   But you hadn't filled out the proper paperwork to be the

20  lawful mayor at that time?

21  A.   No, no.

22  Q.   What date did you post the notice of election?

23  A.   Which election?

24  Q.   The notice of the town council election.

25  A.   I don't remember exactly what date.  It was after the

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

CROSS - HAYWOOD STOKES, III

```
1   meeting we had when the attorney brought down the -- gave us

2   the information.

3            THE COURT:  Did you post for more than one election?

4            THE WITNESS:  No.

5            THE COURT:  Oh, okay.  Because you said which

6   election.

7            THE WITNESS:  Well, she asked me, did I ever post

8   anything --

9            THE COURT:  Oh, you didn't know which --

10           THE WITNESS:  So I didn't know what she was asking.

11           THE COURT:  Okay.

12  BY MS. FAJANA:

13  Q.   So you don't know whether or not you posted the notices of

14  election in the time frame that was required to hold a special

15  election?

16  A.   According to the League of Municipalities, yes, I did.

17  Q.   But you just said you don't recall when you posted it?

18  A.   I do not know the date or the time.

19  Q.   So -- go ahead.

20  A.   But when we were giving -- given the information after the

21  qualifying time, we were -- I put the notices up within the

22  special election time frame that was requested by the League of

23  Municipalities.

24  Q.   So you know you posted the notices in the right time

25  frame, but you don't know the date you posted them?
```

80

1    A.    That's correct.

2    Q.    And what was the right time frame from the League of

3    Municipalities?

4    A.    I don't --

5              THE COURT:  Hold on.  Hold on.  I'm going to give you

6    something.  I would like you to put Exhibit 1, page 16 up there

7    so everybody can see what I'm giving him, please.  16, 17, and

8    18.  This is something that the defense gave me.  It's called

9    Newbern 2020 Municipal Election Calendar.

10             Can you tell me what this is and have you ever seen

11   it before?  If somebody can put it up so that everybody can

12   see.

13             Thank you, ma'am.

14             Have you ever seen it before.

15             THE WITNESS:  Yes, I do believe I have.  That's what

16   was -- we were instructed to do right there.

17             THE COURT:  Well, that's where I'm going.  You keep

18   saying they told us to do this, they told us to do that.  Are

19   you referring to these instructions right here that I just

20   handed you?

21             THE WITNESS:  If this is from the League and given --

22             THE COURT:  I don't know.  I don't know.

23             THE WITNESS:  That's what I'm saying.  This is from

24   our attorney, what he got, information.  Ma'am, I told -- I

25   said -- as I said, I turned it over to the attorney because I

CROSS - HAYWOOD STOKES, III

1    don't know the laws.

2            THE COURT:  Right.  Okay.  I'm not asking you the

3    law.  I'm asking you, you keep saying "they told us."  Is this

4    the form they told you?

5            THE WITNESS:  This is the information that they told

6    us to do right here.

7            THE COURT:  Okay.  So when you said, I put up the

8    notices according to the information they gave us, are you

9    referring to what's on Exhibit 1, page 16?

10           THE WITNESS:  This is Exhibit 1?  Yes.

11           THE COURT:  Okay.

12           THE WITNESS:  Yes.

13           THE COURT:  And so when we asked you the date, does

14   that refresh your recollection of when you may have put up the

15   notices?

16           THE WITNESS:  In October?

17           THE COURT:  I don't know when you put up the notices.

18   I'm asking you.

19           THE WITNESS:  This is September.

20           THE COURT:  You put them up in September?

21           THE WITNESS:  Yes, that would have been when I put

22   them up then.

23           THE COURT:  But you just know it was some time in

24   September.  You just don't know when, though?

25           THE WITNESS:  [Shakes head side to side.]

CROSS - HAYWOOD STOKES, III

1      THE COURT:  Okay.  Well, someone testified earlier

2  that perhaps it was after a town council meeting.  Do you

3  recall it being after a town council meeting?

4      THE WITNESS:  I received the --

5      THE COURT:  Flyers?

6      THE WITNESS:  I pulled up the flyer at the town

7  council meeting.

8      THE COURT:  And then --

9      THE WITNESS:  From the attorney.

10      THE COURT:  Right.  And then did you immediately go

11  put them up that day; do you recall?

12      THE WITNESS:  I put up -- I put the one up in the

13  town hall after that.

14      THE COURT:  Okay.

15      THE WITNESS:  The store, I think I did the store -- I

16  know I did the post office the next morning when they opened.

17      THE COURT:  Okay.

18      THE WITNESS:  Because --

19      THE COURT:  Because why?

20      THE WITNESS:  Because I could have put in the -- the

21  box in the store is on the outside.  It's not locked.  So I

22  could have put it in there.  I'm not going to swear to it.

23      THE COURT:  I'm just trying to get a time frame.

24      THE WITNESS:  Within the 24 hours of that council

25  meeting that I was given the form, the notices were up.

1          THE COURT:  All right.  That's where I was trying to

2     go.

3          THE WITNESS:  Okay.  Thank you.

4     BY MS. FAJANA:

5     Q.   So, looking at the election calendar, did you file a list

6     of qualified voters by September 1st?

7     A.   A list of qualified voters?

8     Q.   Yes.

9     A.   No, I didn't.

10    Q.   Why not?

11    A.   There is no list of qualified voters.

12    Q.   Did you attempt to create a list of qualified voters so

13    that it could be filed by September 1st?

14    A.   No, I did not.

15    Q.   Why not?

16    A.   That is, my understanding, what the Board of Registrars

17    does.

18    Q.   This election calendar that we are -- that we have been

19    discussing says that the mayor must file a list of qualified

20    voters with the clerk, and then it cites to the Alabama code.

21    And it says if the mayor is a candidate in the election, the

22    council must appoint a qualified person to perform this duty.

23          So did the town council appoint someone to perform

24    this duty?

25    A.   I guess they appointed me to do it.

CROSS - HAYWOOD STOKES, III                                    84

1   Q.   Weren't you acting as the mayor at that time?

2   A.   Yes.

3   Q.   So then you didn't comply with the Alabama code regarding

4   this provision?

5   A.   I guess not.

6   Q.   Did you and the other city council members file your

7   Appointment of Principal Campaign Committee form with the

8   probate judge by September 7th?

9   A.   I'm not understanding what you are saying.

10  Q.   Are you able to see this portion of the calendar?

11  A.   Okay.

12  Q.   So looking at September 7th.

13  A.   Yes.

14  Q.   And the first bullet point after that, last day for

15  candidates who qualified on September 1st to file an

16  Appointment of Principal Campaign Committee form with the

17  probate judge and then it cites again to Alabama code.

18       So did you and the other defendants file the

19  Appointment of Principal Committee form with a probate judge by

20  September 7th, 2020?

21  A.   That's for the special election forms?

22  Q.   I'm asking you.  This is a specific form, whether or not

23  this specific form was filed with the probate judge?

24  A.   If it's the form -- if it's the qualifying, yes, we did.

25  Q.   It's a specific form.  So it's not the candidate form.

CROSS - HAYWOOD STOKES, III

1   It's the Appointment of Principal Campaign Committee form

2   that's meant to be filed with the probate judge.  Did you and

3   the other defendants do this?

4   A.   I'm not -- I'm not following what a Principal Campaign

5   Committee form is.

6   Q.   So then you didn't submit this form with the probate

7   judge?

8         THE COURT:  I don't see how that's at all pertinent

9   to the issue here.

10        THE WITNESS:  I don't --

11        THE COURT:  I'm not here about procedural process or

12   whether he met Alabama law on that or not.  I'm here about

13   whether we have voters that were disenfranchised from voting.

14   BY MS. FAJANA:

15   Q.   Okay.  So, turning to the process for getting ready for

16   the special election, what steps did the city council do to get

17   ready for it?

18   A.   For the special election for council members?

19   Q.   Yes, for town council members.

20   A.   We posted notice of election.  It stayed up whatever the

21   time frame that it was required.  We -- I say "we."  The

22   council members that were present filled out qualifying papers,

23   paid their dues, and turned them in.  And, at the end of the

24   time, the qualifying -- the notices were removed and the

25   council members were then, I was told, seated by default

CROSS - HAYWOOD STOKES, III

1  because nobody ran against them.

2  Q.   And when you say the council members who were present,

3  what do you mean?

4  A.   The -- the previous current sitting council members that

5  were there then.  I don't know how you want me to answer that.

6  Q.   And how did those town council members know to fill out

7  their forms?

8  A.   They read the information, the qualifying form.

9  Q.   Did they learn about how to qualify at a town council

10 meeting?

11 A.   First they did, yes.  That was the first night they did it

12 at the council meeting.

13 Q.   And then everyone submitted their forms a few days after

14 that meeting?

15 A.   Correct.

16 Q.   Even before the notice was posted?

17 A.   No, no.

18 Q.   How do you know --

19 A.   That was because the notices were posted within 24 hours,

20 and nobody qualified, I don't think, until some time later that

21 month.  We had to get the papers to qualify on.  We didn't have

22 them.

23 Q.   How did you get the qualifying papers?

24 A.   We got them from the -- they were sent in -- to my

25 knowledge, if I'm correct, they were sent to the attorney from

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

CROSS - HAYWOOD STOKES, III

87

1    Mobile -- I mean, Montgomery.  Not Mobile.

2    Q.    And who is that?

3    A.    Who is that?

4    Q.    Who is the attorney that you are referring to?

5    A.    William Holmes.

6    Q.    The qualifying forms were sent to William Holmes from

7    whom?

8    A.    I think from Montgomery.

9    Q.    And, when you are saying from Montgomery, are you

10   referring to the League of Municipalities and someone else in

11   Montgomery?

12   A.    The League of Municipalities, the capital, wherever the

13   paperwork comes from.  I don't know.

14   Q.    So William Holmes got the paperwork for the sitting town

15   council and gave it to you-all to fill out?

16   A.    Correct.

17   Q.    Why didn't you-all get your own qualifying forms?

18   A.    We did.

19   Q.    I mean, personally.  Why didn't you go and get those forms

20   personally?

21   A.    Well, we did not know where to get them, so we asked

22   Mr. Holmes, just like Mr. Braxton asked where to get papers.

23   If you don't know, you ask.

24   Q.    And no one else qualified during this time period; is that

25   right?

CROSS - HAYWOOD STOKES, III

1   A.   That's correct.

2   Q.   And who gave the advice about how long the qualifying

3   period should be?

4   A.   The League of Municipalities.

5   Q.   Did they speak to you directly?

6   A.   No.

7   Q.   So how did you know what the qualifying time period should

8   be?

9   A.   They told Attorney Holmes how long it needed to be up.

10  Q.   And Attorney Holmes told you?

11  A.   Correct.

12  Q.   But you, otherwise, don't know whether or not that was the

13  correct time frame?

14  A.   No, I didn't write the law.

15  Q.   I'm not asking that.  You, otherwise, didn't confirm

16  whether or not you were actually following the special election

17  law within the Alabama code?

18  A.   I was doing as I was instructed from an attorney.

19            MS. FAJANA:  Okay.  Okay.  No further questions.

20            THE WITNESS:  Jesus.

21            THE COURT:  Yeah.  Commentary is not necessary --

22            THE WITNESS:  I'm sorry.

23            THE COURT:  -- Mr. Stokes.

24            Let me ask you a question here.  You said you took

25  the notices were removed at the end of the qualifying time.  So

1   according to the municipal, you would have done it according to

2   the instruction you had been given?

3          THE WITNESS:  That's correct.

4          THE COURT:  So did you actually go back to each of

5   those four places and take down the notice?

6          THE WITNESS:  I took down three of them.

7          THE COURT:  You took down three of them?

8          THE WITNESS:  One was already done.

9          THE COURT:  One was gone.  Do you remember which one

10  was gone?

11         THE WITNESS:  The one from the mercantile.

12         THE COURT:  Okay.  So you would have done that on

13  September the 1st, then, if you did it in accordance --

14         THE WITNESS:  In accordance what all is instructed,

15  yes.

16         THE COURT:  Okay.  All right.  So your testimony that

17  you put them up in September, you must have been mistaken,

18  then?

19         THE WITNESS:  Ma'am?

20         THE COURT:  Your previous testimony that you put them

21  up some time in September, that was a mistake then?

22         THE WITNESS:  Yes, I wasn't clear on the dates.

23         THE COURT:  Okay.  So you took them down

24  September 1st or real close to that date then?

25         THE WITNESS:  I think they were up -- they had to be

REDIRECT - HAYWOOD STOKES, III                                    90

1    posted for 30 days or --

2              THE COURT:  Or something like that.

3              THE WITNESS:  Or something.  Whatever that date, time

4    window was is how long it was up.

5              THE COURT:  And so right after the town council

6    meeting, within 24 hours, you went and posted, and then

7    whatever time period that was until September the 1st, you

8    are testifying that they remained posted?

9              THE WITNESS:  Yes, ma'am.

10             THE COURT:  Okay.  All right.  Go ahead.

11                    **REDIRECT EXAMINATION**

12   BY MR. HOWARD:

13   Q.   Woody, Dena keeps a notebook of all the town documents;

14   correct?

15   A.   To my knowledge, correct.

16             MR. HOWARD:  Your Honor, can I approach and have him

17   look through Exhibit 1?

18             THE COURT:  Okay.

19             MR. HOWARD:  And I have no more substantive

20   questions, but just to authenticate these documents.

21             THE COURT:  Well, we are not going to put the whole

22   of Exhibit 1 in unless you refer to them.  I mean, they don't

23   become relevant to this hearing unless you somehow or another

24   refer to them, asked a question about them, plan to make an

25   argument that you have a specific one.

REDIRECT - HAYWOOD STOKES, III

1          I mean, because, look, it's like 50 pages.  So I'm

2    real careful of whatever exhibits that go in need to be

3    something that I know what they mean.

4          I do have to question for you -- are you asking to

5    ask him a question about my question earlier about page 9 and

6    what that meant, inadvertently and mistakenly failed to satisfy

7    the requirements of a municipal election.

8          You were supposed to have the election on

9    August 25th; correct?

10          THE WITNESS:  Okay.

11          THE COURT:  Do you recall that -- that you were told

12    that at any point that you were supposed to have an election on

13    August the 25th.

14          THE WITNESS:  I'm sure we were told that.

15          THE COURT:  Okay.  So what requirements for a

16    municipal election did you fail to comply with?  In your town

17    council meeting as mayor, you say that the town had

18    inadvertently and mistakenly failed to satisfy the requirements

19    for a municipal election.  I'm trying to find out what you

20    didn't satisfy for that election.

21          THE WITNESS:  That was -- after the qualifying for

22    mayor, correct?

23          THE COURT:  Right.

24          THE WITNESS:  I think that's when we were notified by

25    the League that we did not do -- we did not post for the mayor

```
 1   election and council members.

 2            THE COURT:  Oh, so that's what you didn't do?

 3            THE WITNESS:  Because we never knew.  That was the

 4   first we heard of it.

 5            THE COURT:  That's what you were trying to correct

 6   the second time?

 7            THE WITNESS:  Yes, ma'am.  Yes, ma'am.

 8            THE COURT:  All right.  Go ahead.

 9   BY MR. HOWARD:

10   Q.   If you could, this is part of the town documents that I

11   got from the clerk.  Do you know what this is, this oath of

12   office statement?

13   A.   Do I know what this is?

14   Q.   Yes.

15   A.   That's the qualifying?  Is that the qualifying statement?

16   Q.   Okay.  We'll turn this --

17            THE COURT:  I'm sorry to interrupt, but there's one

18   other thing.  I'm sorry.

19            MR. HOWARD:  Okay.

20            THE COURT:  So when you -- they called you up or

21   somehow or another you got information from Lori Lein, Lori

22   Lynn --

23            THE WITNESS:  Yeah.

24            THE COURT:  -- that you failed to post notices for

25   the first election, why wasn't then that -- why did she tell
```

REDIRECT - HAYWOOD STOKES, III

```
 1   you then that Braxton was the mayor if that first election

 2   wasn't valid and you had redo it?

 3            THE WITNESS:  I was told he won by default because he

 4   filled out qualifying papers.

 5            THE COURT:  Right.  But if the reason that you had to

 6   have a second election is because you failed to post notice,

 7   well, why -- wouldn't that have invalidated the whole election?

 8   I mean, you probably should have Lori Lein up here talking to

 9   her.  But, I mean, all I have is you, and he told me you can

10   answer these questions.  So here you go.

11            THE WITNESS:  So all I know is -- I get what you are

12   saying, but I don't -- I can't answer that.

13            THE COURT:  You can't answer, you can't answer.

14            THE WITNESS:  You would think it would, but I was

15   assuming we were following protocol not to botch again because

16   we didn't know.  So we wanted to do the council members'

17   election properly.

18            THE COURT:  Okay.

19   BY MR. HOWARD:

20   Q.   Quickly, I'll show you what's marked as Exhibit 1,

21   page 63.  Is that the oath of office for Mr. Leverett?

22   A.   Yes.

23            THE COURT:  Okay.  So we are Exhibit 1, page 63.

24   BY MR. HOWARD:

25   Q.   Yes.  The next one is page 64.  Is that the oath of office
```

1    for Willie Tucker?

2    A.    Yes.

3    Q.    Exhibit 1, page 65, is that the oath of office for Woody

4    Stokes, Jr.?

5    A.    Yes.

6    Q.    Exhibit 1, page 66, is that the oath of office for

7    Voncille Thomas?

8    A.    Yes.

9    Q.    Exhibit 1, page 62, is that the oath of office for Gary

10   Broussard?

11   A.    Yes.

12            MR. HOWARD:  Your Honor, that's all I have.  And

13   that's the day we talked about earlier in the statute of

14   limitations.

15            THE COURT:  63, 64, 65, 66, and what was the last

16   one?

17            MR. HOWARD:  62 through 66.

18            THE COURT:  Okay.  Got it.

19            All right.  Thank you, sir.

20            Let's see.  That was your witness.  Do you have any

21   other witnesses?

22            MR. HOWARD:  No, Your Honor.  That's good.

23            THE COURT:  Thank you, sir.  You may step down.

24            Why don't we take a break.  And then we are going to

25   come back and we'll have some argument, and I'll have some

1    questions on the law.  About 10 minutes.

2        [Recess.]

3        THE COURT:  All right.  Let's see.  Okay.  Let me

4    look at my notes.  So why don't we talk next about -- well, I

5    want to ask a few more things about the merit of the claim of

6    substantive due process.

7        So, Mr. Howard, the way I understand that you are

8    defending that particular claim at this point is that notice

9    was given.

10        MR. HOWARD:  Along with the statute of limitations,

11    that's correct.

12        THE COURT:  Talk to me about how -- first of all, I

13    think the answer is you don't know, but, under state law, where

14    is that provided that you can cure an inadequate first notice

15    by having a second notice in a special election because special

16    elections are usually to fill vacant positions.

17        But you said the notice -- you said the second time

18    around it was your first lack of notice and then we are only

19    going to have a partial election.  I understand what you are

20    saying.  I don't know that there's a specific statute for you

21    to cure that.  And Lori Lein is at the League of

22    Municipalities.  She's not a state official.  She's a lobbyist

23    or she was.

24        MR. HOWARD:  I think the reasoning is the people that

25    were already there, as town council members, were entitled --

1    or not entitled.  It says if you don't have an election on the

2    election day, whoever is in office stays in office until you

3    basically can fix that.  So I have that statute here.

4         THE COURT:  Okay.  So if you don't have an election.

5    So immediately before the election, which was supposed to be

6    August the 25th -- and so, on August the 10th, the town

7    council said we didn't meet the requirements for municipal

8    election -- and, now, I know what that means.  That means we

9    didn't give the proper notice.  -- so we are not gonna have an

10   election.

11        And so you are saying that the state law says that if

12   you failed to have an election, then you get to have a special

13   election, partial special election?

14        MR. HOWARD:  The statute that I have got, in my

15   notes, is 11-46-72, procedure for elections not held on day

16   appointed.

17        THE COURT:  11-46-42.  Let me see if that's one of

18   the ones I have printed here.  11-46-22.  48.  49.  Maybe -- do

19   you have that right there?  Maybe if you want to put it on the

20   screen for all of us to see.

21        MR. HOWARD:  Yes, Your Honor.

22        THE COURT:  Okay.  Oh, 72.  I thought you said 42.

23        MR. HOWARD:  I may have.  It's 11-46-72.  There's

24   about 5 million election statutes.

25        THE COURT:  Okay.  So with this Ms. Lein told them to

1  have -- or Mr. Holmes, I don't know which one -- told them to

2  have a partial election to cure their lack of notice the first

3  time.

4         MR. HOWARD:  I don't know if they said partial

5  election, but they were clear that Mr. Braxton was the mayor.

6         THE COURT:  Okay.  All right.  That's the authority

7  that they were going under.

8         But then you still have the issue of -- the complaint

9  is that their substantive due process rights have been violated

10 for years because there was never an election.

11        So you would argue that was all cured by the special

12 election?

13        MR. HOWARD:  Well, that in conjunction with the

14 statute of limitations.

15        THE COURT:  Well, you are not going to win on that

16 part because if they were -- if they were disenfranchised from

17 voting and the people that are holding office are as a result

18 that, it's a continuing violation.  So you are not going to --

19 your 1983 -- I'm going to look at it, but your 1983, I think,

20 is not going to win the day for you.

21        MR. HOWARD:  Well, then, yes, that would cure it.

22        THE COURT:  That cured it.

23        Okay.  Let me -- let's see.  You answered that.  And

24 the current council also on that August the 10th date passed

25 a resolution saying, Mr. Braxton, you are the mayor.

1          MR. HOWARD:  Yes.

2          THE COURT:  And then they gave him notice of that

3    resolution?

4          MR. HOWARD:  We called him.  I know that.  I don't

5    know if he got special notice "you are the mayor," but they

6    handed him the keys to town hall.

7          THE COURT:  Okay.  Who handed him the keys to town

8    hall?

9          MR. HOWARD:  Woody, Mr. Stokes.

10         THE COURT:  Mr. Stokes, you are still under oath.

11   You handed him the keys to town hall?

12         DEFENDANT STOKES:  Yes, ma'am.

13         THE COURT:  All right.  So that's answered.  That's

14   answered.

15         All right.  So, now, we move to -- let's assume that

16   they can meet their burden.  Obviously, there's an issue of

17   fact whether they are going to be able to meet their burden on

18   the procedural -- excuse me -- on the substantive due process.

19   But I know I make decisions of fact for purposes of a

20   preliminary injunction only, not for purposes of determining

21   whether they prevail on that claim.

22         But you-all have to show that you have irreparable

23   harm, and I have red all your cases.  But I have a case that I

24   want you to talk about.  I don't think you are going to have

25   any problem convincing anybody that it's irreparable harm to

1    deny someone to vote.

2         And almost every case that we have has to do with an
3    upcoming election.  There's about to be an election in Georgia.
4    There's about to be an election, and the district attorney's
5    name is not on the ballot.  They are not even going to let us
6    vote for district attorney.  Do something about it.  It's
7    urgent.  It's imminent.  It's about to happen.  All right?  The
8    governor of Florida case, you know, about to happen.  It's
9    about to happen.  It's about to happen.

10        In your case, it's not about to happen.  It's already
11   happened.  So you are asking me to not do a prohibitive
12   injunction and keep the status quo, which is what preliminary
13   injunctions are about.  You are asking me to do a mandatory
14   injunction and give you declaratory relief now.

15        All right.  And, you know, in order to do that, your
16   burden is like way high.  But you've got two problems.  Okay?
17   And I want you to address these two problems.  Looking at the
18   case of Alabama versus United States Department of Commerce,
19   this was a case -- it was a three-judge panel that occurred
20   back in 2021.  This case had to do with when they changed
21   the -- how you counted votes for -- I mean, how you counted the
22   census.  And in that case -- and I can't give you the exact
23   dates, but my memory is that they -- the Department of Commerce
24   or something said, okay, we are changing the rules about who
25   you count or how you count or something.

1          And, a couple of years later, some congressman from

2     Alabama and some citizens from Alabama sued saying, you know,

3     that's not right.  You shouldn't do it that way, blah, blah,

4     blah.  We want a preliminary injunction.

5          And the Court held a three-judge panel on that, which

6     I didn't know you had three-judge panels on that, on the census

7     thing, but I learned that.

8          And Judge Newsom, who sits on the Eleventh Circuit,

9     was on the panel along with Judge Marks and I forgot the --

10    Judge Huffaker was on the panel.

11         And, there, it had been like 2 years.  And, in that

12    case, they said, "Indeed, the very idea of a preliminary

13    injunction is premised on the need for speedy and urgent action

14    to protect a plaintiff's rights before a case could be resolved

15    on the merits.  The preliminary injunction standard's focus on

16    imminent harm also places the onus on a plaintiff to

17    demonstrate some sense of 'urgency or necessity' and by sitting

18    on his or her rights for even a few months, a plaintiff has

19    squandered any corresponding entitlement to injunctive relief."

20    Injunctive relief.  Because injunctive relief is a very rare

21    power for the Court to exercise.  All right?  And "Courts

22    typically decline to grant preliminary injunctions in the face

23    of unexplained delays of more than two months."  We have three

24    and a half years here.

25              MS. WONG:  Thank you, Judge.  So there's a couple

1  things I want to respond to, and I don't have the Alabama case

2  in front of you, but I know we are talking about whether the

3  delay militates against the irreparable harm shown by the

4  constitutional violations here.  And I do want to say that,

5  first and foremost, it's just one factor to weigh against the

6  irreparable harm.  And as you have very --

7          THE COURT:  Well, you say that, but that's not what

8  the Eleventh Circuit -- well, they are not the Eleventh

9  Circuit.  That's not what the three-judge panel told us a

10 couple of years ago.  It's like important.  It's like if you

11 sit on your rights for over 4 months, you know, where is the

12 urgency?

13         MS. WONG:  Yeah, I think two things.  To the

14 plaintiffs, the imminent harm is that, as of right now, there

15 is still a dispute of who is authorized to hold an election

16 even in 2025.  And if we take no action this year into next

17 year, we basically run into redoing the harm that has been, you

18 know -- that took place in 2020.

19         There's no other alternative.  No one will step up

20 and hold an election.  So, on that first factor, I believe the

21 harm is imminent.  Not only are plaintiffs not having their

22 needs responded to by any town governance, which, you know, is

23 one of the harms of being disenfranchised, they are actually

24 going to be -- we can predict that we will be disenfranchised

25 because, as you wisely noted, Judge, there was had a special

1  election calendar that these plaintiffs -- I'm sorry -- these

2  defendants passed in their own August meeting and then they

3  failed to follow.  No voter role was submitted --

4         THE COURT:  But let's go back.  You are asking me to

5  just declare a special election.  All right?  And you said --

6  but, now, what you are saying to me is, we don't know if they

7  are going to do the 2025 like they are supposed.

8         MS. WONG:  We don't know if anyone is authorized to

9  do it at this rate.

10        THE COURT:  All right.  So 2025 is a year and

11  5 months from now, the election would be.  So how is that

12  urgent or imminent?

13        MS. WONG:  I think there's multiple reasons for

14  urgency --

15        THE COURT:  Here's the thing.

16        MS. WONG:  Yes.

17        THE COURT:  You are asking me to issue -- I'm sorry I

18  keep interrupting you.  I used to hate it when judges did that

19  to me.  Go ahead.

20        MS. WONG:  Your Honor, I think what would be helpful

21  if I could provide some cases where judges do take action when

22  the harm is so -- it cuts at the fundamental fairness of, you

23  know -- let me find the quote before I just try to -- yeah.

24        In Gonzalez, for example, this case we have

25  continuously been using, the Court here says -- and they cite

1   to Duncan as well.  So multiple cases both in the Fifth and

2   Eleventh Circuit, which this Court also adheres to.  -- that if

3   there's a violation of the state constitution and state law,

4   then the Fourteenth Amendment is also violated and in Duncan,

5   and in Griffin, the judge could only remedy this violation of

6   such basic unfairness by holding new elections because there

7   was no other way to undue the disenfranchisement that had

8   already happened.

9           And, in those cases, both of those cases, the facts

10  were that, you know, there was supposed to be an election under

11  the state constitution, and state officials decided not to hold

12  an election and, instead, just appointed a position instead.

13  Whatever convenient reasons they gave, they just did not hold

14  elections based off the state law.

15          And, in that case, in Duncan, for example, the

16  federal court intervenes then and says that was a

17  disenfranchisement of the residents' rights.  If the state law

18  requires special elections for the position of judge, for

19  example, in this case, then the residents should be able to

20  vote for the position of judge.  And, when you appointed,

21  whatever your reasons are, you took that right away.

22          And so it is a real -- it's a -- it's a big remedy

23  and a big relief, Judge, to order new elections, but we believe

24  that it's the only way to remedy such a scale of

25  disenfranchisement that has happened.

```
 1          THE COURT:  All right.  And so let's just take it
 2   like this.  You have a jury trial, and the jury comes back and
 3   says, there was inadequate notice, you know, there wasn't any
 4   notice.  I don't know what a jury might say.  In other words,
 5   you win your substantive due process argument or claim.  At
 6   that point there is no council.  The second council is not
 7   there.  And so any acts they did are not there.
 8          And even -- and I'm certainly not getting into the
 9   whole -- his residence or he didn't show up for a meeting and
10   all that.  That's not on the table right now.
11          But he's the mayor.  If you win in front of a jury,
12   Mr. Braxton is the mayor, and then I don't know how he gets a
13   city council.  Nobody in the room can tell me how he gets a
14   city council.  But he's the mayor.  So why would I be ordering
15   a special election?
16          MS. WONG:  Well, Your Honor, our relief requested is
17   a special election for town council.
18          THE COURT:  I know what you are asking for.
19          MS. WONG:  Uh-huh.
20          THE COURT:  But he's the mayor, and then it becomes a
21   state issue because you've won your substantive due process
22   argument or claim.  He's the mayor.  There is no other, yeah,
23   you know --
24          MS. WONG:  Absolutely.
25          THE COURT:  Then it becomes he's the mayor and he
```

```
1    better do what's right.  He's got to do it under state law or

2    he'll get sued.  All right?  That wouldn't be for me to make

3    those determinations.  All right.  So do you disagree with

4    that?

5            MS. WONG:  Well, I think I understand what you are

6    saying, Your Honor, and I did want to clarify earlier to your

7    question of what happens usually when there's a vacancy.  Your

8    intuition is right, and I can confirm in the Alabama state

9    code, what happens typically is that the town council, existing

10   town council, and the authorized mayor would go to the governor

11   or a probate judge to essentially either appoint for those

12   vacancies or hold a special election.  So you are right.  If

13   the -- if Your Honor reinstates Mayor Braxton as the lawful --

14           THE COURT:  I wouldn't be reinstating him.  That's

15   another thing.  You know, I would not be reinstating him.  What

16   I would be doing is, it would go back to the status quo of

17   October the 5th.

18           MS. WONG:  Yes.

19           THE COURT:  You know?  And he was the -- according to

20   the town council, he was the mayor on October 5th.  I'm in

21   way would be saying they were right or they did that right or

22   anything like that because I think there's all sorts of

23   problems with that.

24           We are talking about whether the voters were

25   disenfranchised, and that's it.  And if we say before October
```

1    the 5th, we go back to that date, he's the mayor, and then

2    it's up to them to decide what to do.

3            MS. WONG:  Well --

4            THE COURT:  That's how I see it right now, but I'm

5    listening.

6            MS. WONG:  I think we are almost on the same page,

7    Your Honor.  On October 5th, Mayor Braxton was the

8    mayor-elect.  He had not become the mayor yet.  But, on

9    November 2nd, what would have happened and what essentially

10   did happen is that the mayor-elect got sworn in as the mayor.

11   There were five vacancies, and the mayor-elect appointed them.

12           THE COURT:  Wait.  Get the dates right.  October

13   the 2nd?

14           MS. WONG:  Sorry.  November the 2nd is when the

15   mayor-elect was sworn in.  And then that's when he would have

16   been charged to fill those vacancies, and he did it to the best

17   of his guidance and, you know, town custom and practice.

18           But, again, if we go back to the status quo of

19   November 2nd, Your Honor, not October 5th, but

20   November 2nd and you and this court and all the Town of

21   Newbern recognizes that the status quo is that Mayor Braxton is

22   the mayor, then, I believe, yes, he will have to go and --

23           THE COURT:  I don't recognize that; the city council

24   recognized him.

25           MS. WONG:  The city council recognized it as of

1    November 2nd.  I mean, one of the issues in this case,

2    unfortunately, as you know, Judge, is that they have removed

3    him or they believe they have formally removed him with the

4    authority of an advisory opinion and --

5          THE COURT:  Yeah.  You've got a real problem with

6    your due process -- your procedural due process thing.  I don't

7    see that sticking around.  I haven't ruled on your motion to

8    dismiss yet, but I don't see that procedural due process.

9          MS. WONG:  Which part, Your Honor?  Sorry.

10         THE COURT:  Well, we are not getting into motions

11   today.  I am just saying I wouldn't be relying on me taking

12   care of that part of your claim.  Even if we go to trial on the

13   other stuff, I don't see that sticking around.  But the

14   decision has not been made.  I've just tried to do a review of

15   that before I got here today so I could know what all the

16   claims were and that stuff.

17         MS. WONG:  Understood, Your Honor.  With all that

18   said, I am in agreement with you that, as of November 2nd, if

19   the status quo is left to stand, that the city -- the purported

20   city council at the time did not remove Mayor Braxton, he is

21   still the mayor, then it would be his responsibility to fill

22   the vacancies of the town appointments or the town council

23   positions.  That could be my appointment or it could be by

24   holding a special election, but it would have been his

25   responsibility and his right, as of November, to do so.

```
 1          THE COURT:  All right.  Let me ask you a question:
 2   In your brief, you say the current terms expire this November.
 3   Why would you say that?  Because the law says they expire in
 4   November of -- yeah, they go until the November of '25.
 5          MS. WONG:  Your Honor, respectfully, I think we
 6   will -- we should amend our brief to -- I think we meant next
 7   year, 2025.  I'm very sorry about that.
 8          THE COURT:  But you used that as a reason for it was
 9   imminent, and so I just wanted to get that clear, that it's not
10   this November, it's next November their terms expire if they
11   are -- if nothing happens?
12          MS. WONG:  Correct.  If they are the recognized
13   mayor, then their term expires next year, and they have the
14   authority to figure out what to do with all the town council
15   vacancies.
16          THE COURT:  Do you have anything else or any other
17   cases you want to point me to on your requirements of
18   imminency.
19          MS. WONG:  For imminency, no, Your Honor.  Just that
20   I would reiterate that it is a balance between delays and
21   irreparable harm, and constitutional violations not only
22   presume irreparable harm but are -- this is a constitutional
23   violation.
24          THE COURT:  A constitutional violation is presume
25   irreparable harm, but you still have to have -- they have to be
```

```
 1    imminent for it to get a preliminary injunction.  You still

 2    have to do it.  I mean, that's what that case talks about in

 3    detail.

 4            So anything else you want to say?

 5            MR. HOWARD:  No, Your Honor.

 6            THE COURT:  All right.  Here is how I see this case.

 7    I think you have a real good shot at winning on your

 8    substantive due process claim, but I cannot find urgency and

 9    imminency in the facts that have been presented to me.

10            Instead, this is what we are doing.  We are going to

11    have 90 days for discovery.  We are going have a pretrial

12    conference on August the 12th.  We are going to have a trial

13    on September the 3rd.  Anybody give -- can't be there for

14    that?  Take a look.  I know it's quick.

15            MS. FAJANA:  I'm sorry.  Did you say August

16    the 12th?

17            THE COURT:  August 12th pretrial conference and

18    September the 3rd trial.  90 days of discovery.  I don't know

19    what else is needed.  Sounds like you have done a ton of

20    depositions already and exchanged documents.

21            Whatcha got, Mr. Howard?  It's the day after Labor

22    Day.  Oh, you got vacation?

23            MR. HOWARD:  Well, not anymore.

24            THE COURT:  Tell me the truth.

25            MR. HOWARD:  No, I don't.
```

```
 1          THE COURT:  Are you sure?

 2          MR. HOWARD:  I'm sure.

 3          THE COURT:  Because I love vacations and I'll do the

 4   week before or the week after.

 5          MS. FAJANA:  Could we request the week after

 6   September 3$^{rd}$?

 7          THE COURT:  What's wrong?  What's wrong with

 8   September 3$^{rd}$?  You don't want September 3$^{rd}$?  Nobody wants

 9   September 3$^{rd}$?

10          MR. HOWARD:  I really don't.

11          THE COURT:  Be honest.

12          MR. HOWARD:  I don't have a valid objection to tell

13   you.

14          THE COURT:  You don't want September 3$^{rd}$?

15          MS. FAJANA:  No.  But, I guess, you know, how many

16   days do you think we would use for the trial because, perhaps,

17   we could start later that week?

18          THE COURT:  I don't know.  It's your case.  You tell

19   me.

20          MR. HOWARD:  I would rather come back on a Monday.

21   If we are going to get it started, let's get it over with.

22          THE COURT:  All right.  Let's look at the dates

23   again.

24          MS. WONG:  Your Honor, could we suggest potentially

25   doing the trial even sooner, like maybe early August?  Because
```

```
 1   the discovery is pretty limited at this point.  As you can

 2   probably tell, we've -- yeah, we have talked to all the

 3   defendants and plaintiffs and really somebody --

 4           THE COURT:  If this was my only case, I would say

 5   yes.

 6           MS. WONG:  Right.

 7           THE COURT:  But it's not.

 8           All right.  Mr. Howard, how does life look for you on

 9   the 26th of August?

10           MR. HOWARD:  Only pretty bad if we have trial.

11           MS. FAJANA:  We would prefer the first half of

12   August.

13           THE COURT:  What's wrong with the 26th?

14           MS. FAJANA:  I already have commitments in the last

15   two weeks of August.

16           THE COURT:  Yeah.  Do you have a trial?

17           MS. FAJANA:  I don't have another trial.

18           THE COURT:  Do you have a vacation that's prepaid and

19   planned that you don't want to --

20           MS. FAJANA:  I do.  I do, yes.

21           THE CLERK:  You can't do the first half of August.

22           MS. FAJANA:  Or even if July honestly.  I think we --

23           THE COURT:  I can't.  And I can't -- I've got a

24   three-week trial in August.

25           MR. HOWARD:  Morgan has three trials in August.
```

1          MS. BECKMAN:  On August 26, I have one set in

2    Montgomery and two set in Monroe County.

3          THE COURT:  I can't help it, Nicole.  I'm going to

4    have to do the 9th.  You don't have to come along.  I have to

5    do the 9th.  How long do you think it will last?

6          MS. WONG:  2 days.

7          MS. FAJANA:  2 days.

8          THE COURT:  Just 2 days?

9          MS. WONG:  Yeah.

10         MS. FAJANA:  If that, honestly.

11         THE COURT:  Y'all have asked for a jury.

12         MS. FAJANA:  Not in the third amended complaint.  We

13    took out that request for a jury trial.

14         THE COURT:  Are you asking for a jury?  You never

15    have.

16         MR. HOWARD:  I haven't yet.

17         THE COURT:  It's going to be in Selma.

18         MR. HOWARD:  Air conditioner?

19         THE COURT:  It works now.

20         MR. HOWARD:  Okay.  No jury.  As long as you have

21    air-conditioning there.

22         THE COURT:  Okay.  Two days, 9th and 10th of

23    September then.  Does that make everybody's vacation happy?

24    Okay.

25         MR. HOWARD:  9th and 10th nonjury?

1          THE COURT:  9th and 10th nonjury, September.

2          MS. WONG:  Judge, I apologize.  I already am out of

3   the country on the 9th and 10th.

4          THE COURT:  Oh, jeez.

5          MS. WONG:  I'm sorry.  What was -- yeah.  Could we do

6   the second half of like -- 5th and 6th, if Rick wan his Labor

7   Day?

8          MR. HOWARD:  I don't have a vacation.  I just don't

9   get many holidays.

10         MS. WONG:  Totally understood, Rick.  Maybe we could

11  do the 5th and 6th so that the Labor Day is enjoyed, and you'll

12  still have two business days afterward before the trial.

13         MR. HOWARD:  The 11th and 12th?

14         MS. WONG:  I'm out that entire week, and I do have

15  tickets booked.  I am part of a wedding in another country.

16         THE COURT:  You can't do it the whole week of the

17  26th of August?

18         MS. FAJANA:  That's right.  I'm unavailable the last

19  two weeks of August.

20         MS. WONG:  Oh, you know what, Judge?  I can do the

21  9th and 10th.  It's the following week I can't do.  So let's

22  do 9th and 10th.  I'm so sorry.

23         THE COURT:  All right.  9th and 10th of September

24  it is.  Is everybody happy now?

25         MS. FAJANA:  Yes.  Thank you.

1          THE COURT:  Even Nicole.  It only matters if Nicole

2     is happy.

3          THE CLERK:  That's not true.

4          MS. WONG:  Your Honor, can I clarify something that

5     you were talking about earlier?  If our relief for P.I. was

6     both a new election but also declaratory relief that

7     Mayor Braxton is the mayor -- and you are not granting that

8     today.

9          THE COURT:  No.

10         MS. WONG:  Is it -- there's no -- essentially,

11    there's no judgment or opinion on who should be serving as town

12    council right now and mayor?

13         THE COURT:  I'm going to have to look at your other

14    claims, but I've been focused today on the substantive due

15    process and what relief is available for your substantive due

16    process claim.

17         Your declaratory -- you are asking for declaratory

18    relief on your substantive due process, and that is that the

19    special election should be invalidated because the notice was

20    inadequate and it disenfranchised everybody, nobody got to

21    vote, nobody knew to vote.  That's your claim.

22         If that turns out to be true, then you -- your relief

23    from that is the special election is invalidated, and,

24    according to the town council, Mr. Braxton is the mayor.  And

25    then y'all have to sort out, since nobody really seems to know,

1   who is the town council.

2          I mean, unless your procedural due process claim

3   stays in because that's the only claim that would then give

4   procedural relief to your clients.  And that's the problem I'm

5   seeing with your claims, on your motion to dismiss or his

6   motion to dismiss, that it appears, on first reading, that

7   it's -- they are due to be granted, the procedural due process

8   claims.

9          So I'm getting a cart ahead of the horse here.  And

10   my trustee law clerk up there is helping me with the motion to

11   dismiss, and we are going to get that out as quickly as

12   possible.  So we'll have a -- so you'll know what your claims

13   are for trial.

14          MS. WONG:  Right.  Understood, Your Honor.  Thank

15   you.

16          MR. HOWARD:  At the time of the pretrial conference,

17   is that here or Selma?

18          THE COURT:  I'm going to need to have it at noon

19   because I think I'm in trial.  So I'll tell you what.  We'll do

20   it by phone.

21          MR. HOWARD:  Either way is fine.

22          THE COURT:  What's wrong?

23          THE CLERK:  Can we do it the 13th just because it's

24   jury selection day.

25          THE COURT:  Is the 12th?

1    THE CLERK:  The 12th is a Monday.

2    THE COURT:  Oh yeah, you know what?  She's right.  In

3    fact, let's do it on that Wednesday.  The first day of trial is

4    always crazy.

5    So we are going to do it on that Wednesday at noon,

6    and y'all can call -- you can call in.  You don't have to come.

7    You can call in.  We are going to get orders out to tell you

8    what to do before.  There's a standing order about pretrial

9    conferences, and you are like, well, didn't we skip motions for

10   summary judgment.  Yes, we did, because I can already see

11   there's a factual issue to be resolved by a fact-finder instead

12   of a jury.  So there's no need to waste your clients' resources

13   on motions for summary judgment, especially since this is going

14   to be a bench trial.  So we'll take all that up at the bench

15   trial because I've got to make -- I've got to make findings of

16   fact and conclusions of law.

17   And so, just hearing today, I can already hear

18   there's a dispute as to whether there was any notice or not.

19   And, even if there was posted notice, there's still an issue

20   about whether there's been adequate notice for the whole

21   process there and whether that notice that was posted was

22   adequate.  All that has to be resolved.  I don't know.  I'm not

23   making any predeterminations on that.

24   So.  All right.  Anything else?

25   MS. WONG:  [Shakes head side to side.]

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

1          MR. HOWARD:  No.

2          THE COURT:  No?  All right.  We'll be in recess.

3          Oh, one other thing.  Magistrate Judge Nelson is

4     available for a settlement conference if you wish to have a

5     settlement conference with her.  Let us know that in the next

6     couple of weeks, and we'll get that scheduled for you.

7          If nothing else, we'll in recess.

8          MS. WONG:  Thank you, Your Honor.

9          MS. FAJANA:  Thank you, Your Honor.

10     [Recess.]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF WITNESSES

 2
                                        PAGE LINE VOL
 3   PATRICK B. BRAXTON

 4   DIRECT BY MS. FAJANA: . . . . . . . . . .12   18   1
     CROSS BY MR. HOWARD: . . . . . . . . . . .30   21   1
 5   REDIRECT BY MS. FAJANA: . . . . . . . . .43    1   1

 6   JANICE QUARLES

 7   DIRECT BY MS. WONG: . . . . . . . . . . .46   10   1
     CROSS BY MR. HOWARD: . . . . . . . . . . .56    2   1
 8

 9   VONCILLE THOMAS

10   DIRECT BY MS. FAJANA: . . . . . . . . . .60    6   1
     CROSS BY MR. HOWARD: . . . . . . . . . . .69    2   1
11

12   HAYWOOD STOKES, III

13   DIRECT BY MR. HOWARD: . . . . . . . . . .71    8   1
     CROSS BY MS. FAJANA: . . . . . . . . . . .78    8   1
14   REDIRECT BY MR. HOWARD: . . . . . . . . .90   12   1

15

16

17

18

19

20

21

22

23

24

25
```

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
155 ST. JOSEPH STREET, MOBILE, ALABAMA  36602

```
 1   STATE OF ALABAMA)
                    :
 2   COUNTY OF MOBILE)

 3           PATRICK BRAXTON; JAMES BALLARD; BARBARA PATRICK;
              JANICE QUARLES; WANDA SCOTT; DOROTHY HOLLEY,
 4                              vs.
              HAYWOOD STOKES, III; GARY BROUSSARD;
 5       JESSE DONALD LEVERETT; VONCILLE BROWN THOMAS;
          WILLIE RICHARD TUCKER; TOWN OF NEWBERN
 6                     CASE NO. CV23-00127

 7

 8           I, Melanie Wilkins, do hereby certify that the above

 9   and foregoing transcript of proceedings in the matter

10   aforementioned was taken by me in machine shorthand on May 06,

11   2024, and the questions and answers thereto were reduced to

12   writing under my personal supervision using computer-aided

13   transcription, and that the foregoing represents a true and

14   correct transcript of the proceedings upon said hearing.

15

16           I further certify that I am neither counsel nor

17   related to the parties to the action, nor am I in anywise

18   interested in the result of said cause.

19   Dated:  May 08, 2024
     Pages 1 to 119, inclusive
20

21           _____
                 Melanie Wilkins, Official Court Reporter
22               Registered Merit Reporter
                 Certified Realtime Reporter
23               U.S. District Court, So. District of AL
                 155 St. Joseph Street
24               Mobile, Alabama  36602

25
```